KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
William M. Goodman (SBN 61305)
E-mail: wgoodman@kasowitz.com
Christopher J. McNamara (SBN 209205)
E-mail: cmcnamara@kasowitz.com
101 California Street, Suite 2050
San Francisco, CA 94111
Telephone: (415) 421-6140
Facsimile: (415) 398-5030

**E-filing**



Attorneys for Defendant:
Sonitrol Corporation

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## (SAN FRANCISCO DIVISION)

| | |
|---|---|
| S.N.D.A., a California non-profit mutual benefit corporation, | **CV 08 2168** |
| Plaintiffs, | CASE NO.: |
| v. | **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b)** |
| SONITROL CORPORATION, a Delaware Corporation, and DOES 1-50. | |
| Defendants. | |

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

   **PLEASE TAKE NOTICE THAT** Defendant Sonitrol Corporation ("Sonitrol") hereby

removes to the United States District Court for the District of Northern California, San Francisco

Division, the action pending in the Superior Court of the State of California, in and for the

County of San Francisco, Case No. CGC-08-474387, based upon diversity jurisdiction, 28

U.S.C. § 1332(a) and § 1441(b). In support of its removal, Sonitrol states as follows:

### I.  THE STATE COURT CASE

1.    On or about April 17, 2008, S.N.D.A., a California non-profit mutual benefit corporation ("SNDA") filed a Summons and Complaint in the Superior Court of the State of California, in and for the County of San Francisco, identified as Case No. CGC-08-474387 and styled "S.N.D.A., a California non-profit mutual benefit corporation v. Sonitrol Corporation, a Delaware corporation, and Does 1-50, Defendants" (the "State Court Case").

2.    SNDA served its Summons and Complaint in the State Court Case upon the defendant identified therein, Sonitrol, on or about April 18, 2008.  A copy of the Summons and Complaint in the State Court Case, along with the Civil Case Cover Sheet and Notice of Case Management Conference, are attached hereto as Exhibit A.

3.    On or about April 25, 2008, SNDA served via e-mail upon counsel for Sonitrol, Stradley Ronon Stevens & Young, LLP, in Philadelphia, Pennsylvania, a copy of its *Ex Parte* Application for a Temporary Restraining Order, together with its proposed form of Temporary Restraining Order, purported supporting Declarations of Doug Curtiss and Jim Buckalew, and Certificate of Notice (collectively hereinafter referred to as the "SNDA TRO Application").  The SNDA TRO Application is attached hereto as Exhibit B.

### II.  SONITROL'S REMOVAL TO THIS FEDERAL COURT IS TIMELY

4.    Sonitrol's removal is timely in that this Notice of Removal is filed within thirty days of the service upon Sonitrol of the Summons and Complaint filed in the State Court Case1.

### III.  SONITROL'S REMOVAL TO THIS FEDERAL COURT IS PROPERLY BASED UPON 28 U.S.C. § 1332(a) AND § 1441(b), BECAUSE PLAINTIFF AND DEFENDANT ARE CITIZENS OF DIFFERENT STATES AND THE AMOUNT IN CONTROVERSY IS IN EXCESS OF $75,000.

5.    Sonitrol's removal is appropriate under 28 U.S.C. § 1441(b) because this federal court has original jurisdiction over the State Court Case under 28 U.S.C. § 1332(a).  The State

Court Case is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    SNDA is a corporation and is currently, and at the time of filing the State Court Case was, a citizen of the State of California and the State of Ohio. See Complaint at Exhibit A, ¶ 1.

7.    Sonitrol is also a corporation and is currently, and at the time of the filing of the State Court Case was, a citizen of the State of Delaware and the Commonwealth of Pennsylvania. See Complaint at Exhibit A, ¶ 2.

8.    Accordingly, the Plaintiff and Defendant are citizens of different states and the diversity requirement for original jurisdiction under 28 U.S.C. § 1332(a) is satisfied.

9.    By its Complaint, SNDA seeks declaratory and injunctive relief against Sonitrol, a franchisor, to determine and enforce the purported rights of the members of SNDA, alleged to be Sonitrol franchisees. See Complaint at Exhibit A, ¶¶ 4-7, and, i.e., ¶¶ 22, 29, 38, 45, and 62.

10.    One example of declaratory relief sought by SNDA is its request for a declaration that "Sonitrol Corporation may not charge franchisees royalties on their revenues from sales of Complementary Products and/or Competing Products." See Complaint at Exhibit A, ¶ 29(a)(ii).

11.    Another example is that SNDA asks for a declaration that "Sonitrol cannot sell or service National Accounts within a Dealer's exclusive territory without that Dealer's prior approval." See Complaint at Exhibit A, ¶ 37(d).

12.    The declarations sought by SNDA, such as the examples cited above, if indeed declared by a court as SNDA requests, would result in Sonitrol losing revenue in excess of $75,000, exclusive of interest and cost.

13.    Therefore, the amount in controversy requirement for original jurisdiction under 28 U.S.C. § 1332(a) is satisfied.

14.    Following the filing of this Notice of Removal, Sonitrol will serve all adverse parties with the Notice to Adverse Parties of Removal to Federal Court.  A copy of this notice (without exhibits) is attached hereto as Exhibit C.  (A Certificate of Service of Notice to Adverse Parties of Removal to Federal Court will be electronically filed.)

DATED: April 28, 2008

KASOWITZ, BENSON,
TORRES & FRIEDMAN, LLP

William M. Goodman (SBN 61305)
E-mail: wgoodman@kasowitz.com
Christopher J. McNamara (SBN 209205)
E-mail: cmcnamara@kasowitz.com
101 California Street, Suite 2050
San Francisco, CA 94111
Telephone: (415) 421-6140
Facsimile: (415) 398-5030

Attorneys for Defendant:
Sonitrol Corporation

# EXHIBIT A

04/17/2008  13:39  7078223717                    SINGLER LAW OFFICES                    PAGE  02

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Bruce Napell (SBN 110116)
Singler, Napell & Dillon, LLP
127 S. Main Street
Sebastopol, CA 95472
TELEPHONE NO: 707/823-8719   FAX NO: 707/823-8737
ATTORNEY FOR (Name): S.N.D.A.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

CASE NAME:
S.N.D.A. v. Sonitrol Corporation

<div style="border:1px solid">

CIVIL CASE COVER SHEET
[✓] Unlimited      [ ] Limited
(Amount           (Amount
demanded          demanded is
exceeds $25,000)  $25,000 or less)

Complex Case Designation
[ ] Counter    [ ] Joinder
Filed with first appearance by defendant
(Cal. Rules of Court, rule 3.402)

</div>

FILED
Superior Court of California
County of San Francisco
APR 17 2008
GORDON PARK-LI, Clerk
BY _____
Deputy Clerk

CASE NUMBER:
CGC - 08 - 474387

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

Auto Tort
[ ] Auto (22)
[ ] Uninsured motorist (46)

Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

Non-PI/PD/WD (Other) Tort
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

Employment
[ ] Wrongful termination (36)
[ ] Other employment (15)

Contract
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[✓] Other contract (37)

Real Property
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

Unlawful Detainer
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

Judicial Review
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

Provisionally Complex Civil Litigation
(Cal. Rules of Court, rules 3.400–3.403)
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

Enforcement of Judgment
[ ] Enforcement of judgment (20)

Miscellaneous Civil Complaint
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

Miscellaneous Civil Petition
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is  [✓] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [ ] monetary  b. [✓] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action (specify): 3
5. This case [ ] is  [✓] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related cases. (You may use form CM-015.)

Date: April 17, 2008
Bruce Napell
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

NOTICE
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]                    CIVIL CASE COVER SHEET                    Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
                                                                                        Cal. Standards of Judicial Administration, std. 3.10

(vertical text, left margin) FILE BY FAX

04/17/2008 THU 16:05  FAX                                              003/005

04/17/2008  13:36    787822          SINGLER LAW OFFI              PAGE  03

**SUMMONS**
**(CITACION JUDICIAL)**

SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

NOTICE TO DEFENDANT:
(AVISO AL DEMANDADO):

Sonitrol Corporation, a Delaware corporation; and DOES 1 - 50.

YOU ARE BEING SUED BY PLAINTIFF:
(LO ESTÁ DEMANDANDO EL DEMANDANTE):

S.N.D.A., a California non-profit mutual benefit corporation.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.

The name and address of the court is:
(El nombre y dirección de la corte es):
Superior Court of California, County of San Francisco
400 McAllister Street
San Francisco, CA 94102

CASE NUMBER:
(Número del Caso):
CGC - 08 - 474387

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Bruce Napell,   Singler, Napell & Dillon, LLP
127 S. Main Street, Sebastopol, CA   Tel. 707/823-8719

CRISTINA E. BAUTISTA

DATE:                                     GORDON PARK-LI
(Fecha:)    APR 17 2008                  (Secretario)                    , Deputy
                                                                          (Adjunto)
(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citation use el formulario Proof of Service of Summons, (POS-010)).

NOTICE TO THE PERSON SERVED: You are served
1. [  ] as an individual defendant.
2. [  ] as the person sued under the fictitious name of (specify):

3. [  ] on behalf of (specify):
    under: [  ] CCP 416.10 (corporation)          [  ] CCP 416.60 (minor)
           [  ] CCP 416.20 (defunct corporation)   [  ] CCP 416.70 (conservatee)
           [  ] CCP 416.40 (association or partnership)  [  ] CCP 416.90 (authorized person)
           [  ] other (specify):
4. [  ] by personal delivery on (date):

                                                                       Page 1 of 1
Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. January 1, 2004)                  SUMMONS                 Code of Civil Procedure §§ 412.20, 465
                                                                        American LegalNet, Inc. www.USCourtForms.com

FILE BY FAX

7/2008  13:35   78782▨▨▨7              SINGLER LAW OFF▨▨▨           PAGE  04

BRUCE NAPELL (State Bar No. 115116)
BRYAN W. DILLON (State Bar No. 203052)
SINGLER, NAPELL & DILLON, LLP
127 S. Main Street
Sebastopol, California 95472
Telephone: (707) 823-8719
Facsimile: (707) 823-8737

Attorneys for S.N.D.A., Inc.

FILE BY FAX

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| S.N.D.A., a California non-profit mutual benefit corporation, | CASE NO.: CGC-08-474587 |
| Plaintiff, | UNLIMITED JURISDICTION |
| v. | COMPLAINT FOR: |
| SONITROL CORPORATION, a Delaware corporation; and DOES 1-50. | 1. Declaratory Relief; 2. Temporary and Permanent Injunction |
| Defendants. | |

Plaintiff, S.N.D.A., alleges as follows:


## GENERAL ALLEGATIONS

1.      Plaintiff, S.N.D.A. ("SNDA" or "Plaintiff"), is a corporation organized and duly existing in accordance with the California Nonprofit Mutual Benefit Corporation Law.  As a non-profit trade association, SNDA has no fixed place of business.  The Association's general administrative services are performed by MEI, Inc., located in Dayton, Ohio.

2.      Defendant, Sonitrol Corporation ("Sonitrol" or, "Defendant"), is a Delaware corporation having its principal place of business and principal executive offices in Berwyn, Pennsylvania.

360040002.11                                          COMPLAINT

3.     SNDA is currently unaware of the true names and capacities of those Defendants designated as DOES 1-50, but will seek leave of this Court to amend its complaint once such information is ascertained. SNDA is informed and believes that, at all relevant times, each Defendant was the agent or employee of each other Defendant and was acting within the scope of such agency or employment.

4.     A substantial number of SNDA's members entered into contracts with Defendant in California. SNDA's Members have performed services pursuant to those contracts in California and the relief sought in this action relates to the interpretation and legal duties under those agreements.

5.     Sonitrol has qualified to do, and conducts, business in California, including the offering and sale of franchises, and the sale of products and the provision of services to its California franchisees. Sonitrol is a franchisor of businesses which provide security monitoring equipment and services using proprietary impact-activated audio detection technology under the "Sonitrol" name. Sonitrol sells equipment for use in the franchised business, including a central monitoring station which permits a franchisee to monitor the detection devices placed in numerous customers' premises from a single location. These products, which carry the "Sonitrol" trademark, are collectively referred to herein as the "Sonitrol Products."

6.     In addition to licensing franchises, running the Sonitrol franchise system, and selling Sonitrol Products, Sonitrol also engages in the security monitoring business through wholly-owned local offices (referred to herein as "Company Owned Locations"). Except as described herein, Sonitrol's Company Owned Locations provide the same types of products and services as do independent franchisees. Approximately 40% of the Sonitrol businesses in the U.S. are Company Owned Locations, including locations within California.

7.     SNDA's membership is comprised of corporations or other legal entities which are parties to Sonitrol franchise agreements and who are residents of the United States or Canada. SNDA's U.S. members are residents of approximately 32 different States, including California, Delaware and Pennsylvania.

8.     For the purposes of this action, SNDA is representing the interests of its members

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719   (707) 823-8737 Fax

2

1    throughout the U.S. and Canada, who will be referred to collectively as SNDA's "Members."

2        9.    SNDA's legal purpose is, as set forth in its Articles of Incorporation, "to engage in

3    any lawful act or activity for which a corporation may be organized under such law."

4        10.    Each of SNDA's Members currently operates its respective Sonitrol franchise(s)

5    pursuant to a franchise agreement with Sonitrol Corporation or a licensed distributor of Sonitrol

6    Corporation (collectively referred to as the "Franchise Agreements").

7        11.    SNDA's Members operate under myriad forms of Franchise Agreements.  In the

8    early 1970s, Sonitrol offered franchises with 40 year terms and the right to renew for additional

9    terms.  Subsequent forms of the Franchise Agreement had shorter terms, but also provided for

10    renewal rights.  SNDA's Members mostly operate under Franchise Agreements signed between

11    1972 and 2007, with approximately half signed in or after 1998.  The stated current terms of over

12    one-half of SNDA's Members' approximately 105 Franchise Agreements are scheduled to expire

13    by 2012.  Despite the numerous different forms of Franchise Agreements, the provisions relevant

14    to SNDA's claims herein are substantially similar or the same.

15        12.    Disputes have arisen between SNDA and Sonitrol Corporation regarding the

16    interpretation of contractual rights and obligations under the Franchise Agreements.  SNDA's

17    members have standing to seek the relief herein requested in their own right.  The interests

18    involved in this action and issues presented below are germane to the Association's purpose in that

19    resolving these issues is necessary to protect and promote the Association's members' economic

20    interests.  Neither the claims presented here, nor the relief sought, require individualized

21    participation by SNDA's Members, as the claims relate to provisions which appear in most or all

22    of the Franchise Agreements, and the legal rights and obligations of SNDA's member who are

23    subject to such language.

24        13.    The validity of Sonitrol's interpretations as to the questions raised by each Cause of

25    Action herein is of immediate concern to SNDA's Members.   So that they can make critical

26    business decisions and avoid significant and imminent injury, it is essential to SNDA's Members

27    that the Court determine, without further delay, their legal rights and obligations with regard to the

28    issues presented in this Complaint.

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719   (707) 823-8737 Fax

3

FIRST CAUSE OF ACTION
(Sale of Non-Sonitrol Products)

14.     SNDA incorporates Paragraphs 1-13 as though fully set-forth below.

15.     The Franchise Agreements place certain restrictions on the products franchisees may purchase, and the suppliers from whom they may purchase products. Most forms of the Franchise Agreement provide that, without Sonitrol's written approval, franchisees may only purchase Sonitrol Products from Sonitrol Corporation or its approved suppliers. The most recent forms of the agreement define the products franchisees may purchase as "proprietary products" and "non-proprietary" products.

16.     Other provisions in the Franchise Agreements, and in Sonitrol's Standards Manual, expressly or implicitly permit franchisees to purchase and sell non-Sonitrol Products. Non-Sonitrol products, which do not perform the same function as a Sonitrol Product, are referred to herein as "Complementary Products." Non-Sonitrol products which perform the same function as Sonitrol products are referred to herein as "Competing Products."

17.     All SNDA Members purchase and sell Complementary Products with Sonitrol's tacit, if not explicit, approval. Sonitrol is, and has been for many years, aware that franchisees purchase and sell Complementary Products. During that time, Sonitrol has regularly inspected and evaluated the businesses of franchisees that sold Complementary Products but has neither objected nor demanded that franchisees stop selling Complementary Products. Furthermore, Sonitrol has accepted royalty payments from franchisees based on their sales of Complementary Products and renewed the Franchise Agreements of franchisees who it was aware sold Complementary Products. Some SNDA Members are affiliated, or have common ownership, with other companies which sell Complementary and/or Competing Products, but such companies have no other relationship with Sonitrol, do not operate under the Sonitrol trademarks and pay no royalties to Sonitrol with regard to such sales

18.     All of Sonitrol's Company Owned Locations purchase and sell Complementary Products. In addition, Sonitrol's Company Owned Locations operate and service thousands of conventional/digital alarm systems, which perform the same function as Sonitrol Products (i.e., are

4

1    Competing Products). Sonitrol does not distinguish between Sonitrol and Complementary or

2    Competing Products when servicing such products/accounts and freely uses the Sonitrol

3    trademarks in conjunction with such activities (such as service trucks bearing the Sonitrol marks,

4    and Sonitrol personnel in Sonitrol-labeled uniforms)

5        19.    Since approximately the early 1980's, and with Sonitrol's tacit or explicit approval,

6    many of SNDA's Members have sold or serviced Competing Products in a number of

7    circumstances, such as:  a) after acquiring a competitive business; or b) to serve markets or

8    accounts, such as residential alarm applications, for which Sonitrol Products were not designed or

9    are not otherwise suitable.

10        20.    In some cases, Sonitrol actively encouraged SNDA's Members to sell or service

11    Complementary Products (such as telephone services) and also sold them in its Company Owned

12    Locations, only to later abandon such lines.

13        21.    A current controversy exists between Sonitrol Corporation and SNDA regarding

14    the legal rights and obligations under the Franchise Agreements with regard to the following

15    question: May SNDA Members purchase and sell Complementary Products and/or Competing

16    Products, in conjunction with their Sonitrol franchise businesses?

17        The parties assert as follows:

18        a.    Sonitrol Corporation asserts that without its written approval,  SNDA's

19            Members may only purchase equipment and supplies from Sonitrol Corporation

20            or suppliers it designates.  Sonitrol Corporation also asserts that it may legally

21            prohibit SNDA's Members from purchasing or selling Complementary or

22            Competing Products.  Sonitrol Corporation asserts that it may prohibit the

23            purchase or sale of such products in its absolute and sole discretion.

24        b.    SNDA contends that Sonitrol has acquiesced to the sale of Complementary

25            Products and Competing Products by:  (i) inducing franchisees to sell or

26            promote Complementary Products; (ii) its consistent and long term failure to

27            object to franchisees' sale of Complementary Products and Competing

28            Products; (iii) renewing of the Franchise Agreements of franchisees it knew

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

J66/04/0092.11                                             COMPLAINT

1    purchased and sold Complementary Products and Competing Products; (iv)

2    accepting royalties based on franchisees' sale of Complementary Products and

3    Competing Products; (v) including standards relating to the sale of

4    Complementary and Competing Products in the Sonitrol Standards Manual and,

5    (vi) selling Complementary Products and Competing Products in its own

6    Company Owned Locations.  SNDA also asserts that, pursuant to the Uniform

7    Commercial Code and applicable law, Sonitrol must exercise its discretion in a

8    reasonable manner when deciding whether or not to approve products and

9    services that may be sold as part of franchise businesses.

10   22.    Wherefore, SNDA requests relief as follows:

11          c.     That pursuant to section 1060 of the Code of Civil Procedure, the court

12                 enter a declaration of rights under the Franchise Agreements that:

13                        i.      Sonitrol may not prohibit franchisees from selling

14   Complementary Products;

15                        ii.     Sonitrol may not prohibit franchisees from selling

16   Competing Products;

17                        iii.    Sonitrol may not disapprove products which are of the

18   same or superior quality as products authorized for sale by SNDA's Members, or which it sells

19   in its Company Owned Locations;

20          d.     That SNDA have and recover its costs of suit herein; and,

21          c.     That the court grant such other and further relief as it deems proper.

22

23

24                              SECOND CAUSE OF ACTION
                      (Royalties on Complementary and Competing Products)

25

26   23.    SNDA incorporates Paragraphs 1-21 as though fully set-forth below.

27   24.    Some SNDA Members sell Complementary Products without restriction, in the

28   operation of their Sonitrol franchises, and pay a royalty on such sales to Sonitrol as if they were

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

6

1    Sonitrol Products.  Sonitrol does not object to or otherwise regulate the types of products and

2    services SNDA Members offer in this fashion.  All of Sonitrol's Company Owned Locations sell

3    Complementary Products of the same type and function as those sold by SNDA's Members.

4    Some SNDA Members are under common ownership, or otherwise affiliated with, security-related

5    companies which offer and sell Complementary Products without using the Sonitrol trademarks,

6    and such businesses are run separate from the Sonitrol franchises.  Sonitrol has for years expressly

7    or tacitly condoned such activity, including by including provisions relating to such separate

8    businesses in the Sonitrol Operating Manual.

9            25.    Recently, Sonitrol has threatened some of SNDA's members that they may be in

10   default of their Franchise Agreements if consumers confuse the Sonitrol franchise business with

11   an affiliated security business.  Sonitrol has singled out these certain Dealers despite the fact that

12   other Sonitrol Dealers, and Sonitrol's Company Owned Locations, routinely engage in the same

13   conduct.  In essence, Sonitrol takes the position that as long as a dealer or its affiliate pays a

14   royalty, selling Complementary Products or Competing Products is "O.K."  However, if a

15   franchisee does not pay a royalty, or is affiliated with a separate company that sells

16   Complementary Products or Competing Products, this could constitute a default under that

17   dealer's Franchise Agreement.

18           26.    Prior to the mid -1980s Sonitrol franchisees paid Sonitrol a monthly fee based on

19   the number of sound monitoring units it was operating for its customers.  Since the mid – 1980s

20   the Franchise Agreements have required franchisees to pay Sonitrol a royalty based on their

21   monthly gross revenues.  "Gross revenues" is a defined term, the definition of which has remained

22   essentially constant:

23               the amount of all revenue received by DEALER from the sale of all products and
               services, and all income of every kind or nature, whether direct or indirect, received by
24             DEALER, related to the DEALER's franchised business which is the subject of this
               Agreement.
25

26           27.    The Franchise Agreements refer to a "franchised business" as the basis for

27   assessing royalties and other similar requirements. Many of the Franchise Agreements here

28   relevant provide: "Franchisee agrees to and shall use the "SONITROL" trademark in connection

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

7

1    with, and exclusively for, the promotion and conduct of the business to be operated by Franchisee

2    under this Agreement (the "Franchised Business")."   Other Franchise Agreements here relevant

3    do not define "franchised business" but only refer to general a restriction on using the Sonitrol

4    trademarks on products not licensed or purchased from Sonitrol.

5          28.    A current controversy exists between Sonitrol Corporation and SNDA regarding

6    the legal rights and obligations under the Franchise Agreements with regard to the following

7    questions:

8          a.   May Sonitrol require franchisees to pay royalties based on revenues received

9               from their sale of Complementary Products and/or Competing products which

10              do not bear the Sonitrol trademarks?

11         b.   May Sonitrol declare a franchisee in default because a separate, affiliated

12              company sells Complementary Products and/or Competing Products (without

13              using the Sonitrol Trademarks) of the same types and functions as those being

14              offered by Sonitrol franchisees and Sonitrol's Company Owned Locations?

15   The parties assert as follows:

16              i.   Sonitrol asserts that it has the right to charge a royalty on all revenue

17                   received by franchisee, including from the sale of Complementary Products

18                   and Competing Products not bearing the Sonitrol trademarks.  It also asserts

19                   that a franchisee may be declared in default if an affiliate of that franchisee

20                   sells Complementary Products and/or Competing Products of the same

21                   types and functions as those being offered by Sonitrol franchisees or

22                   Sonitrol's Company Owned Locations.

23              ii.  SNDA contends that the obligation to pay royalties under the

24                   Franchise Agreements are limited to revenue "related to... the franchised

25                   business" (i.e. products and services which bear or are sold using the

26                   Sonitrol trademarks); that sales of Complementary Products and/or

27                   Competing Products are not related to the franchised business; and that

28                   therefore they are not required to pay royalties on revenue derived from

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

8

such sales.

29.    Wherefore, SNDA requests relief as follows:

a.    That pursuant to section 1060 of the Code of Civil Procedure, the court enter a declaration of rights under the Franchise Agreements that:

i.    Franchisees' sales of Complementary Products and/or Competing Products are not part of their franchised businesses; and

ii.    Sonitrol Corporation may not charge franchisees royalties on their revenues from sales of Complementary Products and/or Competing Products;

iii.    Sonitrol may not declare a franchisee in default if an affiliate of that franchisee sells Complementary Products and/or Competing Products of the same types and functions as those being offered by other Sonitrol franchisees or Sonitrol's Company Owned Locations.

b.    That SNDA have and recover its costs of suit herein; and,

c.    That the court grant such other and further relief as it deems proper.

THIRD CAUSE OF ACTION
(Independent National Accounts Program)

30.    SNDA incorporates Paragraphs 1-13 as though fully set-forth below.

31.    Some Franchise Agreements provide limited exclusive territories (Area of Primary Responsibility or "APR") within which franchisees may locate their business and (if they have one) central monitoring station. The Franchise Agreements permit Sonitrol Corporation to service certain accounts within a franchisees' APR under defined circumstances. Other, generally older, Franchise Agreements granted Dealers "sole and exclusive" rights to sell within a defined territory "all burglar alarm products manufactured, distributed, or sold by Sonitrol." (Collectively, APRs and exclusive territories are sometimes referred to as simply "territories," or a "Dealer's territory").

32.    Under Agreements providing for APRs, the following terms are relevant:

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719    (707) 823-8737 Fax

9

a.    Sonitrol may service:  (i)  "Subscribers located in Franchisee's APR when such sale is part of a package sale to a business with national or regional locations and such locations are both inside and outside of the APR"; (ii) "Key Accounts" which are "Subscriber Accounts that have locations both within and outside Franchisee's APR"; but (iii), in either case, only if the franchisee declines to provide service to those Subscribers in its APR after having been given the option by Sonitrol.

b.    Franchisees are required to use their "best efforts to secure such 'Key Accounts' that have their national or regional headquarters located in Franchisee's APR," to "provide" reports of their efforts to Sonitrol, and to "assist" Sonitrol "in securing such Key Accounts."

33.    Sonitrol Franchisees believe that a key component to selling multi-location accounts is the ability to offer localized monitoring and servicing, and that customers value a "personal touch."  As such, they desire to pursue multi location accounts within their APR, and be able to refer the sale and service of both Sonitrol and Complementary Products and Services to other authorized Sonitrol Franchisees for potential or existing customers who operate locations in the APRs of such other franchisees.  Said another way, the Dealers desire to form a coalition whereby they could sell to more customers within each of their respective APRs by offering the services of other participating Dealers to serve the customers' additional locations.

34.    In addition, Dealers find it financially disadvantageous to participate in the National Accounts program for the following reasons:

a.    Pursuant to that program, when Sonitrol enters into a National Account contract, it sets the price for the local service, installation and monitoring. Sonitrol offers the local Dealers the option of servicing the locations of the National Accounts in their APR, at the National Account price.

b.    The National Account price is in almost all instances lower than the price Dealers would charge if they contracted independently with the National Account customer's locations in their APRs.  In at least one pending case,

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-4737 Fax

1    Sonitrol has agreed to a National Account contract which not only set the

2    monthly monitoring charge as low as 60% of the Dealer's usual rate, but also

3    agreed to a "0" equipment purchase and installation charge, effectively

4    requiring the Dealers to finance the sale and installation without

5    compensation. In addition to this, Dealers must pay Sonitrol a commission

6    in the amount of 13% of the "total contract value" at the time they accept the

7    account, which commission is not refundable in the event the National

8    Account terminates early or the customer fails or refuses to pay in the future.

9    c.    Dealers have the dubious "option" to accept or decline to service National

10    Accounts. If the Dealers accept, they are obligated to accept the National

11    Account prices for installation, service and monitoring; the National Account

12    prices frequently provide for a lower profit than the Dealers' standard rates,

13    and are often so low that participating Dealers lose money on National

14    Accounts. If they decline, Sonitrol services the locations in the Dealers'

15    APRs, or exclusive territories. In such cases, Sonitrol has established a

16    presence in the Dealer's territory, and has deprived the Dealer thereafter of a

17    potential customer. Further, one of Sonitrol's two national alarm monitoring

18    centers will operate within the Dealer's territory, and will inevitably make

19    contact with local law enforcement agencies. The potential exists to impair

20    the local Dealer's reputation and relationship with local law enforcement

21    agencies. For example, if dispatch policies differ, or if the quality of the

22    national central station's operations is not as high as the Dealer's local

23    central station, police response to Dealer's other customer locations could

24    suffer, thereby irreparably damaging Dealers' business.

25    d.    Sonitrol invoices and collects payment for all National Accounts. Dealers

26    who service National Accounts provide information to Sonitrol concerning

27    services provided to National Account customers, and Sonitrol has

28    committed to making payment on National Accounts within 40 days of

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719 (707) 823-8737 Fax

11

SINGLER, NAPELL, & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

1     Dealers delivery such information, regardless of whether or not Sonitrol has

2     received payment from the relevant National Account customer.  However,

3     Sonitrol regularly delays payment, resulting in Dealers accruing past due

4     receivables from Sonitrol in aggregate amounts in excess of $100,000.  It is

5     not uncommon for Sonitrol Corporation to be a Dealer's largest, and longest,

6     overdue account.  Sonitrol Corporation is in this way using its Dealers as a

7     source of  no-interest financing, delaying payment to Dealers while

8     demanding expedited payment from them.

9     e.     Sonitrol's National Account bookkeeping is confusing, complicated and

10     inefficient.  Dealers who service National Accounts incur additional expense

11     and expend extra energy and time each month correcting and otherwise

12     dealing with Sonitrol's National Account bookkeeping in order to ensure that

13     Sonitrol pays the correct amount for their servicing of National Accounts. On

14     occasion, Sonitrol's National Accounts billing department has failed to even

15     set up a new National Account location for billing, leaving the Dealer to

16     continue to deliver service to the National Account customer for months or

17     even years, without being paid.

18     f.     When Sonitrol enters into a National Account agreement with a customer

19     with whom one or more Dealers already have relationships, Sonitrol insists

20     that such independent relationships are terminated.  Dealers are required to

21     cease all independent contact with such existing customers, and are only

22     offered the option to service those same customers pursuant to the terms of

23     the National Account – regardless whether those terms are less profitable, or

24     would even require the dealer to lose money to service them.

25     35.     Sonitrol has, and continues, to aggressively promote National Account sales in

26     Dealer territories, be they APRs or exclusive territories.

27     36.     A current controversy exists between Sonitrol and SNDA regarding the legal rights

28     and obligations under the Franchise Agreements with regard to the following question:  May

franchisees create and service their own multi-dealer program?

37.    The parties assert as follows:

    a.    Sonitrol Corporation asserts that it has the sole right to organize and direct national account programs within the Sonitrol system and that franchisees who created their own national account system would be in breach of contract.

    b.    Sonitrol further contends that it has the right to sell and service National Accounts within the territories of Dealers to whom it has granted exclusive territories.

    c.    SNDA contends that Sonitrol has not reserved the sole right to operate a national account program and that franchisees can organize a program through which franchisees service the locations of multi-location Subscribers within their APRs as part of a single contract without breaching any obligations under their Franchise Agreements.

    d.    SNDA further contends that exclusive territories are exclusive for all purposes, and that Sonitrol cannot sell or service National Accounts within a Dealer's exclusive territory without that Dealer's prior approval.

38.    Wherefore, SNDA requests relief as follows:

    a.    That pursuant to section 1060 of the Code of Civil Procedure, the court enter a declaration of rights that:

        i.    Sonitrol has not reserved to itself the exclusive right to organize and direct national accounts programs under the Franchise Agreements, and that franchisees can join together to provide service to multi-location accounts, each servicing the locations within their APR without breaching any obligations under the Franchise Agreements; and,

        ii.    That Sonitrol may not sell or promote National Accounts within the

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

13

1  territory of any Dealer to whom it has granted exclusive territorial rights,

2  without that Dealer's permission.

3  e.    That SNDA have and recover its costs of suit herein; and,

4  f.    That the court grant such other and further relief as it deems proper.

5

6  FOURTH CAUSE OF ACTION
   (Participation in National Account Programs)

7

8  39.    SNDA incorporates Paragraphs 1-13 and 30-38 as though fully set-forth below.

9  40.    Sonitrol operates a National Account program. Pursuant to that program, when

10 Sonitrol enters into a National Account contract, it sets the price for the local service, installation

11 and monitoring. Sonitrol offers the local Dealers the option of servicing the locations of the

12 National Accounts in their APR, at the National Account price.

13 41.    It is disadvantageous to Dealers to participate in the National Account program

14 because the National Account price is almost always lower than the price a Dealer would

15 otherwise charge the same customer for the same service, and for the other reasons set-forth

16 above. Nonetheless, Sonitrol insists that Dealers market the National Accounts program to

17 potential customers within their APR whether or not the Dealers benefit from or participate in the

18 National Account program.

19 42.    Such requirement imposes a hardship on the Dealers, as Dealers have no obligation

20 to service such accounts, and offering the National Account pricing would undermine their ability

21 effectively promote their own business within their APRs.

22 43.    A current controversy exists between Sonitrol and SNDA regarding the legal rights

23 and obligations under the Franchise Agreements with regard to the following question:  May the

24 franchisees decline to promote Sonitrol's National and Key Accounts programs?

25 44.    The parties assert as follows:

26 a.    Sonitrol asserts that while franchisees may opt not to service National or Key

27 Account Subscribers within their APRs, they are nonetheless obligated to

28 promote the programs to the headquarters of regional and national chain

14

366/04/0092.11                                              COMPLAINT

businesses located in their APRs, to report on their efforts to Sonitrol, and to
pass leads along to Sonitrol.

b.   SNDA contends that if Dealers receive no benefit from the National Account
program, they cannot be compelled to market it to customers and potential
customers within their APRs. Such activities effectively undermine their
own efforts and the rights conferred under the Franchise Agreements.

45.   Wherefore, SNDA requests relief as follows.

(i)   That pursuant to section 1060 of the Code of Civil Procedure, the court
enter a declaration of rights that franchisees may opt not to participate in
marketing the Sonitrol National and Key Accounts programs to potential
subscribers within their APRs;

(ii)   That SNDA have and recover its costs of suit herein; and,

(iii)   That the court grant such other and further relief as it deems proper.

FIFTH CAUSE OF ACTION
(National Accounts Interference with Existing Relationships)

46.   SNDA incorporates Paragraphs 1-13 and 30 - 45 as though fully set-forth below.

47.   SNDA 's members have received notice from Sonitrol that Sonitrol has recently
entered into National Account agreements with Briad Restaurant Group, and Cardinal Health
Care. Briad is the operator of TGIF restaurants throughout the country and in virtually all (if not
all) of SNDA's Members' territories.

48.   With regard to Briad Restaurant Group, the National Account agreement provides
for purchase, installation and monitoring at prices and upon payment terms which are significantly
lower than the prices and terms Dealers ordinarily charge. The agreement provides that there will
be no up front charge for the purchase and installation of the equipment; dealers would ordinarily
charge approximately $5,300 per location. Instead, the cost is to be paid by an $83 monthly
payment for 60 months – which totals less than $5,000, essentially requiring any participating
Dealer to both discount the installation and purchase charges, and then finance them for five years

366/04/0002.11

COMPLAINT

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA  95472
(707) 823-8719  (707) 823-8737 Fax

1    interest free. Affected dealers have been given two weeks to accept or reject this program.

2        49.    With regard to Cardinal Health Care, numerous Dealers already have contracts with

3    this customer, covering locations within their respective territories. The National Account

4    program will terminate those contracts, substituting the terms of the National Account agreement

5    for those established by individual Dealers. Dealers will be required to either agree to participate

6    in the National Account program for less than they were receiving under their existing agreements,

7    or decline to participate and lose these customers entirely.

8        50.    Permitting Sonitrol to impose the terms of the a National Account on the Dealers

9    with pre-existing relationships (such as the Cardinal Health Care account) will cause the Dealers

10   severe financial losses, in that they will be required to give up ongoing contracts negotiated with

11   local customers, and/or the possibility of entering into such contracts with such local customers.

12   They will lose not only the income from such contracts, but also the independent relationships

13   with the customers which enhance their ability to market their products and services within their

14   territories.

15       51.    Permitting Sonitrol to set commercially unreasonable terms for National Accounts,

16   such as the Briad Restaurant Group National Account, will cause Dealers severe financial losses,

17   in that they will be required to give up their ability to market their services to the locations of the

18   Briad Restaurant Group within their APR, and if they desire to participate in the National

19   Account they will be required to sell and install the equipment at a significant discount (if not

20   actual loss), with commercially unreasonable financing terms, and to charge a monthly monitoring

21   fee significantly below the price they ordinarily charge within their APR.

22       52.    All the while, Sonitrol benefits from these accounts in that: (i) Sonitrol sells

23   Sonitrol Products to Dealers at a substantial profit (which costs the Dealers need to pay

24   immediately, despite not being able to receive sales or installation revenues from the customer),

25   and the Dealers pay a 13% commission to Sonitrol.

26       53.    The damages suffered by the Dealers due to such loss of business would be

27   difficult or impossible to calculate, and as numerous Dealers located in numerous States would

28   suffer such harm, would result in a multiplicity of suits.

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

54. Wherefore, SNDA requests relief as follows.

   a. That the court issue a temporary and permanent injunction prohibiting Sonitrol from:

      i. requiring any Dealer with a current contract or relationship within their APR from abandoning such contracts, relationships or sales efforts (specifically including but not limited to the Briad Restaurant and Cardinal Health Care accounts);

      ii. Offering commercially unreasonable terms as part of any National Account Program, including requiring Dealer financing of the purchase and installation of the equipment, or terms that would substantially deprive Dealers of significant profits or marketing opportunities within their territories.

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-3737 Fax

## SIXTH CAUSE OF ACTION
### (Effect on Non-Compete Covenant of Sonitrol's Material Breach)

55. SNDA incorporates Paragraphs 1-13 as though fully set-forth below.

56. The Franchise Agreements contain post term covenants not to compete which generally provide that, following termination of the Franchise Agreement, the former franchisee may not:

   directly or indirectly own, manage, operate, join, control, or participate in the ownership, management, operation or control of, or be connected in any manner with, any business or engage in any business involving the manufacture, promotion, sale, or delivery of security product and services.

57. Sonitrol Franchise Agreements may terminate under several circumstances: they may expire naturally without renewal (either due to the dealer's choice or due to Sonitrol's refusal to renew); or they may be terminated before expiration for cause by Sonitrol, for cause by the dealer, or by mutual consent.

58. SNDA Members may terminate for cause, or decide not to renew upon the

366/04/0092 11                                                        COMPLAINT

1    expiration of their Franchise Agreement, due to material breach or failure to perform by Sonitrol.

2    Under those circumstances, in order to properly service its customers, the dealer will continue

3    offering similar products and services without using the Sonitrol name and Marks.

4        59.    Sonitrol has materially breached the Franchise Agreements and/or related policies

5    (e.g. by failing to timely pay Dealers for National Account services).  Many of SNDA's Members

6    have agreements, the written term of which has or will expire in the near future.

7        60.    A current controversy exists between Sonitrol Corporation and SNDA regarding

8    the legal rights and obligations under the Franchise Agreements with regard to the following

9    question: Does a material breach of the Franchise Agreement by Sonitrol which caused the

10    franchisee to terminate or fail to renew the franchise prevent Sonitrol from enforcing the post term

11    non-compete covenant against the former franchisee?

12        61.    The parties assert as follows:

13            a.    Sonitrol Corporation asserts that it may enforce the non-compete covenant

14                against any terminated franchisee, regardless of grounds for termination.

15            b.    SNDA contends that when a party materially breaches a contract, thereby

16                causing the other party to terminate or not to renew the contract, the

17                breaching party loses its right to enforce any of the contract's provisions – in

18                particular those prohibiting competition following termination - against the

19                non-breaching party.

20        62.    Wherefore, SNDA  requests relief as follows:

21            a.    That pursuant to section 1060 of the Code of Civil Procedure, the court enter

22                a declaration of rights under the Franchise Agreements that in the event that

23                Sonitrol materially breaches a Franchise Agreement, it is prevented by its

24                breach from enforcing the non-compete covenant against the non-breaching

25                former franchisee;

26            b.    That SNDA  recover its costs of suit herein; and.

27            c.    That the SNDA  be awarded such other and further relief that the court

28                deems proper.

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA  95472
(707) 823-8719  (707) 823-8737 Fax

18

SEVENTH CAUSE OF ACTION
(Requiring Sonitrol to Provide all Dealers Equal Access to MySonitrol.net)

63.     SNDA incorporates Paragraphs 1-13 as though fully set-forth below.

64.     In 2001 Sonitrol established a website, "mySonitrol.com," for use by Sonitrol, Dealers and customers. MySonitrol.com permitted Dealers and customers to input information about the customer, including information specifically identifying the customer and describing the security system installed at the customer's premises. Furthermore, MySonitrol.com included links to video monitoring equipment in customers' premises, and permitted that monitoring equipment to be accessed over the internet.

65.     In order to be able to participate in MySonitrol.com Dealers were required to enter into a "Franchisee Web Site Agreement" with Sonitrol, and dealers are charged an ongoing license/maintenance fee with regard to MySonitrol.com.

66.     Between 2001 and late 2007 MySonitrol.com was the only web site operated by Sonitrol for Dealers and customers to access information about their accounts, to confirm or alter the monitoring arrangements, and to monitor customers' premises on line. MySonitrol.com never provided an acceptable level or quality of service. Dealers and customers were not satisfied with it, and in 2007. Sonitrol created and began operating an improved web site, "MySonitrol.net."

67.     MySonitrol.net resolved many of the problems Dealers and customers complained about regarding MySonitrol.com. Sonitrol established a schedule for transferring Dealers and their customers' accounts and information from MySonitrol.com to MySonitrol.net, and began the process of transferring. However, in March 2008, Sonitrol stopped the transfer process before all Dealers and their customers' accounts had been transferred (or given access) to MySonitrol.net. Sonitrol announced that going forward only Dealers who changed over to specified new equipment (which must be purchased from Sonitrol) would be permitted to transfer to MySonitrol.net, although the new equipment is not necessary in order to receive the benefits of MySonitrol.net. The Dealers (and their customers) who are required to remain on MySonitrol.com are not receiving the same level of service from Sonitrol as the Dealers who have been given access to MySonitrol.net. The excluded Dealers are being damaged in that they are

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719 (707) 823-8737 Fax

19

1   unable to offer the levels of convenience and service customers and potential customers expect

2   from Sonitrol, and for which the Dealers have already paid under relevant license agreements.

3       68.    Wherefore, SNDA requests relief as follows:

4           a.    That the court issue a temporary and permanent injunction prohibiting Sonitrol

5               from denying access to MySonitrol.net to any dealer who was licensed to use

6               MySonitrol.com;

7           b.    That SNDA recover its costs of suit herein; and,

8
9           c.    That the SNDA be awarded such other and further relief that the court deems

                proper.

10
11                          EIGHTH CAUSE OF ACTION
            (Prohibiting Sonitrol's Disclosure of Dealers' Confidential Information)
12

13      69.    SNDA incorporates Paragraphs 1-13 and 64-67 as though fully set-forth below.

14      70.    Dealers and their customers share confidential information with Sonitrol through

15  various means, including (i) participation in the MySonitrol.net and MySonitrol.com web sites; (ii)

16  reporting warranty information upon the sale of Sonitrol Products; and, (iii) required sales reports

17  that Dealers submit upon the sale of Sonitrol Products.  This information includes the names and

18  contact information for the customers, as well as specific information about the type of equipment

19  installed at the customers' locations (the "Confidential Information"), and access to video

20  monitoring of customers' premises.

21      71.    The Confidential Information has value to the Dealers, is not generally known

22  within the industry or to the Dealers' competitors, and the Dealers take care to maintain its

23  confidentiality, including but not limited to instructing their employees not to disclose it,

24  restricting access to it, and storing it securely.  SNDA is informed and believes that Sonitrol

25  acknowledges the value of the Confidential Information, and in the ordinary course of business

26  also takes care to maintain its confidentiality.

27      //

28      //

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

20

72.     Pursuant to the provisions of the Franchisee Web Site Agreement and the incorporated Sonitrol Privacy Policy, Sonitrol is obligated to protect the confidentiality of the Confidential Information, and with limited specific exceptions, is not permitted to share the Confidential Information with third parties without the Dealers' advance written approval.

73.     Sonitrol is currently seeking a buyer to purchase the stock of the corporation. SNDA is informed and believes that the sale process has progressed to the stage where potential buyers are performing their "due diligence" with regard to Sonitrol's assets, and that Sonitrol has agreed to give buyers access to Dealers' Confidential Information as part of this process.

74.     SNDA is further informed and believes that one or more of the potential buyers own and/or operate businesses which also offer commercial security monitoring products and services, and who are therefore in direct competition with Sonitrol and SNDA's members.

75.     If Sonitrol gives access to Confidential Information to competitors, it will destroy the value of that information to the Dealers and to the Sonitrol system: not only will competitors will be able to target marketing efforts directly at the Dealers' customers, but the Dealers' customers will lose confidence in the reliability of Sonitrol Dealers due to the disclosure of their private information. Thus, disclosure of the Confidential Information threatens the Dealers' relations with their customers.

76.     Wherefore, SNDA requests relief as follows.

    a.    That the court issue a temporary and permanent injunction prohibiting Sonitrol from:

    b.    Disclosing any of Dealers' Confidential Information customers to any third party unless Sonitrol has first informed the relevant Dealer as to the specific information to be revealed, and received the Dealer's written approval.

//
//
//
//
//

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-3737 Fax

21

366/04/0002.11

COMPLAINT

c.  That SNDA recover its costs of suit herein; and,

d.  That the SNDA be awarded such other and further relief that the court deems proper.

Dated: April 17, 2008

SINGLER, NAPELL & DILLON, LLP

By _____
    Bruce Napell
    Attorneys for S.N.D.A.

366/04/0902.11

22

COMPLAINT

04/17/2008 THU 16:07  FAX                                                    ⌀005/045

CASE NUMBER: CGC-08-474387  S.N.D.A. A CALIFORNIA NON-PROFIT MUTUAL BENEFIT \

## NOTICE TO PLAINTIFF

A Case Management Conference is set for …

DATE:    SEP-19-2008

TIME:    9:00AM

PLACE:   Department 212
         400 McAllister Street
         San Francisco, CA  94102-3680

All parties must appear and comply with Local Rule 3.

> CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.
>
> However, it would facilitate the issuance of a case management order without an appearance at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

### ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

> IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL.
> (SEE LOCAL RULE 4)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

See Local Rules 3.6, 6.0 C and 19 D re stipulation to commissioners acting as temporary judges

# EXHIBIT B

BRUCE NAPELL (State Bar No. 115116)
BRYAN W. DILLON (State Bar No. 203052)
SINGLER, NAPELL & DILLON, LLP
127 S. Main Street
Sebastopol, California 95472
Telephone: (707) 823-8719
Facsimile: (707) 823-8737

Attorneys for S.N.D.A.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| S.N.D.A., a California non-profit mutual benefit corporation, | CASE NO.: CGC-08-474387 |
| Plaintiff, | UNLIMITED JURISDICTION |
| v. | CERTIFICATE OF NOTICE RE: EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER |
| SONITROL CORPORATION, a Delaware corporation; and DOES 1-50. | Date:   April 28, 2008 |
| Defendants. | Time:   11:00 am |
| | Dept.:  301 |

I, Bruce Napell, declare as follows:

1.   I am an attorney licensed to practice before all the courts of the State of California. I am a partner in the firm of Singler, Napell & Dillon, LLP, who are counsel for the Plaintiff herein. All statements in this declaration are made of my own personal knowledge and if called upon I could competently testify thereto.

2.   Defendant was notified of this TRO as follows:  Defendant's attorney's name, address and telephone number and e-mail address are:

David E. Beavers

Stradley Ronon Stevens & Young, LLP

2600 One Commerce Square

1

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

1  Philadelphia, PA  19103

2  215.564.8036

3  dbeavers@stradley.com

4

5  3.  On Friday, April 25, 2008 at 9:45 a.m., I telephoned David Beavers, the attorney for

6  Defendant Sonitrol Corporation to give notice of this Ex Parte appearance.  Mr. Beavers was not

7  in the office, but I left a message for Mr. Beavers with his assistant Helene, the SNDA would be

8  appearing Ex Parte on Monday, April 28, 2008 at 11:00 a.m. in Department 301 of the San

9  Francisco Superior Court.  I gave Helene my telephone number and told her Mr. Beavers could

10 call me if he had any questions.

11     4.  At 12:15 p.m. the same day, Mr. Beavers and his partner Jeff Grossman phoned me and

12 confirmed that Sonitrol intends to appear and contest this Ex Parte Application.

13     5.  The complaint in this matter was filed on April 17, 2008.  Sonitrol Corporation was

14 personally served with the complaint and summons on April 18, 2008.  Pursuant to Mr. Beavers'

15 request, I also e-mailed him a copy of the summons and complaint on April 18.

16     6.  SNDA has not previously moved for any Ex Parte relief in this matter.

17     I declare under the penalty of perjury of the laws of the State of California that the

18 foregoing is true and correct.  Executed this 25th day of April, 2008 at Sebastopol, California.

19

20 

21                                    Bruce Napell

22

23

24

25

26

27

28

SINGLER, NAPELL & DULON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-4719  (707) 823-3737 Fax

566/04/0012.1                                    CERTIFICATE OF NOTICE

BRUCE NAPELL (State Bar No. 115116)
BRYAN W. DILLON (State Bar No. 203052)
SINGLER, NAPELL & DILLON, LLP
127 S. Main Street
Sebastopol, California 95472
Telephone: (707) 823-8719
Facsimile: (707) 823-8737

Attorneys for S.N.D.A.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| S.N.D.A., a California non-profit mutual benefit corporation, <br><br> Plaintiff, <br><br> v. <br><br> SONITROL CORPORATION, a Delaware corporation; and DOES 1-50. <br><br> Defendants. | CASE NO.: CGC-08-474387 <br><br> UNLIMITED JURISDICTION <br><br> DECLARATION OF DOUG CURTISS IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER <br><br> Date: April 28, 2008 <br> Time: 11:00 am <br> Dept.: 301 |

*(left margin vertical text)* SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

I, Doug Curtiss, declare as follows:

1.  I am the Chairman of Sonitrol Security Systems of Hartford, Inc, which is a franchisee of Sonitrol Corporation under a franchise agreement for a territory in Connecticut. I am also the Chairman of companies which are Sonitrol franchisees for territories in Rhode Island and Massachusetts. All statements in this declaration are made of my own personal knowledge and if called upon I could competently testify thereto.

2.  I am the President of S.N.D.A. ("SNDA"), the association of independent Sonitrol dealers, which is the Plaintiff in this action.

3.  SNDA is a trade association whose members ("Members") collectively own more than 105 Sonitrol franchises throughout the United States and Canada. Defendant Sonitrol Corporation

1

1   ("Sonitrol") owns the Sonitrol trademarks. It franchises other business owners to provide goods

2   and services under such trademarks, and it directly operates businesses which provide goods and

3   services under such trademarks. The defining characteristics of Sonitrol security systems are in-

4   place electronic detectors which respond to sound (referred to as impact activated audio detection

5   devices), and centralized monitoring of detection devices located at numerous customers'

6   premises. When a break-in is detected and verified by the central monitor, a report is made to the

7   local police. The majority of Sonitrol customers are served by independent franchises, but

8   approximately 45% are served by Sonitrol. SNDA's members operate under a number of different

9   forms of franchise agreement, dating in some cases back to the early 1970s. Except regarding

10  territorial exclusivity, the differences between the various forms of franchise agreement are not

11  relevant to the relief SNDA seeks in this lawsuit.

12       4.   As providers of security services, Sonitrol franchisees are necessarily privy to

13  confidential information regarding their customers, including their customers' and their

14  customers' employees' names, addresses, contact information, and hours of operation, the physical

15  layout of their facilities, and the design of their security systems. Customers expect the security

16  company to keep this information confidential. Indeed, maintaining the confidentiality of such

17  information is vital to successfully providing security service. In addition, the identity of a

18  Sonitrol franchisee's customers, as well as specific information about each customer, such as the

19  nature of its security needs and concerns and the amount it pays for security service, are that

20  franchisee's trade secrets. Exclusive possession of this information about its customers gives the

21  franchisee a competitive advantage over other security providers.

22       5.   When a Sonitrol franchisee enters into a contract with a customer, it is required to

23  provide information about the customer to Sonitrol. In 2001 Sonitrol implemented an internet

24  service which allows franchisees and their customers access to customer information on-line. This

25  service was originally called "MySonitrol.com." In 2007 Sonitrol began offering an improved

26  version, called "MySonitrol.net." Sonitrol has access to the confidential franchisee and customer

27  information on both websites (collectively the "Internet Sites"). In addition, approximately 75%

28  of the franchisees use late generation Sonitrol equipment known as "SonitNT" which transmits

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-3737 Fax

2

1   some customer information to Sonitrol, whether or not the franchisee uses one of the Internet
2   Sites.

3       6.   Sonitrol requires franchisees to enter into a Franchisee Web Site Agreement before the
4   franchisee or its customers are allowed to use the Internet Sites.  [A copy of the Franchisee Web
5   Site Agreement (the "Web Agreement") is attached as Exhibit A].  A Privacy Policy is
6   incorporated into the Web Agreement.   [A copy of the Privacy Policy is attached as Exhibit B].

7       6.   Paragraph 3 of the Web Agreement includes a provision which, under ordinary
8   circumstances, prohibits Sonitrol from disclosing franchisees' or customers' personal information
9   without the franchisees' prior written permission.

10      7.   SNDA's Members take great effort to keep their customers' private information
11  confidential.  These efforts include written policies that all customer information is confidential,
12  requiring employees to sign non-disclosure agreements, limiting the public's access to the physical
13  files and the computers in which the information resides, and limiting employees access to only
14  such information as is necessary for performance of their jobs. The information Members and their
15  customers put on the Internet Sites is password protected and encrypted, so that only the Member,
16  the customer ,and Sonitrol have access.

17      8.   In the ordinary course of business, SNDA's members are satisfied that Sonitrol has no
18  incentive to disclose their confidential information or trade secrets, particularly to competitors.
19  The present circumstances are not ordinary, because Sonitrol is currently attempting to sell its
20  business.  In the course of the sale process, Sonitrol will provide interested parties with access to
21  information which it would otherwise keep confidential, likely including customer information
22  and franchisees' trade secrets.

23      9.   Some of the parties interested in purchasing Sonitrol, such as Stanley Works and
24  Siemens compete in the security industry.  As competitors they would benefit from access to
25  Sonitrol's customers' and franchisees' confidential information and trade secrets, and could use
26  that information to compete with Sonitrol franchisees or to undermine the relations with Members'
27  customers.  The sale process has proceeded to the point where potential buyers are performing
28  their "due diligence" and investigating Sonitrol with its cooperation.  SNDA fears that Sonitrol's

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719   (707) 823-8737 Fax

3

1  incentive to sell itself will result in granting potential buyers access to SNDA's members' and

2  their customers' confidential information and trade secrets in an effort to assist in the buyers' due

3  diligence.

4      10. Revealing this information will damage SNDA's members in three ways:  First,

5  granting access to this information to any third party increases the risk that the information will be

6  used improperly.  Second, sharing such information threatens Sonitrol's and its franchisees'

7  reputations for reliability and trustworthiness, which can damage their relationships with current

8  customers and make it more difficult to attract new customers.  Third, granting competitors access

9  to the Confidential Information will enable them to target SNDA's members' customers more

10  effectively, thus reducing the competitive advantage the members have created through their

11  investment in those relationships.

12      11. Any harm resulting from Sonitrol's disclosure of franchisees' and their customers'

13  confidential information to its potential purchasers will fall disproportionately on the franchisees.

14  Their relationships with their customers will suffer, due to a decrease in trust; their vulnerability to

15  competition from alternate security service providers will increase if competitors can use the

16  confidential information to target their specific customers, or to price their services.  Furthermore,

17  this type of harm cannot be easily remedied, once confidential information has been shared, the

18  bell cannot be un-rung; the mere act of disclosure threatens to create mistrust between franchisees

19  and their customers.  In addition, disclosure to competitors threatens to give the competitors an

20  unfair advantage, knowledge of franchisees' systems and customers greater than franchisees have

21  of the competitors'.

22      12. It is unclear that Sonitrol would suffer any harm if it were ordered to get franchisees'

23  written permission before disclosing confidential information or trade secrets to potential

24  purchasers.  Disclosure of information concerning its system without disclosure of confidential

25  information identifiably linked to franchisees and their customers should be sufficient.  If buyers

26  want to see examples of how the Internet Sites work from Sonitrol's perspective, Sonitrol has the

27  option of disclosing such  information only relating to customers of its non-franchised, company

28

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-4733 Fax

4

owned locations. In addition, if a potential purchaser requires franchisees' information, Sonitrol
can request the franchisees' approval, and offer necessary safeguards in exchange.

13. Sonitrol franchise agreements provide for exclusive territories or "Areas of Primary
Responsibility" ("APR") within which franchisees may offer their products and services.
Franchise Agreements from the 1970s, such as Sonitrol of Hartford's 1972 agreement, provided
for exclusive territories. Agreements from the 1980s and after provide for APRs with limited
exclusivity. [Examples of franchise agreements from 1972 and 1995 are attached as Exhibits C
and D]. The later franchise agreements also provide that Sonitrol may establish National Account
or Key Account programs, under which Sonitrol enters into a contract to provide security service
for a single customer with multiple locations owned, controlled or licensed throughout various
APRs or exclusive territories. Under such National Account contracts, Sonitrol establishes the
prices for sale and installation of monitoring equipment and for ongoing monitoring. Franchisees
are offered the following "option:" Provide the equipment and services specified in the National
Account contract at the prices Sonitrol specifies, or refuse to participate in the account. If the
franchisee refuses, Sonitrol will sell and install the equipment itself or authorize another to do so,
and provide monitoring from its own Central Monitoring Stations.

14. The National Account prices agreed to by Sonitrol are almost always lower than the
prices individual franchisees would charge to local customers. In addition, when Sonitrol enters
into a National Account agreement, it insists that franchisees terminate their agreements and
direct dealings with its current customers which are part of the system covered by the new
National Account contract. If the franchisee wants to continue servicing those locations, it must
accept the National Account rate.

15. Like many franchisees I am familiar with, my companies' goal is to at least break even
on the sale and installation of monitoring equipment (covering the cost of the equipment, labor,
and allocated overhead), which requires a 20 – 25% return on investment. Sonitrol's standard
markup on products it sells to franchisees is 100%. When Sonitrol enters into a National Account
contract it does not decrease the price of the equipment to be installed charged to the franchisees.
Furthermore, Sonitrol receives a 13% commission on the total contract value of all National

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

5

1   Accounts, and we dealers also pay royalties on the revenues derived from such accounts that we

2   service. National Account agreements which provide for a less than 20% return on the equipment

3   and installation provides result in participating franchisees losing money on the installation.

4       16. Sonitrol's franchisees are required to purchase Sonitrol branded equipment from

5   Sonitrol, thus Sonitrol can charge a non-competitive price, because franchisees cannot buy from

6   alternative suppliers. In addition, most Sonitrol franchisees also pay a royalty to Sonitrol on their

7   gross revenues, including on the sale of Sonitrol branded equipment to their customer. Thus, so

8   long as Sonitrol franchisees have gross revenues, Sonitrol makes money. On the other hand,

9   franchisees whose gross revenues are insufficient to cover their costs lose money, while remaining

10  responsible to pay royalties to Sonitrol. Franchisees (SNDA members) are therefore much more

11  sensitive to market fluctuations than Sonitrol. Franchisees who remain in business purchase

12  equipment from Sonitrol and pay Sonitrol royalties. Nonetheless, a decline in the franchisee's

13  business will result in a loss of profitability.

14      17. Sonitrol recently gave notice to its franchisees that it has entered into a National

15  Account contract with Cardinal Health Care to provide security monitoring service to all its

16  locations nationwide. Numerous SNDA members have contracts to provide security monitoring

17  service to individual Cardinal Health Care locations. According to Sonitrol's notice, those

18  contracts must be terminated, and all services to Cardinal Health Care locations must be pursuant

19  to the National Account program and administered by Sonitrol. [A copy of the notice regarding

20  the Cardinal Health account is attached as Exhibit E].

21      18. Sonitrol's insistence on terminating these agreements will damage the franchisees by

22  destroying their individual relationship with the customer; reducing their presence as an

23  independent business within their own market area (APR); it will deprive them of the benefit of

24  their bargain for the remaining terms of the agreements by forcing them to either accept the

25  National Account rate for monitoring; and in the event the franchisee had not recouped its full

26  equipment and installation cost, interfering with the contractual relationship which included the

27  full cost recovery. It will damage the franchisees' goodwill and reputations in their APRs if they

28  are forced to terminate a customer relationship.

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-4737 Fax

6

366/04/0010.1                                DECLARATION OF D. CURTISS

19. Finally, it means that there are at least two different Sonitrol monitoring stations serving the same territory. Sonitrol distinguishes itself from other security services because its audio monitoring permits the Central Station Operator to determine whether the alarm was caused by a break-in or a non-threatening event. When a Sonitrol Monitor calls in a "verified" alarm, the police respond within minutes, as opposed to much longer response time for a non-verified alarm. This is a major selling point for Sonitrol over other companies offering remote monitoring. Local police do not distinguish between different Sonitrol Central Stations, so if the non-local Station monitoring a National Account does not perform up to the standards of the local SNDA member, the local police will begin to discount all reports from "Sonitrol." Thus, the SNDA member loses control over its local reputation and its relationship with the local police.

20. Sonitrol, through the franchise agreements, requires SNDA's members to market the Sonitrol system within their territory. Sonitrol encourages SNDA's members to enter into contracts with businesses in their territories, whether or not the customer is an independent business or part of a chain. Sonitrol profits from SNDA's members' entry into such contracts – they purchase equipment from Sonitrol to install at the customer's location and pay royalties on all revenues received. SNDA members also pay Sonitrol other fees, including the monthly fee for participating in the Internet Sites.

21. If this TRO is granted, the harm to Sonitrol (if any) is far less than the harm that SNDA's Members will suffer if it is not granted. If granted, Sonitrol will continue to receive the royalties from the SNDA member's servicing their customers. In the event of upgrades or system expansion, it will receive its profit for the sale of the new or additional equipment. Thus, while SNDA's members and other franchisees will lose income and goodwill and harm to their

//
//
//
//
//
//

SINGLER, NAPELL & DILLON, LLP<br>127 S. Main Street, Sebastopol, CA 95472<br>(707) 823-8719  (707) 823-3757 Fax

7

DECLARATION OF D. CURTISS

1   reputations, granting the TRO will not harm Sonitrol, as its income stream from the various

2   franchisees' contracts local customers will continue unchanged.

3       I declare under the penalty of perjury of the laws of the State of California that the

4   foregoing is true and correct. Executed this 24th day of April, 2008 at Hartford, Connecticut.

5

6

7                            Doug Curtiss

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SPINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719   (707) 823-8737 Fax

**EXHIBIT A**




## FRANCHISEE WEB SITE AGREEMENT

This Agreement, dated as of the date set forth below, is between Sonitrol Corporation ("Sonitrol") and the undersigned franchisee ("Franchisee"). Collectively "the parties".

Whereas, Franchisee is a franchisee of Sonitrol pursuant to the terms and conditions of a Sonitrol Dealer Franchise Agreement ("Franchise Agreement"), and

Whereas, as a service to Sonitrol Franchisees and their subscribers Sonitrol has developed a web site accessible over the world-wide-web at www.mySonitrol.com. (hereinafter "Web Site"), and has promoted and encouraged Franchisee to subscribe to it, and

Whereas, Franchisee and Sonitrol desire to have access to certain tools on the Web Site that will permit Franchisee to input and retrieve certain information regarding Franchisee's subscribers, which information is more fully described in the Privacy Policy posted on the Web Site ("Personal Information"), and

Whereas, Franchisee and Sonitrol further desire to make the Web Site accessible for use by subscribers for the purpose of inputting and retrieving Personal Information, and in certain applications performing video based activities, pursuant to the terms of a Web Site User Agreement in a form prescribed by Sonitrol.

Now, therefore, by signing below and using Franchisee's assigned password to access the Web Site, Franchisee and Sonitrol agree to the following terms and conditions:

1. The parties acknowledge that the Personal Information that is displayed over the Web Site is provided by (a) Franchisee electronically inputting Personal Information through SONNT applications or by other means of modifying the SONNT database; (b) Franchisee electronically inputting Personal Information over the Web Site; (c) the subscriber electronically inputting Personal Information over the Web Site; (d) Sonitrol, or its web host provider, electronically retrieving Personal Information from the data base of Franchisee's SONNT Central Station; and (e) video cameras installed in the subscriber's premises. Franchisee hereby agrees that Sonitrol, or its web host provider, may electronically access the database of Franchisee's SONNT Central Station to retrieve Personal Information for each of Franchisee's subscribers and, based upon input from the Franchisee or Franchisee's subscribers accessing the Web Site, to electronically change Personal Information stored in the database of Franchisee's SONNT Central Station. Further, Franchisee agrees to maintain the computer hardware and software specified by Sonitrol, and to maintain the necessary links, that will enable Sonitrol, or its web host provider, to electronically access Personal Information stored in the database of Franchisee's SONNT Central Station.



Further, Franchisee agrees to comply with all standards and procedures regarding the use of the Web Site that are promulgated by Sonitrol.

2. Franchisee acknowledges that the content of Personal Information that is displayed over the Web Site is based upon information that is provided by Franchisee or Franchisee's subscriber. Sonitrol is not responsible for the accuracy of Personal Information, and any reliance by Franchisee on Personal Information shall be at Franchisee's own risk.

3. Sonitrol may monitor use of the Web Site by Franchisee and subscribers and, subject to Sonitrol's Privacy Policy for the Web Site, may freely use any Personal Information and materials received from or collected over the Web Site for sales or marketing analysis, determining Web Site usage, responding to Franchisee or subscriber inquiries, and any other lawful reason or purpose consistent with the terms of this Agreement and the Franchisee Agreement. Sonitrol agrees that it will not disclose Personal Information relating to Franchisee's subscribers to third parties without advanced written permission except consultants, attorneys or others that have signed a non-disclosure agreement.

4. Sonitrol may change, suspend or discontinue the Web Site, or any aspect thereof, at any time, including the availability of any Web Site feature, database, or content. Sonitrol also may impose limits on certain features and services or restrict Franchisee's or its subscriber's access to parts or all of the Web Site with reasonable attempt to notify. Sonitrol shall not be liable to Franchisee for any loss by Franchisee of fees or other payments Franchisee charges its subscribers for use of the Web Site. Franchisee will not be liable for any Web Site fees considered in this agreement while services are suspended or discontinued.

5. The Web Site is protected by copyright as a collective work and/or compilation, pursuant to U.S. copyright laws, international conventions, and other copyright laws. All materials contained on the Web Site are protected by copyright, and except for Personal Information, and are owned and/or controlled by Sonitrol or the party credited as the provider of the content of the Web Site. Franchisee will abide by any and all additional copyright notices, information, or restrictions contained in any content on the Web Site. Franchisee may download and make copies of the content and other downloadable items displayed on the Web Site for its business records, provided that Franchisee maintains all copyright and other notices contained in such content. Copying, distributing or storing of any content for any other purpose is expressly prohibited without prior written permission from Sonitrol or the copyright holder identified in the individual contents copyright notice.

6. Franchisee represents, warrants and covenants that it shall not upload, post or transmit to or distribute or otherwise publish through the Web Site any materials which (a) restrict or inhibit any other user from using and enjoying the Web Site; (b) are unlawful, threatening, abusive, libelous, defamatory, obscene, vulgar, offensive,

pornographic, profane, sexually explicit or indecent; (c) constitute or encourage conduct that would constitute a criminal offense, give rise to civil liability or otherwise violate law; (d) violate, plagiarize or infringe the rights of third parties including, without limitation, copyright, trademark, patent, rights of privacy or publicity or any other proprietary right; (e) contain a virus or other harmful component; (f) contain any information, software or other material of a commercial nature; (g) contain advertising of any kind; or (h) constitute or contain false or misleading indications of origin or statements of fact. Moreover, Franchisee warrants and covenants that it will not use the Web Site to access information regarding other Sonitrol franchisees, or subscribers of other Sonitrol franchisees.

7.    The Web Site may contain links and pointers to other related World Wide Web Internet sites, resources, and sponsors of the Web Site. Links to and from the Web Site to other third party sites, maintained by third parties, do not constitute an endorsement by Sonitrol or any of its subsidiaries or affiliates of any third party resources, or their contents.

8.    Franchisee hereby agrees to indemnify, defend and hold Sonitrol, and all its officers, directors, owners, agents, employees, information providers, affiliates, franchisees, licensors and licensees (collectively, the "Indemnified Parties") harmless from and against any and all liability and costs, including reasonable attorneys fees, arising out of or related to claims or actions brought by third parties against Sonitrol for Franchisee's breach of this Agreement, or as a result of the Franchisee's or its subscriber's use of or reliance upon the information displayed or distributed over the Web Site.

9.    Sonitrol and Franchisee do not and cannot review all materials posted to the Web Site by users, and Sonitrol and Franchisee are not responsible for any such materials posted by users. However, Sonitrol and Franchisee reserve the right at all times to disclose any information as necessary to satisfy any law, regulation or government request, or to edit, refuse to post or to remove any information or materials, in whole or in part, Sonitrol's discretion is objectionable or in violation of this Agreement.

10.   THE WEB SITE, INCLUDING ALL CONTENT, SOFTWARE, FUNCTIONS, MATERIALS AND INFORMATION MADE AVAILABLE ON OR ACCESSED THROUGH THE WEB SITE, IS PROVIDED "AS IS", AND SONITROL MAKES NO WARRANTY AS TO ITS USE, ACCURACY OR COMPLETENESS TO THE EXTENT PERMISSIBLE BY APPLICABLE LAW.  SONITROL AND ITS SUBSIDIARIES AND AFFILIATES DISCLAIM ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  SONITROL DOES NOT WARRANT THAT THE FUNCTIONS CONTAINED IN THE WEB SITE OR ANY MATERIALS OR CONTENT CONTAINED THEREIN WILL BE UNINTERRUPTED OR ERROR FREE, THAT DEFECTS WILL BE CORRECTED, OR THAT THE WEB SITE OR THE SERVER




THAT MAKES IT AVAILABLE IS FREE OF VIRUSES OR OTHER HARMFUL
COMPONENTS.

11.  NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY
DAMAGES OR INJURY, INCLUDING COMPENSATORY, SPECIAL,
CONSEQUENTIAL OR LOST PROFITS, CAUSED BY THE INACCURACY OF THE
INFORMATION ON THE WEB SITE OR ANY FAILURE IN PERFORMANCE OF THE
WEB SITE, OR ANY INTERRUPTION, DEFECT, DELAY IN OPERATION OR
TRANSMISSION, THE LOSS OF DATA, ALTERED DATA, INABILITY TO ACCESS
THE WEB SITE, COMPUTER VIRUS OR LINE FAILURE.

12.  Franchisee's authorized employees ("Administrators") shall be assigned a
unique USER ID and password.  Franchisee shall prohibit its Administrators from
transferring or sharing the assigned USER ID and password and institute procedures
to protect against any unauthorized use of the USER ID and password by its
Administrators.  Any transfer, sharing or unauthorized use of the USER ID and
password by the Administrator shall result in the immediate termination of the
Administrator's right to access the Web Site.  Franchisee agrees to immediately notify
Sonitrol of any known or suspected unauthorized use of a USER ID and password,
and shall also notify Sonitrol when an Administrator's authority to access the Web Site
has been terminated by Franchisee, including upon termination of the Administrator's
employment.

13.  Franchisee acknowledges that it has reviewed the Sonitrol Privacy Policy
posted on the Web Site and agrees to the terms and conditions thereof, as if they
incorporated herein by reference.  Franchisee agrees that it will not use or attempt to
use the Web Site to access information regarding other Sonitrol franchisees, or
subscribers of other Sonitrol franchisees, and shall not otherwise use the Web Site in
a manner which is contrary to the Privacy Policy.  Sonitrol reserves the right to make
changes to the Privacy Policy.  If changes are made, they will be posted on the Web
Site with a notation indicating the date on which the Privacy Policy was last revised.
Franchisee agrees to review the Web Site on a regular basis to ascertain which
changes, if any, have been made to the Privacy Policy.

14.  This Agreement shall be governed by and construed in accordance with
the laws of the Commonwealth of Virginia, without regard to conflicts of laws
provisions.  Sole and exclusive jurisdiction for any action or proceeding arising out of
or related to this Agreement shall be in appropriate State or Federal Court located
within the geographic boundary of the Alexandria Division of the United States District
Court for the Eastern District of Virginia.

15.  This Agreement constitutes the entire agreement between Sonitrol and
Franchisee with respect to Franchisee's use of the Web Site.  If for any reason a court
of competent jurisdiction finds any provision of the Agreement, or portion thereof, to be
unenforceable, the remainder of this Agreement shall continue in full force and effect.

 

16. In the event of a default by Franchisee under this Agreement, Sonitrol reserves the right, upon ten (10) days written notice, to terminate this Agreement and deactivate USER ID's and passwords assigned to Franchisee's Administrators and to each of Franchisee's subscribers, provided that Franchisee has not cured the default with such ten (10) day notice period. Upon termination the Franchise Agreement between Sonitrol and Franchisee, Sonitrol reserves the right to immediately and without further notice terminate this Agreement and deactivate USER ID's and passwords assigned to Franchisee's Administrators and to each of Franchisee's subscribers.

17. Franchisee hereby agrees to the amounts set forth on Exhibit A that will be paid for Web Site usage.

SONITROL CORPORATION

16-8-04
_____
Date

By: _____

SONITROL FRANCHISEE

Sonitrol of Tallahassee
_____

9-16-04
_____
Date

By: _____



## EXHIBIT A

### FRANCHISEE WEB SITE AGREEMENT DATED August 30, 2004

Set-Up Fee                                                   $ 200

Total Monthly Payment Per Workstation                        $ 175

Total Monthly Payment for Sonitrol of Tallahassee            $ 350

Note:  Any monitoring workstation added to the SONNT configuration after initiation of this agreement will be billed accordingly starting the 1st of the month after the new monitoring workstation has been added.

**EXHIBIT B**



## PRIVACY POLICY

Sonitrol Corporation recognizes and respects the personal privacy of all users to this Web Site and makes every effort to protect the privacy of non-public, personal information received over this Web Site. This privacy policy describes how personal information collected over the Web Site is used and protected.

### Personal Information We Collect

This Web Site contains non-public, personal information ("Personal Information") about customers of Sonitrol Franchise Dealers ("Franchisee"). Customers are assigned a personal User I.D. and password to access and use this Web Site as a part of the security products and services provided to the customer by a Franchisee. The type of Personal Information regarding customers that may be accessed through the Web Site includes:

- A customer's name, address, email address, telephone number, personal User I.D., and password.

- Information identifying a customer's facility at which security protection is being provided, such as the name of the facility, the identification code assigned the facility by the Franchisee, and the location of the facility. In some applications where video cameras are used, portions of a customer's facility may be viewed over the Web Site.

- Customer call lists, access control card I.D. numbers, PIN numbers, access control level information, data regarding alarm activity at a customer's location (e.g. alarm signals, dispatches from the central station)

- Information on a customer's system options (e.g. access levels, shifts, periods and holidays)

- Information regarding service of a customer's system.

### Access to and Use of Personal Information

A Franchisee's customer can access its own Personal Information, but it cannot access the Personal Information of other customers. The Franchisee with whom the customer has contracted also has access to the customer's Personal Information for use in providing the customer security services. Sonitrol Corporation has access to Personal Information for purposes of analysis, pattern detection and site administration, such as sending a new temporary password to the customer if the current password is forgotten.

### Safeguards to Protect the Privacy of Personal Information

Maintaining the confidentiality of Personal Information is important to us. Although there is no such thing as "perfect security" on the Internet, Sonitrol Corporation uses industry standard procedural, electronic, and physical safeguards to protect the privacy of Personal Information available over the Web Site.

Some web browsers and some firewalls will not permit a secure connection. Your web browser must support a Cipher Strength (Encryption strength) of 128-bits to be able to use this Web Site.

### Editing/Deleting Personal Information

Personal Information for a Franchisee's customer is linked to its mySonitrol.com User Account. Any on-line changes that a Franchisee's customer is permitted to make to its Personal Information can be done by clicking on the appropriate icon for changes to Personal Information and following the instructions. Any on-line changes that a customer makes to its Personal Information will be for security services purposes only. If a customer wishes to change contact information for other reasons, such as making a change in its address for billing purposes, the customer should contact its Franchisee directly.

A customer's ability to delete its mySonitrol.com User Account depends upon the policies and procedures



established by its Franchisee. If a customer desires to have its mySentriol.com User Account deleted, it should contact its Franchisee's mySentriol.com administrator. Deletion of the User Account upon a customer's request will not effect the security services provided to the customer by its Franchisee.

<u>Changes in Privacy Policy</u>

If our privacy policy changes in the future, the new policy will be posted on our Web Site. Your continued use of this site following the posting of any amendment, modification or change shall constitute your acceptance thereof.

**EXHIBIT C**

SNITROL
TY SYSTEMS, INC.
ord Street
rd, Connecticut 03901
-2691

*[handwritten notes]* augued
Term: ~~first Term can~~
sonitrol corp can
Term agreement
only for cause

## EXCLUSIVE TERRITORY

### FRANCHISE DEALER AGREEMENT

This agreement made on this September 12, 1972        by and between
Sonitrol Security Systems, Inc., a Connecticut Corporation, hereinafter
referred to as Sonitrol and Sonitrol Security Systems of Hartford, Inc., a
Connecticut Corporation,   hereinafter referred to as Dealer, and in
consideration of the mutual covenants and agreements herein contained,
the parties now covenant and agree as follows:

1. Sonitrol hereby appoints Dealer to be the ~~exclusive~~
~~dealer~~ ............. within that ............. telephone ............. ter-
ritory held by Sonitrol during the term of this agreement in the Hartford, Windsor,
Windsor Locks, Manchester, Glastonbury and Simsbury telephone exchanges, as shown
on the map attached and marked Schedule A.

2. Sonitrol does herewith give the Dealer the ............. 
............. to sell, promote, and service Sonitrol Burglar Alarm products
............. in the above described territory during the ............. 
............. Sonitrol agrees to supply Dealer with all burglar alarms and
detection products ordered that are supplied by Sonitrol.

3. Dealer agrees not to sell burglar alarm devices other than
Sonitrol products within the above described territory nor to sell Sonitrol
products outside the said territory during the life of this agreement without
the permission of Sonitrol.

4. Dealer at all times will be considered to be an independent
contractor and directly responsible for its actions as an organization and
for those of its employees and agents. Likewise, Sonitrol will be directly
responsible for its actions and those of its employees and agents and hold
Dealer harmless from any loss occasioned thereby.

5. Insurance necessary for the protection of the Dealer will be
carried by the Dealer.

6. Dealer may sell or assign his franchise subject to the
............. approval of Sonitrol; provided, however that before any such sale or
transfer, Dealer ............. offer Sonitrol the right to purchase such business
in full compliance with the terms and conditions of any bona fide offer Dealer
obtains.

-2-

if no such bona fide offer exists, upon such terms and conditions as Dealer and Sonitrol agree to represent a fair market price, a mutual party will be selected to negotiate the disagreement and no further transaction will take place until a fair market price is determined. Sonitrol reserves the right in considering any request for approval of a sale or assignment, to investigate the background, including police and credit, of the proposed transferee - individual or corporation.

7. Sonitrol agrees to sell its burglar alarm and detection products and devices to Dealer at commercially competitive dealer prices for comparable products, reserving the right to make price and model changes upon thirty (30) days written notice to Dealer.

8. During the term of this agreement, Dealer and Sonitrol shall have the right to display and use the Sonitrol registered trademark and trade name in advertisements in all media.

9. All purchases shall be freight prepaid to Dealer. The Dealer agrees that he will abide by Sonitrol's terms which are cash upon delivery.

10. Dealer agrees not to sell burglar alarm devices other than the Sonitrol products nor to sell Sonitrol products outside the said territory established in said agreement without the written permission of Sonitrol. Upon termination of this agreement, Dealer agrees not to sell or provide in any manner any burglar alarm products for a period of one (1) year.

11. Employees must be of sufficient moral and ethical character as to be unlikely to compromise the Sonitrol Security Systems procedures, equipment or trade secrets to either commercial competition or criminal elements. Dealer will have the responsibility of determining the character of all its employees; provided, however, that Sonitrol may request the opportunity to review the character of any such employee and act as final authority.

12. Dealer and its employees will be expected to cooperate to the fullest with all law enforcement agencies, however, under no circumstances will there be a breach of confidence or trust with any customer.

13. For the benefit of Dealer and its customers, Sonitrol warrants the merchantability and fitness of the burglar alarm, all detection products, and devices sold to Dealer hereunder and agrees, during the term of this agreement, to repair or replace any defective products without charge to Dealer, provided such product is returned to Sonitrol prepaid.

-3-

14. Sonitrol will supply necessary assistance to establish Dealer's preliminary relationships with police in the above described territory; Sonitrol will supply technical training help as required by Dealer to establish his business; Sonitrol will assist Dealer in hooking up its central monitoring equipment at its expense.

15. Every effort will be made to procure chain accounts for the Dealer through centralized sales.

16. Dealer agrees to install at least fifty (50) basic systems per year during the first twenty-four (24) months of this contract. No minimum installation exists thereafter.

17.  ($10,000.00) Dollars which is payable upon the signing of this agreement and shall be apportioned as outlined in the Addendum.

Dealer agrees to pay Sonitrol $3.00 per month for each burglar alarm system in service; and $1.50 per month for each Sonitrol local alarm system in service.

18. Sonitrol agrees to operate and manage Dealer's franchise in the event temporary disability precludes its principal officer from doing so until such person has recovered and is able to resume his duties; in such event, Sonitrol will charge only direct costs incurred by it for its services, excluding its general overhead and other indirect costs.

19. Sonitrol shall have the option to purchase the business of Dealer under the provisions of Paragraph Six (6) hereof; in the event of the death or permanent disability of the principal officer of Dealer.

20. Sonitrol will conduct a complete training program in Sales, Installation, Maintenance and Security Techniques at its offices in Stamford, Connecticut and/or Dealer's Offices.

21. Sonitrol may terminate this Agreement only for cause which shall arise upon a material violation of the terms and conditions of this agreement by Dealer, in which event Sonitrol shall notify Dealer in writing of the violation and allow Dealer thirty (30) days to correct such violation. If at the end of such period of time Dealer's violation has not been corrected, Sonitrol may, at its option, terminate and annul this agreement on thirty (30) days written notice of its intention to do so. In the event of such termination for cause hereunder Sonitrol at its option, agrees to purchase from Dealer all new and saleable products on hand to Dealer at their cost to Dealer and/or all accounts of Dealer at a price equal to the gross commission of Dealer, including all lease fees of Dealer, for the

—4—

twelve (12) months preceding.

22. In the event either party hereto shall cease doing business by voluntary or involuntary actions, by bankruptcy, receivership, or otherwise, either party may then terminate this agreement without notice, and shall in no way be construed liable for any obligation of each other. The option of a party to terminate this contract by ceasing business by voluntary action, shall apply only in the event of a bona fide cessation of business.

Executed on the day and year written above

Sonitrol Security Systems of Hartford, Inc.

BY: _Douglas M. Curtis_
     Vice-President & Treasurer

SONITROL SECURITY SYSTEMS, INC.
Connecticut Corporation

BY: _____
          President

SONITROL SECURITY SYSTEMS, INC., an Indiana Corporation, acting herein by _____, its President, hereunto duly authorized, approves and consents to this agreement and further that SONITROL SECURITY SYSTEMS, INC., a Connecticut Corporation has authority to enter into such agreement.

SONITROL SECURITY SYSTEMS, INC.
Indiana Corporation

BY: _____

ADDENDUM

Three thousand five hundred ($3,500.00) Dollars for this exclusive
franchise, Three thousand five hundred ($3,500.00) Dollars for
equipment listed on attached list marked Schedule B, and Three
thousand ($3,000.00) Dollars for sales, installation, maintenance
and security advice, advertising material, and assistance in obtaining
national customers.



SCHEDULE B

## SONITROL SECURITY SYSTEMS, INC.

### DEALER FRANCHISE PROGRAM

### INITIAL INVENTORY SUPPLIED

```
10  M-1 A
 4  P/S-1
 6  P/S-2
40  P/A
 1  C-1 (Console)
 1  Demo
 1  M-1
 6  X-2
 6  P/S-4
20  Pr. #37 Door Switches
10  #24 Door Brackets
 5  Hold Up Switches
 2  Linear (1 in Demo)
 2  Monitor Boards A/P
 2  Monitor Boards C
 1  P/S-1 Board
 2  P/S-2 Boards
 1  Headset
 1  Staple Gun
    Staples - 5M
 1  Volt Ohm Meter
 1  25' Pack Board
 1  M-3 Home Console
 1  H-Board
 1  P/S-4 Board
 1  C-2 Board
    Wire
 1  EI-1 Sonitrol Jr.
 1  Industrial Unit
 1  Fire Alarm
```

**EXHIBIT D**

## SONITROL FRANCHISE AGREEMENT

THIS AGREEMENT, effective this ____1st____ day of
____June____, 19 93, by and among SONITROL CORPORATION, a
Delaware corporation, ____SONITROL SOUTHEAST, INC.____, a
____Delaware____ corporation, hereinafter referred to as
"DISTRIBUTOR," and ____SONITROL OF TALLAHASSEE, INC.____,
____corporation____, formed in the State of ____Florida____,
hereinafter referred to as "FRANCHISEE."

### RECITALS

WHEREAS, SONITROL CORPORATION is the owner of the
registered trademark "SONITROL," and DISTRIBUTOR has been
licensed, with the right to sub-license others, to use the
trademark "SONITROL," registered with the United States Patent
Office under the principal register number 12-681, together
with all the goodwill connected therewith; and

WHEREAS, SONITROL CORPORATION has a unique system for
the promotion, sale and delivery of security products and
services, which is identified by the trademark "SONITROL," and
which system may be improved, further developed, or otherwise
modified from time to time by SONITROL CORPORATION, hereinafter
referred to as the "Sonitrol Product System;" and

WHEREAS, SONITROL CORPORATION is engaged in the business
of granting franchises for the operation of security businesses
using the "SONITROL" trademark and the system identified
therewith; and

WHEREAS, SONITROL CORPORATION has expended time, effort,
and money to obtain knowledge in the field of merchandising,
distributing and promoting the sale of security systems and
related products and services, and has established successfully
a reputation, demand and goodwill for such products and
services under the "SONITROL" trademark, which signifies the
source and quality of products and services sold under the
"SONITROL" name and the high quality of management,
supervision, and merchandising associated therewith; and

WHEREAS, the Sonitrol Alarm Product Line, hereinafter
referred to as "Sonitrol Products," consists of products
bearing the trademark or trade name "SONITROL," which products
consist of intrusion, fire, CCTV, surveillance, access control

0643C Rev.12/15/92

System

- 2 -

products and components using Sonitrol Corporation's premier
audio detection technology and components using emerging
technologies for diverse security system requirements, and
which in many applications are monitored by Sonitrol
Franchisees at central monitoring stations; and

WHEREAS, all of the foregoing having a distinctive and
valuable significance, FRANCHISEE acknowledges and understands
the importance of maintaining the goodwill and good reputation
of the "SONITROL" trademark, and FRANCHISEE desires to purchase
and market equipment and products bearing the "SONITROL"
trademark, and to use and obtain benefits from the Sonitrol
Product System for promoting, leasing, selling and servicing
Sonitrol Products, and to do business using the "SONITROL"
trademark and obtain the benefit of the goodwill inherent
therein; and

WHEREAS, FRANCHISEE has read this Agreement, and
SONITROL CORPORATION's and DISTRIBUTOR's Franchise Offering
Circulars, and understands and accepts the terms, conditions,
and covenants regarding FRANCHISEE's operation and acquisition
of supplies set forth herein as being reasonable and necessary
to maintain the high standards of quality and service at all
Sonitrol dealerships, and thereby protect and preserve the
goodwill inherent in the "SONITROL" trademark;

NOW, THEREFORE, SONITROL CORPORATION, DISTRIBUTOR and
FRANCHISEE, intending to be legally bound in consideration of
the mutual agreements, covenants and promises herein set forth,
do hereby agree as follows:

SECTION ONE

LICENSE OF TRADEMARK AND FRANCHISE TERRITORY

1.1  SONITROL CORPORATION and DISTRIBUTOR hereby license and
grant to FRANCHISEE, upon the terms and conditions set forth
herein, the right to, and primary responsibility for,
promoting, leasing, selling, and servicing Sonitrol Products
bearing the trademark "SONITROL," and to use solely in
connection therewith the "SONITROL" trademark and the Sonitrol
Product System identified with said trademark, within the
following area:
                        Bay County, Florida


hereinafter referred to as Area of Primary Responsibility.


0643CRev.12/15/92

- 3 -

FRANCHISEE shall use the name "SONITROL" in the name under which it conducts business, which name shall be approved in advance by SONITROL CORPORATION, but not in its corporate or other legal name.

1.2  FRANCHISEE agrees that it will not establish a Sonitrol central station or a business premises outside of FRANCHISEE's Area of Primary Responsibility. Further, FRANCHISEE shall not represent itself as a local Sonitrol Dealer in territory outside its Area of Primary Responsibility unless FRANCHISEE has been granted franchise rights to that other territory under a separate Sonitrol Dealer Franchise Agreement.

1.3  SONITROL CORPORATION and DISTRIBUTOR agree that they will not license another FRANCHISEE with the right to establish a central station or a business premises within FRANCHISEE's Area of Primary Responsibility except as otherwise provided in this Agreement and so long as FRANCHISEE complies with the terms and conditions of this Agreement.

1.4  The parties understand and agree that this license is of the registered trademark "SONITROL," and of the related Sonitrol Product System which SONITROL CORPORATION has developed as this system presently exists or may hereafter be modified.  FRANCHISEE agrees to and shall use the "SONITROL" trademark in connection with, and exclusively for, the promotion and conduct of the business to be operated by FRANCHISEE under this Agreement, hereinafter referred to as "Franchise Business," in accordance with such instructions, rules and procedures as may be prescribed by SONITROL CORPORATION from time to time with respect thereto.

1.5  FRANCHISEE understands and agrees that this Agreement confers upon FRANCHISEE no proprietary right, title or interest in the "SONITROL" trademark and trade name, or in the Sonitrol Product System, but only the right to the use thereof during the term of this Agreement.  FRANCHISEE agrees and covenants that it will not register or attempt to register such trademark in its own name or that of any other firm, person or corporation, and that it shall not directly or indirectly contest or aid in contesting the use, ownership and rights of SONITROL CORPORATION in and to the "SONITROL" trademark. Further, FRANCHISEE agrees that it shall not permit, authorize, license or approve others to use the "SONITROL" trademark for any purpose.

1.6  FRANCHISEE agrees to report to SONITROL CORPORATION any unauthorized use of the name or trademark "SONITROL" of which it becomes aware in violation of this Agreement or standards or procedures prescribed by SONITROL CORPORATION from time to time with respect thereto.

0643CRev.12/15/92

- 4 -

1.7 FRANCHISEE shall promptly notify SONITROL CORPORATION of
any suspected infringement of or challenge to the validity of
SONITROL CORPORATION's ownership and rights to its proprietary
marks. FRANCHISEE acknowledges that SONITROL CORPORATION
shall, in its sole and absolute discretion, institute
proceedings or defend proceedings as it shall deem fit and that
SONITROL CORPORATION alone has the right to control any
administrative proceeding or litigation involving the
proprietary marks. If SONITROL CORPORATION undertakes the
defense or prosecution of any litigation relating to the
proprietary marks, FRANCHISEE agrees to execute any and all
documents and to do whatever acts and things as may, in the
opinion of counsel for SONITROL CORPORATION, be necessary or
advisable to carry out the defense or prosecution. FRANCHISEE
shall not, under any circumstances whatsoever, institute or
take any legal proceedings relating to the proprietary marks.

1.8 FRANCHISEE shall only use the trademarks affixed or
related to Sonitrol Products on Sonitrol Products purchased
from DISTRIBUTOR. FRANCHISEE shall not affix or relate the
"SONITROL" trademark or trade name to any other products or
equipment which were not purchased from DISTRIBUTOR, or a
product approved by SONITROL CORPORATION, and respecting which
SONITROL CORPORATION has authorized the affixing of such
trademark or trade name.

1.9 FRANCHISEE understands and agrees that SONITROL
CORPORATION reserves the right to manufacture, sell, promote,
lease and service products other than Sonitrol Products to and
through other sales organizations within the FRANCHISEE's Area
of Primary Responsibility without compensating FRANCHISEE for
same. However, such products will not bear the "SONITROL" name
or trademark, unless such products are Sonitrol Products which
FRANCHISEE has declined to distribute pursuant to Section Six
of this Agreement. FRANCHISEE understands and agrees that
SONITROL CORPORATION reserves the right to manufacture and
promote Sonitrol products within FRANCHISEE's Area of Primary
Responsibility.

1.10 FRANCHISEE further understands and agrees that SONITROL
CORPORATION may sell Sonitrol Products directly to (i) any
agency, office or facility of the United States Government
located in FRANCHISEE's Area of Primary Responsibility, and
(ii) certain customers located in FRANCHISEE's Area of Primary
Responsibility when such sale is part of a package sale to a
business with national or regional locations and such locations
are both inside and outside of the Area of Primary
Responsibility. FRANCHISEE shall have the option of installing
and servicing all such sales of Sonitrol Products by SONITROL
CORPORATION within FRANCHISEE's Area of Primary Responsibility

0643CRev.12/15/92

- 5 -

and being compensated for such installation and service. If
FRANCHISEE chooses not to be responsible for such installations
and service, then SONITROL CORPORATION, or its designee, shall
have the right to provide such installation and service without
compensating FRANCHISEE.

SECTION TWO

TERM OF AGREEMENT AND RENEWAL

2.1  The term of this Agreement shall be for a period of ten
(10) years from the date first written above.

2.2  FRANCHISEE may, at its option, renew its right to use the
"SONITROL" trademark, purchase and market Sonitrol Products,
and use the Sonitrol Product system for an additional ten (10)
year period, provided that at the end of the initial ten (10)
year term:

> 2.2.1.  FRANCHISEE has given SONITROL CORPORATION and
> DISTRIBUTOR written notice of such election to renew not
> less than six (6) months nor more than twelve (12)
> months prior to the end of the term then in effect;
>
> 2.2.2.  FRANCHISEE is not in default of any provision of
> this Agreement, any amendment hereof or successor
> hereto, or any other agreement between FRANCHISEE,
> DISTRIBUTOR and SONITROL CORPORATION, its subsidiary or
> affiliated corporations, and has substantially complied
> with all the terms, conditions and covenants of such
> agreements during the terms thereof;
>
> 2.2.3.  Upon renewal FRANCHISEE shall execute SONITROL
> CORPORATION's then standard form Sonitrol Franchise
> Agreement currently in use.  In the event FRANCHISEE
> chooses for any reason not to execute the then standard
> current form of Dealership contract, FRANCHISEE may
> renew for an additional ten years under the terms of
> this Agreement; however, SONITROL CORPORATION shall have
> the right to establish dealers and shall have the right
> to sell and market products within FRANCHISEE's Area of
> Primary Responsibility without compensating FRANCHISEE
> for the same and said products may bear the SONITROL
> CORPORATION trademark or trade name.  FRANCHISEE shall
> not be required to pay again the initial franchise fee
> provided for, or its equivalent, as a condition of
> renewal;

0643CRev.12/15/92

- 6 -

2.2.4.  FRANCHISEE, DISTRIBUTOR and SONITROL CORPORATION shall execute a mutual general release, in the form of Attachment A, for any and all claims each party shall have against the other, its parent, subsidiary and affiliated corporations, and their officers, directors, agents and employees, excepting only such claims as are precluded from waiver by applicable law,

## SECTION THREE

### TRAINING AND ASSISTANCE

3.1  DISTRIBUTOR, directly or through its designee, will provide to FRANCHISEE and FRANCHISEE will be required to send, at its expense, its general manager or principal operating person, and any other employees required by DISTRIBUTOR and SONITROL CORPORATION, to an initial training program relating to aspects of the franchised business, including startup, financial matters, business operations, marketing and sales procedures, and installation, operation and monitoring of security systems utilizing Sonitrol Products.  The initial training program will be conducted for such period of time as is deemed necessary by SONITROL CORPORATION and DISTRIBUTOR.

3.2  SONITROL CORPORATION and DISTRIBUTOR will provide FRANCHISEE with further sales and operational training courses from time to time as is available to all Sonitrol dealers, which courses specified employees of FRANCHISEE may be required to attend.

3.3  Training programs will be conducted at locations selected by SONITROL CORPORATION and DISTRIBUTOR, or their designee, and FRANCHISEE shall pay the costs of travel, living accommodations and salary for its personnel to attend and the required training fee.

## SECTION FOUR

### SONITROL STANDARDS AND PROCEDURES

4.1  The success of the Sonitrol Product System depends on the national goodwill resulting from consistency among Sonitrol dealers in the sale, promotion, leasing, and servicing of Sonitrol Products.  This conformity can be achieved only by the rigid adherence by FRANCHISEE and by other licensed dealers to a consistent plan of operation.  Consistent therewith, SONITROL CORPORATION will publish and supply to FRANCHISEE manuals, bulletins, handbooks and/or other written material containing

- 7 -

operational standards which may be modified from time to time
by SONITROL CORPORATION. FRANCHISEE covenants and agrees to
operate the Franchise Business in strict conformance with the
operational standards set forth in such publications and agrees
to be bound by any changes made thereto. The franchise
standards and procedures manual, bulletins, handbooks and
information provided contain trade secrets and confidential
information and will remain the property of SONITROL
CORPORATION and therefore FRANCHISEE shall only reveal the
contents of these materials to such of FRANCHISEE's personnel
who need to know the information for the effective operation of
the Franchise Business, and who sign a statement in the form
prescribed by SONITROL CORPORATION agreeing to not reveal such
materials to any other person or entity. FRANCHISEE shall not
otherwise reveal the contents of these materials without
SONITROL CORPORATION's prior written authorization.

SECTION FIVE

PURCHASE AND REPAIR OF SONITROL CORPORATION PRODUCTS

RESTRICTION ON SALE OF OTHER PRODUCTS

5.1  During the term of this Agreement, FRANCHISEE agrees to
purchase and DISTRIBUTOR will sell to FRANCHISEE the
aforementioned Sonitrol Products at DISTRIBUTOR's list prices
for Sonitrol Products as in effect at the time of such sales,
except that DISTRIBUTOR shall not be obligated to sell Sonitrol
Products to FRANCHISEE if FRANCHISEE is in default of this
Agreement. All purchases from DISTRIBUTOR by FRANCHISEE shall
be under the then prevailing terms and conditions for the sale
of products.

5.2  Because repair of Sonitrol Products involves certain trade
secrets and confidential information and procedures, all
servicing and repair of Sonitrol Products shall be performed by
SONITROL CORPORATION, or its designee, under the then
prevailing terms and conditions for repair. FRANCHISEE, or any
person authorized by FRANCHISEE, may not modify, repair, or
attempt to repair Sonitrol Products. Such modification,
repair, or attempt to repair shall void any and all guarantees
and warranties, express or implied, applicable to Sonitrol
Products, and shall constitute a breach of this Agreement.
SONITROL CORPORATION may, in writing, authorize the repair of
certain products in its sole discretion.

5.3  Because the national goodwill inherent in the "SONITROL"
trademark and the Sonitrol Product System depends on the
consumer's identification of the trademark with a high quality

0643CRev.12/15/92

- 8 -

product, and because all products sold, promoted, leased and
serviced by FRANCHISEE tend to be identified by the consumer as
"SONITROL" trademark products, FRANCHISEE shall purchase all
products and equipment which are promoted, leased, sold,
installed, or serviced in the franchise business only from
DISTRIBUTOR or from manufacturers, suppliers or distributors
designated or approved by SONITROL CORPORATION in writing.
SONITROL CORPORATION will provide the Franchisee with a list of
approved sources of products.  The Franchisee shall obtain
SONITROL CORPORATION's written approval prior to the use of any
manufacturer or supplier not designated by SONITROL
CORPORATION.  As a precondition to granting approval, SONITROL
CORPORATION may require the Franchisee to submit samples,
photographs and/or other information concerning the products or
supplies.  The manufacturers, suppliers, or distributors shall
meet in all respects SONITROL CORPORATION's specifications and
standards as to quality, durability, performance, warranties,
finish and appearance for such products and equipment, and who
shall adequately demonstrate the ability, capacity, and
facilities to supply FRANCHISEE's needs in the quantities, at
the times, and with the reliability necessary for efficient and
high quality operation of FRANCHISEE's business.

## SECTION SIX

### NEW PRODUCT DEVELOPMENT

6.1  SONITROL CORPORATION shall notify FRANCHISEE of the
availability and marketing program of any new subscriber
Sonitrol Product(s), hereinafter "New Products", during the
term of this Agreement.  Within ninety (90) days of the receipt
of such notice from SONITROL CORPORATION, FRANCHISEE shall, by
written notice, agree or decline to purchase and distribute
such New Products in accordance with the prescribed marketing
plan.

6.2  If FRANCHISEE agrees to purchase and distribute such New
Products in accordance and consistent with SONITROL
CORPORATION's prescribed marketing plan, then said New Products
shall be considered a Sonitrol Product within the provisions of
this Agreement.  If FRANCHISEE declines to so purchase and
distribute such New Products, then such New Products shall be
excluded from the definition of Sonitrol Product hereunder and
SONITROL CORPORATION and/or DISTRIBUTOR shall have the right to
market said New Products within FRANCHISEE's Area of Primary
Responsibility without compensating FRANCHISEE for the same,
and said New Products may bear the "SONITROL" trademark or name.

0643CRev.12/15/92

- 9 -

## SECTION SEVEN

### MINIMUM PURCHASE AND INVENTORY REQUIREMENTS

7.1  At all times during the term of this Agreement, FRANCHISEE agrees and covenants to use its best efforts to fully develop the market for Sonitrol Products and to effect the widest and best possible distribution of Sonitrol Products within its Area of Primary Responsibility and to promote the Sonitrol Product system within FRANCHISEE's Area of Primary Responsibility.

7.2    Recognizing the obligation of FRANCHISEE set forth in Paragraph 7.1 to effect the widest and best possible distribution of Sonitrol Products within the Area of Primary Responsibility granted herein, FRANCHISEE agrees:

7.2.1  To purchase from DISTRIBUTOR for sale and installation only within FRANCHISEE'S Area of Primary Responsibility granted by this Agreement, at a minimum, the following number of Sonitrol Product subscriber systems during the first through the fifth years of operation, beginning with the date specified in Paragraph 7.2.4:

| Year(s) | Cumulative No. of Subscriber Systems |
|---|---|
| One | 36 |
| One-Two | 72 |
| One-Three | 108 |
| One-Four | 144 |
| One-Five | 180 |

Beginning the sixth year and for each year thereafter for the duration of this Agreement, FRANCHISEE shall purchase each year a number of Sonitrol Product subscriber systems for installation within its Area of Primary Responsibility equal to the number of Sonitrol Product subscriber systems required for the fifth year of operation.

7.2.2  During the first through the fifth years of operation, FRANCHISEE shall install at new subscriber account locations within its Area of Primary Responsibility a number of Sonitrol Product subscriber systems equal to the minimum purchase requirements set forth in section 7.2.1. Beginning the sixth year of operation, and for each year thereafter for the duration of this Agreement, FRANCHISEE shall install at new subscriber account locations within its Area of Primary

0643CRev.12/15/92

~ 10 ~

Responsibility a number of Sonitrol Product subscriber systems equal to the minimum purchase requirements for the fifth year of operation. FRANCHISEE shall provide DISTRIBUTOR with monthly reports setting forth the number of Sonitrol subscriber accounts within FRANCHISEE's Area of Primary Responsibility for the preceding month.

7.2.3  To commence business with, and maintain during the first year of operation, an inventory of Sonitrol Product subscriber systems equivalent to two-twelfths of the minimum purchase requirement for that year, and during the second through fifth years an inventory of Sonitrol Product subscriber systems equivalent to two-twelfths of the difference between the cumulative minimum purchase requirement for the pertinent year and the previous year. Thereafter, FRANCHISEE shall maintain an inventory of Sonitrol Product subscriber systems equivalent to two-twelfths of FRANCHISEE'S Sonitrol Product subscriber system purchases for FRANCHISEE'S preceding fiscal year.

7.2.4  To commence sales and marketing efforts of Sonitrol Product subscriber systems within FRANCHISEE'S Area of Primary Responsibility on or before the 1st day of ___June___ 19_95_.

7.2.5  To acquire an adequate facility within FRANCHISEE'S Area of Primary Responsibility, purchase from DISTRIBUTOR and complete installation of Sonitrol Central Station monitoring equipment, and commence monitoring of subscriber accounts from FRANCHISEE'S facility within the Area of Primary Responsibility within ___ months following the date of this Agreement. FRANCHISEE agrees to submit a purchase order for Sonitrol Central Station monitoring equipment in a reasonable time to permit delivery and installation of same prior to the end of the time period specified in this Paragraph. None required as long as Tallahassee is used for monitoring.



7.3  If FRANCHISEE fails to achieve and/or maintain the minimum requirements set forth in this section, then and in that event, and in addition to those rights under Sections Twenty-One and Twenty-Two of this Agreement, DISTRIBUTOR and SONITROL CORPORATION shall have the right, at their option, to establish an additional dealer or dealers within part or all of FRANCHISEE's Area of Primary Responsibility.

0643CRev.12/15/92

-- 11 --

## SECTION EIGHT

### FRANCHISE AND ROYALTY FEES

8.1  In consideration of the grant to FRANCHISEE of the license to use the "SONITROL" trademark and the Sonitrol Product System and the services to be performed by DISTRIBUTOR and SONITROL CORPORATION as set forth in this Agreement, FRANCHISEE agrees to pay to DISTRIBUTOR a non-refundable franchise fee of $ N/A , receipt of which is hereby acknowledged.

8.2  FRANCHISEE agrees to pay DISTRIBUTOR, on or before the tenth (10th) day of each month, a continuing monthly royalty fee calculated at two and one-half percent (2 1/2%) of FRANCHISEE's gross revenue during the preceding calendar month ("Royalty Fee").  The Royalty Fee percentage may be changed by SONITROL CORPORATION upon thirty (30) days written notice to FRANCHISEE, provided that any such change shall not result in more than a one-quarter percent (.25%) increase over the then-existing rate for any twelve (12) month period.  A service fee of one and one-half percent (1 1/2%) per month will be assessed on all past due Royalty Fees.

8.3  The term "Gross Revenue," as used in this section, means the amount of all revenue received by FRANCHISEE from the sale of all products and services, and all income of every kind or nature, whether direct or indirect, received by FRANCHISEE, related to the FRANCHISEE's franchised business which is the subject of this Agreement; provided, however, that the term "Gross Revenues" shall not include any sales taxes or other taxes collected by FRANCHISEE for transmittal to the appropriate taxing authority.

8.4  At the same time a monthly Royalty Fee payment is made pursuant to the terms and conditions of Paragraph 8.2 above, FRANCHISEE shall also submit a monthly statement to DISTRIBUTOR, in the form prescribed by DISTRIBUTOR, setting forth the Gross Revenue of FRANCHISEE for the immediately preceding calendar month.

8.5  SONITROL CORPORATION and/or DISTRIBUTOR shall have the right to audit or cause to be audited the Gross Revenue reports and financial statements delivered to DISTRIBUTOR pursuant to this agreement, and the books, records and sales and income tax returns of the FRANCHISEE, and if the FRANCHISEE is a corporation or partnership, the owners of the FRANCHISEE.  If any audit discloses an understatement of Gross Revenue of the franchise business for any period or periods, the FRANCHISEE, within ten (10) days of receipt of the audit, shall pay DISTRIBUTOR the unpaid amount due on the previous unreported

0643CRev.12/15/92

- 12 -

Gross Revenue, plus interest from the due date at the maximum
rate permitted by law, not to exceed 18% per annum.  In
addition, if an understatement for any period equals 3% or more
of the Gross Revenue of the Franchise Business for the period,
Franchisee shall reimburse SONITROL CORPORATION and/or the
DISTRIBUTOR for the cost of the audit, including without
limitation the charges of any independent accountant and the
reasonable travel expenses, room and board of any persons
employed by SONITROL CORPORATION and/or DISTRIBUTOR to make the
audit.


### SECTION NINE

### ADVERTISING FEES

9.1   FRANCHISEE agrees, upon establishment of a Dealer
Cooperative Advertising Council (hereinafter "Council"), to pay
SONITROL CORPORATION a monthly advertising and sales promotion
contribution to be placed in a Sonitrol Advertising Fund
(hereinafter "Fund").  FRANCHISEE shall pay this contribution
by the tenth (10th) day of each month, and the amount of the
contribution shall be established by SONITROL CORPORATION and
the Council, but in no event will it exceed three percent (3%)
of FRANCHISEE's Gross Revenues from the business which is the
subject of this Agreement for the preceding month.

9.2   The Council will direct all advertising programs, it shall
have discretion over the maintenance and allocation of the
Fund, and the creative concepts, materials and media used in
advertising programs.  The Fund is intended to maximize general
public recognition and acceptance of the "SONITROL" trademark,
and the products and services associated therewith.  SONITROL
CORPORATION and the Council undertake no obligation in
administering the Fund to make expenditures for FRANCHISEE
which are equivalent or proportionate to FRANCHISEE's
contributions, or to ensure that FRANCHISEE benefits directly
or proportionately from the placement of advertising.

9.3   FRANCHISEE agrees that the Fund may be used to meet any
and all costs of maintaining, administering, directing and
preparing national, state or regional advertising materials,
programs and public relations activities.  The Fund shall be
accounted for separately from other funds of SONITROL
CORPORATION by the Council.  SONITROL CORPORATION assumes no
direct or indirect liability or obligation to FRANCHISEE with
respect to the maintenance, direction or administration of the
Fund.

– 13 –

9.4  The term "Gross Revenues," as used in this Section shall
be as defined in sub-paragraph 6.3.


SECTION TEN

DEALER'S BUSINESS PLAN

10.1  FRANCHISEE acknowledges that conformity to the Business
Plan prepared by FRANCHISEE and submitted to SONITROL
CORPORATION and DISTRIBUTOR prior to execution of this
Agreement, which Business Plan is attached hereto and made a
part hereof as Attachment B, is required for the successful
performance by FRANCHISEE of all of the duties and obligations
required to be performed, fulfilled and observed by FRANCHISEE
under this Agreement, and FRANCHISEE agrees to conform to the
Business Plan in the conduct of its business.  FRANCHISEE
hereby certifies that the Business Plan, including FRANCHISEE's
representations contained therein, is true and correct, and
FRANCHISEE acknowledges and understands that SONITROL
CORPORATION and DISTRIBUTOR rely upon FRANCHISEE's Business
Plan in entering into this Agreement.

10.2  FRANCHISEE hereby certifies that the total capitalization
set forth in FRANCHISEE's Business Plan is true and correct,
and that said capitalization is available as of the date first
above written, and FRANCHISEE acknowledges and understands that
SONITROL CORPORATION and DISTRIBUTOR rely upon this
certification by FRANCHISEE in entering into this Agreement.


SECTION ELEVEN

TAXES AND INSURANCE

11.1  FRANCHISEE shall be responsible for paying and shall
discharge all applicable tax liabilities.

11.2  FRANCHISEE shall maintain at its expense insurance
against all types of liability as SONITROL CORPORATION and
DISTRIBUTOR may require, including, but not limited to,
comprehensive general liability insurance (covering premises,
products liability, completed operations, blanket contractual
and personal injury liabilities), errors and omissions
insurance, worker's compensation insurance, and automobile
insurance.  Coverage limits for each type of insurance shall be
in accord with generally accepted and/or statutorily mandated
limits.  In any event, FRANCHISEE shall maintain a minimum
liability limit of not less than One Million Dollars
($1,000,000.00) for each type of insurance for which such

0643CRev.12/15/92

- 14 -

limits are available. FRANCHISEE shall purchase all such
insurance from a responsible and accredited insurer and each
such policy shall include SONITROL CORPORATION and DISTRIBUTOR,
or any of their designated subsidiary or affiliated
corporations, as additional insureds and shall also provide
that such policies may not be cancelled or their coverage
materially changed without thirty (30) days prior written
notice to all named insureds. FRANCHISEE shall provide
SONITROL CORPORATION and DISTRIBUTOR with certificates of
insurance on all policies and evidence that the premiums
therefore have been paid.


## SECTION TWELVE

## PERSONNEL AND BUSINESS APPEARANCE STANDARDS

12.1   FRANCHISEE acknowledges that the successful operation of
FRANCHISEE's business under this Agreement requires
professional management, and FRANCHISEE agrees that the General
Manager or principal operating person (hereinafter "Manager")
of FRANCHISEE shall be a person who is capable of performing on
behalf of the Franchise Business all of the duties and
obligations required to be performed, fulfilled, and observed
by FRANCHISEE under this Agreement.

12.2   FRANCHISEE shall keep all records on the installation,
servicing and monitoring of its customers' accounts in the
strictest confidence and will permit only the necessary minimum
of trusted employees to have access to such records.
FRANCHISEE shall maintain all of its records and files in a
secure manner so as to safeguard its records and files from
exposure to criminal elements or any other unauthorized
person(s). SONITROL CORPORATION and DISTRIBUTOR shall have the
right to review FRANCHISEE's security procedures and may
require reasonable changes in such procedures to increase
FRANCHISEE's security.

12.3   FRANCHISEE shall adhere to high ethical standards and
shall conduct its business in strict compliance with all
applicable laws, regulations, ordinances and requirements of
any federal, state, county, municipal or other government, and
shall obtain all necessary permits, licenses, or other consents
for the operation of FRANCHISEE's business.

12.4   FRANCHISEE and its employees shall cooperate with all law
enforcement agencies to the fullest extent compatible with its
duty to customers. However, no duty to customers shall require
FRANCHISEE or its employees to act in violation of the law.


0643CRev.12/15/92

– 15 –

12.5  Recognizing that a favorable business reputation is difficult to achieve and thereafter maintain, and that the goodwill inherent in the "SONITROL" trademark depends upon the identification of the trademark with businesses operated in accordance with high standards of quality, FRANCHISEE agrees:

12.5.1  To keep its business premises, vehicles and furnishings clean, neat and orderly so as to maintain an attractive appearance;

12.5.2  To keep all equipment used in the conduct of the business and its inventory stock clean and in a state of good repair;

12.5.3  To maintain reasonable financial stability and credit standing;

12.5.4  To maintain good customer relations;

12.5.5  To strive to ensure that its employees respond promptly and courteously to all business and servicing inquiries and that its employees are neat and well groomed in personal appearance.

12.6  FRANCHISEE agrees that DISTRIBUTOR and SONITROL CORPORATION may from time to time, during the FRANCHISEE's course of operation, with or without notice, inspect the FRANCHISEE's business premises and operation of business to determine if the business is being operated in accordance with the standards and procedures set forth herein and in the franchise standards and procedures manual.  SONITROL CORPORATION and DISTRIBUTOR shall report to FRANCHISEE in writing any aspects of FRANCHISEE's operations which are not in conformity with the manual or this Agreement, and FRANCHISEE shall take immediate steps to correct such deficiencies. Failure of the FRANCHISEE to correct any deficiencies within 30 days of receipt of notice of such deficiencies shall constitute a default of this Agreement and the Agreement may be terminated pursuant to Section Twenty-Two.


SECTION THIRTEEN

ACCOUNTING AND RECORDS REQUIREMENTS

13.1  FRANCHISEE shall maintain true and accurate records, reports, accounts, books and data which shall accurately reflect all particulars relating to the Franchise Business in compliance with the standard financial management system prescribed by SONITROL CORPORATION for record keeping;

0643CRev.12/15/92

- 16 -

bookkeeping, accounting and reporting all business and
operation of the Franchise Business, and shall permit SONITROL
CORPORATION's and DISTRIBUTOR's representative to examine and
audit said records, reports, accounts, books and data at all
reasonable times and at SONITROL CORPORATION's and
DISTRIBUTOR's expense.

13.2  The FRANCHISEE shall provide SONITROL CORPORATION and
DISTRIBUTOR with financial statements relating to the Franchise
Business subject to this Agreement, including a profit and loss
statement and balance sheets.  The first financial statement
shall be due six (6) months after the effective date of this
Agreement, and semi-annually thereafter.  Within four (4)
months following the close of each fiscal year, the FRANCHISEE,
at its expense, shall provide to SONITROL CORPORATION and
DISTRIBUTOR a financial statement prepared by an independent
Public Accountant.  The FRANCHISEE shall utilize recognized and
customary accounting procedures.

13.3  FRANCHISEE shall deliver to SONITROL CORPORATION and
DISTRIBUTOR on or before the date of this Agreement a complete
list of its stockholders, (or if FRANCHISEE is a partnership, a
complete list of all its general and/or limited partners) all
of whom shall appear to be of good moral and ethical
character.  In the event a change in the list is proposed under
circumstances where SONITROL CORPORATION or DISTRIBUTOR has the
right to approve the proposed change pursuant to Section
Eighteen of this Agreement, sufficient advance notice shall be
given to SONITROL CORPORATION and DISTRIBUTOR.  This subsection
shall not apply to publicly held corporations having more than
thirty (30) stockholders.

13.4  SONITROL CORPORATION and DISTRIBUTOR hereby covenant not
to reveal or communicate designated confidential and
proprietary information of FRANCHISEE to any third party
without the prior consent and authorization of FRANCHISEE and
shall use its best efforts to prevent inadvertent disclosure of
such information to any third party, except as may be
appropriate and professionally necessary to FRANCHISEE's and/or
SONITROL CORPORATION's and DISTRIBUTOR's accountants, attorneys
and banking sources, or as required by law.


SECTION FOURTEEN

CHAIN ACCOUNTS AND NATIONAL PROGRAMS

14.1  Within such guidelines as are established and promulgated
from time to time by SONITROL CORPORATION, FRANCHISEE shall use
its best efforts to secure chain accounts which have their

0643CRev.12/15/92

- 17 -

national or regional headquarters located in FRANCHISEE's Area of Primary Responsibility. FRANCHISEE shall provide to SONITROL CORPORATION reports relating to securing said chain accounts.

14.2  Upon request by SONITROL CORPORATION, FRANCHISEE agrees to promote, lease, sell, install and service chain accounts within FRANCHISEE's Area of Primary Responsibility. If FRANCHISEE declines to promote, lease, sell, install and service chain accounts upon request by SONITROL CORPORATION, FRANCHISEE agrees that SONITROL CORPORATION, or DISTRIBUTOR, shall have the right to promote, lease, sell, install and service chain accounts within FRANCHISEE's Area of Primary Responsibility without compensating FRANCHISEE for same.

14.3  Unless precluded by law, FRANCHISEE agrees to promote programs promulgated at the national level by SONITROL CORPORATION.

## SECTION FIFTEEN

### PROTECTION OF TRADE SECRETS

.15.1  To further the business relationship among SONITROL CORPORATION, DISTRIBUTOR and FRANCHISEE, it is necessary and desirable that from time to time SONITROL CORPORATION and approved manufacturers or suppliers will disclose to FRANCHISEE confidential information relating to the Sonitrol Product System, hereinafter referred to as "Sonitrol Information." Sonitrol Information includes, but is not limited to:  current, future, or proposed Sonitrol Products; plans, technologies, operating and monitoring techniques relating to such products; plans and information relating to the marketing, merchandising and sale of Sonitrol Products; and the processes, services, policies, procedures, records and accounts of SONITROL CORPORATION; excluding only that information which is generally known throughout the industry or which is within the public domain.

15.2  FRANCHISEE recognizes that Sonitrol Information is a valuable trade secret. FRANCHISEE shall only reveal Sonitrol Information to such of its personnel who need to know the information for the effective operation of the Franchise Business and who sign a statement as provided in Section Four above. FRANCHISEE hereby covenants not to otherwise reveal or communicate Sonitrol Information, directly or through its employees, agents or representatives, to any third party, which shall include any parent, subsidiary or affiliated corporation of FRANCHISEE, without the prior written consent and

0543CRev.12/15/92

- 18 -

authorization of SONITROL CORPORATION and shall use its best
efforts to prevent inadvertent disclosure of Sonitrol
Information to any third party, except as may be appropriate
and professionally necessary to FRANCHISEE's accountants,
attorneys and banking sources, or as required by law.

15.3   FRANCHISEE further agrees that the aforesaid duty not to
disclose Sonitrol Information shall continue during the term of
this Agreement and any successor agreements, and following the
expiration or termination of this Agreement and any successor
agreements.  Sonitrol information shall be returned upon the
termination or expiration of this Agreement as provided in
subparagraph 22.3.3 of this Agreement.


### SECTION SIXTEEN

### RELATIONSHIP OF PARTIES

16.1   FRANCHISEE is and shall be considered an independent
contractor with entire control and direction of its business
and operations, subject only to the conditions and obligations
established by this Agreement.  No agency, employment or
partnership is created by this Agreement.  FRANCHISEE's
business is separate and apart from any that may be operated by
SONITROL CORPORATION or DISTRIBUTOR.

16.2   No party to this Agreement shall make any representation
tending to create apparent agency, employment, or partnership.
No party will have authority to act for the other in any manner
to create obligations or debts binding on the other, and no
party will be responsible for any obligations or expenses
whatsoever of the other except as otherwise set forth herein.
Neither FRANCHISEE, its employees, nor any person performing
any duties or engaged in any work at the request of FRANCHISEE
shall be deemed an employee or agent of SONITROL CORPORATION or
DISTRIBUTOR.

16.3   In all public records and in its relationship with other
persons, on letterheads and business forms, and invoices, in
accordance with SONITROL CORPORATION's prescribed standards and
procedures which FRANCHISEE agrees to follow, FRANCHISEE shall
indicate its independent ownership of said business, and that
it is a franchise of SONITROL CORPORATION by using the
following language:  "An Independent Sonitrol Dealer
Franchise."  Further, FRANCHISEE agrees to exhibit on its
premises in a place designated by SONITROL CORPORATION, a
notification that it is an independent Sonitrol dealer
franchise.

0643CRev.12/15/92

~ 19 ~

## SECTION SEVENTEEN

### INDEMNITY OF SONITROL CORPORATION AND DISTRIBUTOR

17.1  FRANCHISEE agrees, during and after the term of this Agreement, to indemnify and hold SONITROL CORPORATION and DISTRIBUTOR harmless from and against, and promptly reimburse them for, any and all loss, damage, liability and attorneys' fees and other costs and expenses incurred by SONITROL CORPORATION or DISTRIBUTOR as the result of any violation of this Agreement by, or any act of omission or commission on the part of FRANCHISEE, or any of its agents, servants, or employees, and from all claims, demands, losses, costs, damages, suits, judgments, penalties, expenses, and liabilities of any kind or nature whatsoever arising directly or indirectly out of or in connection with the operation of FRANCHISEE's business.

## SECTION EIGHTEEN

### ASSIGNMENT OF AGREEMENT

18.1  FRANCHISEE shall not assign, sell, transfer, or encumber this Agreement, or any interest in FRANCHISEE (including merger into any other entity and the sale, transfer or disposition of any stock or partnership interest in FRANCHISEE) affecting control of FRANCHISEE, without the prior written consent and approval of SONITROL CORPORATION and DISTRIBUTOR, which consent and approval shall not be unreasonably withheld.  Control is defined as any assignment, sale or transfer which, whether as a single transfer or when aggregated with other transfers that occurred after the date of this Agreement, results in a transfer of twenty-five percent (25%) or more of the ownership interest in FRANCHISEE.

18.2  Written consent and approval of SONITROL CORPORATION and DISTRIBUTOR shall not be required for:

18.2.1  Assignments, sales or transfers of FRANCHISEE's stock, or FRANCHISEE's interest under this Agreement, to a corporation or partnership which owns over seventy-five percent (75%) of each class of voting stock (if a corporation) of FRANCHISEE at the time of the execution of this Agreement, or is the controlling general partner (if a partnership) of FRANCHISEE at the time of the execution of this Agreement, provided FRANCHISEE gives SONITROL CORPORATION and DISTRIBUTOR written notice of such assignment, sale or transfer.

0643CRev.12/15/92

- 20 -

18.2.2  Assignment of this Agreement to a bank or other Financial institution as collateral for a loan provided that FRANCHISEE and the bank or financial institution enter into an agreement identical in form and substance to the one attached hereto as Attachment C, and such agreement is approved by SONITROL CORPORATION and DISTRIBUTOR.

18.2.3  Assignments, sales or transfers of publicly traded stock of FRANCHISEE previously registered under federal securities laws, provided: (a) the transferor owns less than twenty-five percent (25%) of each class of the stock of FRANCHISEE prior to the transfer, and (b) after the transfer the transferee will own less than twenty-five percent (25%) of each class of the stock of FRANCHISEE.

18.3  No such assignment, sale or transfer of interest under this Agreement shall be approved, by SONITROL CORPORATION and DISTRIBUTOR unless FRANCHISEE and its proposed assignee meet the following requirements:

18.3.1  The assignee must be acceptable to SONITROL CORPORATION and DISTRIBUTOR by the standards then utilized in considering applicants for new dealerships;

18.3.2  There shall be no existing default in the performance or observance of any of FRANCHISEE's obligations under this Agreement or any other agreement with SONITROL CORPORATION, its subsidiary or affiliated corporations, or DISTRIBUTOR;

18.3.3  FRANCHISEE shall have settled all outstanding accounts with SONITROL CORPORATION, its subsidiary and affiliated corporations, and DISTRIBUTOR;

18.3.4  FRANCHISEE shall execute a mutual general release, in the form of Attachment A, for any and all claims each party shall have against the other, its parent, subsidiary and affiliated corporations, and their officers, directors, agents and employees, excepting only such claims as are precluded from waiver by applicable law.

18.3.5  FRANCHISEE's assignee must execute all agreements that SONITROL CORPORATION and DISTRIBUTOR then require of new dealers; and

18.3.6  FRANCHISEE's assignee shall have paid a transfer fee of Seven Thousand Five Hundred Dollars ($7,500.00),

- 21 -

$2,500 of which sum shall have been paid to SONITROL
CORPORATION and the remainder to DISTRIBUTOR.

18.4   Since this Agreement limits the transferability of
corporate stock shares, if FRANCHISEE is now incorporated or
incorporates during the term of this Agreement, all
certificates of shares issued by FRANCHISEE shall have endorsed
thereon an appropriate legend to conform with state law,
referring to this Agreement by date and name of parties hereto,
and stating, "Transfer of this certificate is limited," or
similar statutorially required language.  This legend shall not
be required on certificates representing publicly traded stock
of FRANCHISEE previously registered under the federal
securities laws and representing less than twenty-five percent
(25%) of each class of stock of FRANCHISEE.

18.5   SONITROL CORPORATION shall have the right to assign this
Agreement and the rights hereunder to any person, firm,
association, or corporation, provided that such transferee
shall agree in writing to assume all obligations undertaken by
SONITROL CORPORATION herein.

SECTION NINETEEN

RIGHT OF FIRST REFUSAL

19.1   If at any time during the term of this Agreement,
FRANCHISEE or any stockholder, partner or limited partner of
FRANCHISEE, desires to sell or transfer, in whole or in part,
any of its interest under this Agreement or any interest in
FRANCHISEE, whether FRANCHISEE is a partnership, corporation,
firm or other association for profit, FRANCHISEE, or any
selling stockholder, general partner or limited partner of
FRANCHISEE, shall first offer such interest to SONITROL
CORPORATION and DISTRIBUTOR by delivering to SONITROL
CORPORATION and DISTRIBUTOR a written offer setting forth the
interest to be sold, the purchase price and terms of payment,
together with all other documentation relating or incidental to
such offer to sell.

19.2   During the sixty (60) day period following receipt of
such offer to sell, and related documentation from FRANCHISEE,
SONITROL CORPORATION and/or DISTRIBUTOR shall have the right
and option to purchase or otherwise acquire such of
FRANCHISEE's interest under this Agreement, and all such other
property and rights of FRANCHISEE as may be included in such
offer to purchase, upon the same terms and conditions as set
forth in such offer to sell.  DISTRIBUTOR shall have the first
right and option to purchase, and shall exercise such right and

0643CRev.12/15/92

- 22 -

option by giving written notice to FRANCHISEE and SONITROL
CORPORATION within thirty (30) days after receipt of such offer
to sell and related documentation from FRANCHISEE. If
DISTRIBUTOR does not give written notice within the time period
set forth herein or declines in writing before the end of such
time period to exercise its purchase option, then SONITROL
CORPORATION shall have the sole right and option to purchase or
otherwise acquire FRANCHISEE's interest under the foregoing
terms and conditions within the subsequent thirty (30) day
period, and may exercise such right and option by giving
written notice to FRANCHISEE and DISTRIBUTOR.

19.3  If SONITROL CORPORATION and DISTRIBUTOR do not accept
such offer within the time period for acceptance set forth in
paragraph 19.2 above, subject to the provisions of Section
Eighteen, FRANCHISEE shall be free to sell the interest covered
by such written offer to any other person or entity on the
condition that:  (i) such interest is sold during the one
hundred twenty (120) day period immediately following the
expiration of such sixty (60) day period above; and (ii) such
sale is consummated at a price greater than or equal to that
set forth in such written offer and otherwise on the terms
(including payment terms) set forth in such offer.  The
interest subject of the right of first refusal is interest
relating only to the subject matter of this Agreement.

19.4  If SONITROL CORPORATION and DISTRIBUTOR do not receive
such offer to sell and related documentation as set forth in
paragraph 19.1 above, then SONITROL CORPORATION and DISTRIBUTOR
shall have no obligation to consider or consent to the
prospective transfer or assignment of FRANCHISEE's interest(s)
under Section Eighteen of this Agreement.

19.5  SONITROL CORPORATION and DISTRIBUTOR's right of first
refusal granted in subsections 19.1, 19.2, and 19.3 above shall
apply only to assignments, sales or transfers over which
SONITROL CORPORATION and DISTRIBUTOR have a right of consent
and approval under Section Eighteen of this Agreement.


SECTION TWENTY

INCAPACITY OF DEALER'S PRINCIPAL PARTY

20.1  If FRANCHISEE is a natural person, in the event of death
or incapacity of FRANCHISEE the rights and obligations of
FRANCHISEE will pass to FRANCHISEE's executors,
representatives, administrators, heirs or legatees ("Legatee")
capable of performing all of the duties and obligations under
the Sonitrol Dealer Franchise Agreement.  Legatee must within


0643CRev.12/15/92

- 23 -

thirty (30) days of such death or incapacity assume all of
FRANCHISEE's obligations under this Agreement in writing.  If
SONITROL CORPORATION or DISTRIBUTOR determines in good faith
that Legatee is not capable of performing all the duties and
obligations of FRANCHISEE under the Sonitrol Dealer Franchise
Agreement, it will notify Legatee in writing and Legatee shall
have sixty (60) days from the date of notification to locate a
bona fide purchaser and notify SONITROL CORPORATION and
DISTRIBUTOR of the identity of the purchaser and terms of the
purchase.  If Legatee fails to find a purchaser, or SONITROL
CORPORATION or DISTRIBUTOR determines in good faith that the
proposed purchaser is not capable of assuming the duties and
obligations of FRANCHISEE under this Agreement, SONITROL
CORPORATION and DISTRIBUTOR may purchase the FRANCHISEE's
business at fair market value.  DISTRIBUTOR shall have the
first right and option to purchase and shall exercise such
right and option by giving written notice to the Legatee and
SONITROL CORPORATION within thirty (30) days following the
sixty (60) day time period.  IF DISTRIBUTOR does not give
written notice of its intent to purchase the dealership at fair
market value within such time period, then SONITROL CORPORATION
shall have the sole right to purchase the FRANCHISEE's business
at fair market value.

20.2  Transfers of this Agreement, or any interest in
FRANCHISEE, due to the death or incapacity of any natural
person with an ownership interest in FRANCHISEE shall be
governed by, and subject to the assignment and right of first
refusal provisions of Sections Eighteen and Nineteen of this
Agreement.

### SECTION TWENTY-ONE

### DEFAULT

21.1  Any of the following events shall constitute a default of
this Agreement:

21.1.1  An affirmative act of insolvency by FRANCHISEE,
an assignment for the benefit of creditors or similar
disposition of assets by FRANCHISEE, or the filing by
FRANCHISEE of a petition under any bankruptcy,
reorganization, insolvency, or moratorium law, or any
law for the relief of, or relating to, debtors;

21.1.2  The filing of any involuntary petition under any
bankruptcy statute against FRANCHISEE, or the
appointment of any receiver or trustee to take
possession of property of FRANCHISEE, unless such
petition or appointment is set

0643CRev.12/15/92

- 24 -

aside or withdrawn or ceases to be in effect within
thirty (30) days of such filing or appointment;

21.1.3  FRANCHISEE voluntarily abandons the Franchise
Business by ceasing sales, installation, servicing and
monitoring operations for five (5) consecutive days, or
any shorter period after which it is not unreasonable
under the facts and circumstances for SONITROL
CORPORATION and/or DISTRIBUTOR to conclude that the
Franchisee does not intend to continue to operate the
Franchise Business as provided in this Agreement and in
Sonitrol's specifications and standards, unless such
failure to operate is due to fire, flood, earthquake or
other similar causes beyond the Franchisee's control.

21.1.4  A final judgment, or the unappealed decision of
a regulatory officer or agency, that results in
temporary or permanent suspension of any permit or
license, possession of which is a prerequisite to
operation of FRANCHISEE's business under applicable law;

21.1.5  A criminal conviction of FRANCHISEE, or an
officer, director, partner or principal of FRANCHISEE,
for a felony offense, or any other crime or act which
would substantially impair the goodwill associated with
the "SONITROL" trademark, trade name, or the Sonitrol
Product System;

21.1.6  FRANCHISEE's failure, refusal, or neglect to pay
to DISTRIBUTOR or SONITROL CORPORATION, its subsidiary
or affiliated corporations, any monies owing to
DISTRIBUTOR or SONITROL CORPORATION, its subsidiary or
affiliated corporations, under the terms of this
Agreement or any other agreement, on the date such
monies are due or within such terms as may be
established by SONITROL CORPORATION or DISTRIBUTOR;

21.1.7  Any material misrepresentation or false
statement by FRANCHISEE, or made at FRANCHISEE's behest,
to SONITROL CORPORATION or DISTRIBUTOR, in connection
with the execution of this Agreement or in any
accounting, report or plan that FRANCHISEE submits to
SONITROL CORPORATION, its subsidiary or affiliated
corporations, or DISTRIBUTOR pursuant to this Agreement;

21.1.8  The use in FRANCHISEE's business of any products
or equipment in violation of the provisions of Section
Five of this Agreement;

0643CRev.12/15/92

- 25 -

21.1.9  Any purported assignment, sale, transfer, or encumbrance by FRANCHISEE of any of its rights, obligations or interests under this Agreement without having received the prior written consent of SONITROL CORPORATION and DISTRIBUTOR;

21.1.10  FRANCHISEE's failure to comply with, perform or observe any other lawful obligation imposed upon it under this Agreement; or repeatedly failing to comply with, perform or observe the lawful provisions of this Agreement whether or not such noncompliance is corrected after notice. "Repeatedly" as used in this sub-paragraph shall mean two (2) or more times within any twelve month period.

21.2  Upon default FRANCHISEE agrees to pay all costs and expenses, including reasonable attorney's fees, incurred by SONITROL CORPORATION and DISTRIBUTOR in collecting all monies owed by FRANCHISEE or in obtaining other relief to enforce the provisions of this Agreement.

SECTION TWENTY-TWO

TERMINATION

22.1  If conditions exist that constitute a default of this Agreement by one or more of the sub-paragraphs of Section Twenty-One, in addition to all other remedies available to SONITROL CORPORATION and DISTRIBUTOR at law or in equity, all rights granted to FRANCHISEE under this Agreement shall terminate effective upon thirty (30) days written notice to FRANCHISEE (or longer if required by applicable law), provided that FRANCHISEE fails to cure all acts of default within thirty (30) days of such notice.  FRANCHISEE acknowledges and agrees that termination due to a default under one or more of the subsections of Section Twenty-One shall be deemed to be for good cause.  Unless required by applicable law, the cure provisions under this Section shall not apply to a default pursuant to Subsections 21.1.1, 21.1.2, 21.1.3, 21.1.5 and 21.1.10 above for FRANCHISEE repeatedly failing to comply with the provisions of this Agreement.

22.2  Upon any lawful termination or expiration of this Agreement or any successor agreements hereto, FRANCHISEE shall:

22.2.1  Immediately cease to use in any manner whatsoever the "SONITROL" trademark and trade name and any forms, slogans, signs, symbols or devices used in connection with the operation of a Sonitrol franchise or the Sonitrol Product System; and will:

0643CRev.12/15/92

- 26 -

(a)  Upon request by SONITROL CORPORATION and/or
DISTRIBUTOR, mail to all customers a registered
letter, approved by SONITROL CORPORATION, return
receipt requested to DISTRIBUTOR, informing the
customer that the Dealer is no longer authorized
or licensed to operate under the trademark
"SONITROL," and requesting that the customer
remove all signs, decals or other materials
bearing the trademark "SONITROL" from its
premises.  The letter should also notify the
customer that its customer contract must be
replaced.  This mailing will be completed within
thirty (30) days from the date of the termination
of this Agreement.

(b)  Within six (6) months from the date of the
termination of this Agreement, remove all signs,
decals, or other materials bearing the trademark
"SONITROL" from the FRANCHISEE's premises, and
replace all Sonitrol contracts so that they are no
longer in force or effect, and will certify by
letter to SONITROL CORPORATION and DISTRIBUTOR
that this has been completed.

22.2.2  Promptly pay to SONITROL CORPORATION, its
subsidiary or affiliated corporations, and DISTRIBUTOR
all sums owing from FRANCHISEE to SONITROL CORPORATION,
its subsidiary or affiliated corporations, and
DISTRIBUTOR, including all damages, costs and expenses,
including reasonable attorneys' fees incurred by
SONITROL CORPORATION, its subsidiary or affiliated
corporations, and DISTRIBUTOR by reason of any default
of this Agreement by FRANCHISEE, and further including
all costs and expenses, including reasonable attorneys'
fees, incurred by SONITROL CORPORATION, or its
subsidiary or affiliated corporations, and DISTRIBUTOR
in obtaining injunctive or other relief to enforce the
provisions of this Agreement;

22.2.3  FRANCHISEE agrees, upon termination or
expiration of the franchise, to immediately return to
SONITROL CORPORATION all copies of all manuals and other
proprietary information that have been loaned to it by
SONITROL CORPORATION.

22.2.4  Upon termination or expiration of the Franchise
Agreement, FRANCHISEE shall expeditiously take such
action as may be required to properly cancel all assumed
name or equivalent registrations relating to the use of
the "SONITROL" trademark, to notify the telephone

0643CRev.12/15/92

– 27 –

company and all listing agencies of the termination or expiration of the Franchisee's right to use the telephone numbers and classified and other directory listings associated with the "SONITROL" trademark and to authorize the telephone company and listing agencies to transfer to SONITROL CORPORATION all such telephone numbers and directory listings. The Franchisee acknowledges that, as between SONITROL CORPORATION and the Franchisee, SONITROL CORPORATION has the sole right to and interest in all telephone numbers and directory listings associated with the "SONITROL" trademark. The Franchisee authorizes SONITROL CORPORATION, and appoints SONITROL CORPORATION its attorney-in-fact, to direct the telephone company and all listing agencies to transfer telephone numbers and listings to SONITROL CORPORATION.

22.2.5  Continue to comply with and be bound by all applicable provisions of this Agreement which survive termination, including, but not limited to, the noncompetition, and protection of trade secrets provisions.

22.3  Upon any termination or expiration of this Agreement or any successor agreements, DISTRIBUTOR shall have the right to repurchase from FRANCHISEE all unused, Current Sonitrol Products of FRANCHISEE at the cost to FRANCHISEE for such products, and all stocks of supplies and materials bearing the "SONITROL" trademark, paying the cost to FRANCHISEE for such products, supplies and materials. In connection with any such repurchase, DISTRIBUTOR shall be entitled, but not required, to offset against the repurchase price any monies owed by FRANCHISEE to DISTRIBUTOR pursuant to the terms of this Agreement or any other agreement between the parties. For purposes of this subparagraph 22.3, "Current Sonitrol Products" shall mean those products being manufactured by SONITROL CORPORATION, or its subsidiaries, at the time of termination or expiration of this Agreement.

22.4  In the event or as a result of termination by SONITROL CORPORATION or DISTRIBUTOR pursuant to the terms of this Agreement, SONITROL CORPORATION and DISTRIBUTOR shall not be liable to FRANCHISEE for any damages, including consequential or incidental, and including but not limited to profits on sales or anticipated sales, on account of expenditures, investments, or commitments made in connection therewith, in connection with the establishment, development, and maintenance of the business or goodwill of FRANCHISEE. Such termination shall not, however, affect the rights or liabilities of said parties with respect to products previously sold hereunder or with respect to any indebtedness then owing by either party to the other.

0643CRev.12/15/92

- 28 -

22.5  Dealer agrees to pay all costs, including, but not limited to, attorneys' fees, incurred by SONITROL CORPORATION or DISTRIBUTOR in enforcing and/or completing any of the above provisions not completed by FRANCHISEE on a timely basis.


SECTION TWENTY-THREE

RESTRICTION ON EFFECT OF WAIVER

23.1  No delay or omission to exercise a right, power, or remedy accorded to SONITROL CORPORATION or DISTRIBUTOR on any breach or default of FRANCHISEE under this Agreement shall impair any such right, power, or remedy of SONITROL CORPORATION or DISTRIBUTOR, and it shall not be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.

23.2  Any waiver, permit, consent, or approval of any kind or character on the part of SONITROL CORPORATION or DISTRIBUTOR of any breach or default under this Agreement, or any waiver on the part of SONITROL CORPORATION or DISTRIBUTOR of any provision or condition of this Agreement must be in writing and shall be effective only to the extent specifically allowed by such writing.

23.3  All remedies afforded to SONITROL CORPORATION or DISTRIBUTOR, either under this Agreement or by law or otherwise, shall be cumulative and not alternative.


SECTION TWENTY-FOUR

COVENANT NOT TO COMPETE

24.1  Other than pursuant to this Agreement, during the initial term and any extended term of this Agreement, FRANCHISEE (which shall include all entities owned in whole or in part by FRANCHISEE, all parent corporations of FRANCHISEE, all shareholders of FRANCHISEE, and if FRANCHISEE is a partnership, all general and limited partners of FRANCHISEE), agrees that it will not directly or indirectly own, manage, operate, join, control, or participate in the ownership, management, operation or control of, or be connected in any manner with, any business or engage in any business involving the manufacture, promotion, sale, or delivery of security products and services.

0643CRev.12/15/92

– 29 –

24.2  For a period of two (2) years following the voluntary or involuntary termination of this Agreement, FRANCHISEE (which includes all entities owned in whole or in part by FRANCHISEE, all parent corporations of FRANCHISEE, all shareholders of FRANCHISEE, and if FRANCHISEE is a partnership, all general and limited partners of FRANCHISEE) agrees that it will not directly or indirectly own, manage, operate, join, control, or participate in the ownership, management, operation or control of, or be connected in any manner with, any business or engage in any business involving the manufacture, promotion, sale, or delivery of security products and services.  This restriction shall apply to competing businesses operating (a) within FRANCHISEE's Area of Primary Responsibility, and (b) within a geographical area of One Hundred (100) miles from the boundary of FRANCHISEE's Area of Primary Responsibility.  The foregoing restrictions (a) and (b) are distinct and severable.

24.3  During and after the term of this Agreement FRANCHISEE will not disclose or reveal to anyone, directly or indirectly, any confidential information or trade secrets of the business of Sonitrol, including customer lists, personnel information, and secret processes or other technical data, which FRANCHISEE has obtained as a Sonitrol dealer.

24.4  FRANCHISEE further covenants and agrees that during the term of this Agreement and any successor agreement, FRANCHISEE shall not divert or attempt to divert any business of or any customers of the franchised business to any other competing business, by direct or indirect inducement or otherwise.

24.5  FRANCHISEE acknowledges that any violation of the covenants set forth in paragraphs 24.1, 24.2, 24.3 and 24.4 above would cause SONITROL CORPORATION and DISTRIBUTOR to suffer irreparable damage, the exact amount of which may not be reasonably or accurately ascertained, and that the resulting damage to the confidential nature of the Sonitrol Product System could not be adequately compensated by money damages, and therefore, in the event of such violation occurring, FRANCHISEE hereby agrees and consents to the issuance of an injunction, without posting of a bond, restraining FRANCHISEE or anyone acting for or on behalf of FRANCHISEE from violating said covenants or any of them.

24.6  FRANCHISEE shall require all of FRANCHISEE's directors and officers to agree in writing, in a form agreeable to SONITROL CORPORATION, to be bound by the terms and conditions of this Section Twenty-Four.

0643CRev.12/15/92

~ 30 ~

SECTION TWENTY-FIVE

FORCE MAJEURE

25.1  Neither FRANCHISEE, DISTRIBUTOR nor SONITROL CORPORATION shall be held liable for failure to comply with any of the terms of this Agreement when such failure has been caused solely by force majeure, fire, labor dispute, strike, war, insurrection, riot, flood, government restrictions, or act of God beyond the control and without fault on the part of the party involved, provided such party uses due diligence to remedy such default.

SECTION TWENTY-SIX

CONSEQUENTIAL DAMAGES

26.1  None of the parties shall be liable to the other for consequential or incidental damages including but not limited to profits or sales or anticipated sales or on account of expenditure, investments, or commitments made in connection therewith, or in connection with the establishment, development and maintenance of the business or goodwill of the other.

SECTION TWENTY-SEVEN

NOTICES

27.1  Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or mailed, by certified mail - return receipt requested, to the respective parties at the addresses listed below unless and until a different address has been designated by written notice:

| SONITROL CORPORATION: | SONITROL CORPORATION 1800 Diagonal Road, Suite 180 Alexandria, Virginia 22314 |
| DISTRIBUTOR: | SONITROL SOUTHEAST, INC. 520 Howard Court Clearwater, Florida 34616 |
| FRANCHISEE: | SONITROL OF TALLAHASSEE, INC. 1136 Thomasville Road Tallahassee, Florida 32303 |

0643CRev.12/15/92

- 31 -

## SECTION TWENTY-EIGHT

### EFFECTIVE DATE

28.1  This Agreement shall be effective and binding as of the date first written above when it has been accepted and executed by SONITROL CORPORATION at SONITROL CORPORATION's corporate headquarters in Alexandria, Virginia.

## SECTION TWENTY-NINE

### GOVERNING LAW

29.1  This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia, except to the extent that said laws directly conflict with and are incompatible with the laws, if any, of the jurisdiction where FRANCHISEE is located which specifically address and control franchisor-franchisee relationships and which are applicable to this Agreement.

## SECTION THIRTY

### CONSENT TO JURISDICTION

30.1  FRANCHISEE consents to jurisdiction in Virginia for the purposes of any legal proceeding relating to this Agreement or the Sonitrol business granted by this Agreement.

## SECTION THIRTY-ONE

### EFFECT OF PARTIAL INVALIDITY

31.1  The invalidity of any portion of this Agreement will not and shall not be deemed to effect the validity of any other provision.  In the event that any provision of this Agreement is invalid, the parties agree that the remaining provisions shall be deemed to be in full force and effect as if they had been executed by both parties subsequent to expungement of the invalid provision.

## SECTION THIRTY-TWO

### DESCRIPTIVE HEADINGS

32.1  The descriptive headings of the various sections of this Agreement are provided solely for ease of reference and shall not be considered in construing or interpreting this Agreement.
0643CRev.12/15/92

– 32 –

SECTION THIRTY-THREE

ENTIRE AGREEMENT

33.1  This instrument contains the entire agreement of the parties.  No representations, inducements, promises, negotiations or agreements, oral or otherwise, not embodied herein shall be of any force or effect and shall not affect the construction of the rights and obligations of the parties created hereby.  This Agreement may be modified only in writing, signed by the parties hereto, and stating that said writing is a modification or amendment hereto.  Any other attempts at modification, whether by course of conduct, oral or informally written agreement or whatever, shall be of no effect or force.

SECTION THIRTY-FOUR

ACKNOWLEDGEMENT BY FRANCHISEE

34.1  FRANCHISEE acknowledges that it has entered into this Agreement after making an independent investigation and evaluation of SONITROL CORPORATION's and DISTRIBUTOR's operations and the business venture contemplated herein, and not as a result of representations or projections as to the venture's potential for success, if any have been quoted, used illustratively or implied to FRANCHISEE.  Neither SONITROL CORPORATION nor DISTRIBUTOR makes any representation, guaranty, or warranty, express or implied, as to the potential success of the business venture contemplated herein.  FRANCHISEE acknowledges that it has previously received a blank copy of this Agreement in time to afford ample opportunity to seek legal counsel and to review the provisions contained herein.  FRANCHISEE acknowledges that successful operation of this franchise will depend upon its best efforts, capabilities, management, and efficient operation, as well as local marketing conditions and other factors.

IN WITNESS WHEREOF, each undersigned individual in individual and/or representative capacity, having read each and every provision herein and agreeing to the same, and to this contract as a whole, have hereby executed this Agreement as warranty of the capacity in which they have signed this Agreement and as evidence of their understanding and ratification hereof, as a wholly voluntary act.

0643CRev.12/15/92

– 33 –

Dated at Alexandria, Virginia, _____June 1_____, 1995

SONITROL CORPORATION

ATTEST:

By: _____
     Christopher W. Cobb
     Chief Executive Officer

By: _Martha Escobar_
         Secretary

FRANCHISEE:

SONITROL OF TALLAHASSEE, INC.

By: _____
     Doug W. Smith
Title: _____President_____

ATTEST:

By: _Curt E Ward_
         Secretary

DISTRIBUTOR:

SONITROL SOUTHEAST, INC.

By: _____
     John J. Rooney
Title: _____President_____

ATTEST:

By: _Mary C Snyder_
         Secretary

0643CRev.12/15/92

ATTACHMENT A

MUTUAL GENERAL RELEASE

This Mutual General Release is made this ____ day
of _____, 19____, by and between SONITROL
CORPORATION and _____,
a _____ corporation, hereinafter "DEALER."

WHEREAS, SONITROL CORPORATION  and DEALER entered into
a Sonitrol Dealer Franchise Agreement dated_____,
19____, for a term of ten years, and

WHEREAS, DEALER wishes to renew its right to use the
"SONITROL" trademark, to purchase and market Sonitrol products,
and use the Sonitrol Product System for an additional ten year
period, and

WHEREAS, SONITROL CORPORATION and DEALER desire to
execute this Mutual General Release pursuant to the terms of
Section 2.2.4 of the aforesaid Sonitrol Dealer Franchise
Agreement, thereby releasing all claims thereunder and in
connection therewith.

NOW, THEREFORE, in consideration of the above premises
and the mutual agreements herein set forth, and for good and
valuable consideration, acknowledged and received, the parties
hereto agree as follows:

Each party hereto irrevocably and unconditionally
releases and discharges the other party hereto and each of its
owners, stockholders, predecessors, assigns, agents, directors,
officers, employees, representatives, attorneys, subsidiaries,
affiliates (and agents, directors, officers, employees,
representatives and attorneys of subsidiaries and affiliates)
and all persons acting by, through, under, or in concert with
any of them (collectively "Releasees") or any of them, from all
actions, causes of action, suits, debts, liens, contracts,
agreements, obligations, promises, liabilities, claims, rights,
demands, damages, controversies, losses, costs, and expenses of
any nature whatsoever, known or unknown, suspected or
unsuspected, fixed or contingent, which each party now has,
owns, holds, claims to have, claims to own, or claims to hold,
or any time heretofore had, owned, held, claimed to have,
claimed to own, or claimed to hold, against each or any of the
Releasees, including without limitation any and all such claims
which arose from, were based upon or related to the Sonitrol

2253C
11/17/87

-2-

Dealer Franchise Agreement between the parties dated
_____, 19____except that this Release shall not
apply to any pending bona fide dispute between the parties
hereto, provided the party making such claim shall notify the
other party thereof at least sixty (60) days prior to the end
of the term of the Sonitrol Dealer Franchise Agreement.

IN WITNESS WHEREOF, this Agreement has been executed
as of the day first above written.

SONITROL CORPORATION

ATTEST:

                                        By:_____
_____               Title:_____
Secretary


DEALER:

SONITROL OF _____

ATTEST:

                                        By:_____
_____               Title:_____
Secretary

2253C
11/17/87

ATTACHMENT C

## ASSIGNMENT OF SONITROL
## DEALER FRANCHISE AGREEMENT

THIS ASSIGNMENT of the Sonitrol Dealer Franchise Agreement entered into as of this _____ day of _____, 19____, by and between _____ (hereinafter referred to as "Borrower"), and _____ (hereinafter referred to as "Lender").

### W I T N E S S E T H :

WHEREAS, by Sonitrol Dealer Franchise Agreement dated the _____ day of _____, 19____, between Sonitrol Corporation and Borrower, Borrower has certain dealer rights more fully described in said Agreement (a copy of which is attached), and

WHEREAS, the Lender has agreed to make a loan to the Borrower (the "Loan") and requires as a condition that the Borrower agree to collaterally assign its right, title and interest in said dealership to the Lender with the right to reassign same, but only with the prior written consent and approval of Sonitrol Corporation, which consent and approval shall not be unreasonably withheld.

NOW, THEREFORE, in consideration of the premises and the covenants contained herein and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto do agree as follows:

1.  Borrower hereby assigns to Lender all of Borrower's right, title and interest in and to the Sonitrol Dealer Franchise Agreement; provided that the foregoing assignment is a collateral assignment and the Lender agrees not to take any action to assert its rights to make the assignment hereunder absolute unless and until there shall occur and continue to exist an event of default as provided in the agreement relating to the Loan.  Lender shall have the right to reassign such interest only upon the written consent of Sonitrol Corporation pursuant to the terms and conditions of Paragraph 5 below.

2.  Upon the occurrence and during the continuance of an event of default by Borrower under the agreement relating to the Loan, if the Lender chooses to exercise the option of making absolute the aforesaid assignment of all right, title

2784s/vm
09/15/87

- 2 -

and interest to the Sonitrol Dealer Franchise Agreement, the
Lender shall forthwith provide Sonitrol Corporation written
notice that the Borrower is in default and that the Lender
intends to exercise its rights with respect to the Sonitrol
Dealer Franchise Agreement as set forth herein.  The exercise
by Lender of its rights hereunder shall not be effective until
such written notice is received by Sonitrol Corporation.  In
the event Lender exercises its right to make the assignment
granted herein absolute, the Lender shall be deemed to be
assigned all the terms, covenants and obligations of the
dealership and have all the rights and privileges pertinent
thereto and obligations thereunder under the terms and
conditions of the Sonitrol Dealer Franchise Agreement.

   3.   So long as the Lender shall not have exercised
its option to make the assignment herein absolute under the
foregoing provisions, the Lender shall not be liable for any
obligations of the Borrower in connection with the Sonitrol
Dealer Franchise Agreement.

   4.   Sonitrol Corporation shall not be deemed, by
virtue of its consent to the Assignment contained in Paragraph
1 above, to have waived any of its rights, including without
limitation its rights of termination, under the terms and
conditions of the Dealer Franchise Agreement.

   5.   The Lender shall not reassign any right, title
and interest it may acquire pursuant to this Agreement without
the prior written consent and approval of Sonitrol
Corporation.  Lender's assignee must be acceptable to Sonitrol
Corporation by the standards then utilized in considering
applications for new franchises, and Lender agrees to provide
Sonitrol Corporation with information concerning the assignee
requested by Sonitrol Corporation for use by Sonitrol
Corporation in considering the reassignment.  Sonitrol
Corporation's consent and approval for reassignment by the
Lender shall not be unreasonably withheld.  Nothing in this
Paragraph 5 shall be deemed to waive Sonitrol Corporation's
right of first refusal pursuant to the terms and conditions of
the Sonitrol Dealer Franchise Agreement.

   6.   Sonitrol Corporation agrees to send to Lender a
copy of any notice of default given by Sonitrol Corporation to
Borrower under the Sonitrol Dealer Franchise Agreement.  Such
copy shall be sent to Lender at the following address:

2784s/vm
09/15/87

- 3 -

7.    Any notice required by this Agreement to Sonitrol Corporation shall be addressed as follows:

        Sonitrol Corporation
        424 North Washington Street
        Alexandria, Virginia  22314.

8.    This Agreement may not be modified or amended except upon written consent of all parties hereto.

    IN WITNESS WHEREOF, the parties hereto set their hands and seals the day and year first above written.

                                    BORROWER:

ATTEST:                             _____

                                    By:_____

_____            Title:_____
Secretary

                                    LENDER:

ATTEST:                             _____

                                    By:_____

_____            Title:_____
Secretary

CONSENT:

SONITROL CORPORATION

By:_____

2784s/vm
09/15/87

**EXHIBIT E**

 

To:
From: Bruce <bja@singler-law.com>
Subject:
Cc:
Bcc:
Attachments:

**From:** Groenemann, Gregg [mailto:GGroenemann@sonitrol.com]
**Sent:** Friday, March 28, 2008 7:58 AM
**To:** DL All Branch Sales; DL All Branch CSMs; DL All Dealers; DL All Branch CSMs; DL Managers Ops
**Cc:** DL All Executive; Baird, Brian; Lethen, John
**Subject:** Cardinal Health Important Notice



## Attention Sonitrol Sales Team & Franchise Network

**We have just finalized a national account contract with Cardinal Health HQ. This is a great win for Sonitrol!**

However, as part of the agreement their management has asked us to send out a note to all Sonitrol branches announcing that all local contact and negotiations need to cease. They are requiring that all engagement with any Cardinal Health office worldwide be centralized through our National Accounts group. They are sending out a notice internally as well so if you have any active negotiations underway, please notify Brian Baird immediately.

The local offices no longer have the authority to sign a contract with your branch so please do not put Sonitrol or Cardinal in an awkward situation by attempting to push something through. It is important that we honor this customer requirement.

Thanks again for your support on this very important account and congratulations to Brian Baird!

---

**Gregg Groenemann | Vice President, Marketing & Franchise Operations | Sonitrol Corporation | E:** ggroenemann@sonitrol.com <mailto:ggroenemann@sonitrol.com>
1000 Westlakes Drive, Ste 150 | Berwyn, PA 19312 | P: 610.725.9705 | C: 610.202.5157 | F: 817.837.3901

—— End of Forwarded Message

1  BRUCE NAPELL (State Bar No. 115116)
   BRYAN W. DILLON (State Bar No. 203052)
2  SINGLER, NAPELL & DILLON, LLP
   127 S. Main Street
3  Sebastopol, California 95472
   Telephone: (707) 823-8719
4  Facsimile:  (707) 823-8737

5  Attorneys for S.N.D.A.

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF SAN FRANCISCO

10

11 | S.N.D.A., a California non-profit mutual        | CASE NO.: CGC- 08 - 474387

12 | benefit corporation,                            | UNLIMITED JURISDICTION

13 |             Plaintiff,

14 |                                                 | EX PARTE APPLICATION FOR
   |                                                 | TEMPORARY RESTRAINING ORDER
   |      v.                                         | AND ORDER TO SHOW CAUSE;
15 |                                                 | MEMORANDUM OF POINTS AND
   | SONITROL CORPORATION, a Delaware                | AUTHORITIES
16 | corporation; and DOES 1-50,
   |                                                 | Date:  April 25, 2008
17 |                                                 | Time:  11:00 am
   |             Defendants.                         | Dept.: 301
18

19

20

21       Plaintiff S.N.D.A., ("SNDA") hereby applies for a temporary order restraining Defendant

22 Sonitrol Corporation ("Sonitrol"), and its agents and employees, and any other person or entity

23 acting on its behalf from:

24       1. Disclosing any of SNDA's members trade secrets or confidential
         information to any third party without the SNDA member's express
25       written authorization;

26       2. Directly or indirectly selling, servicing or otherwise contracting with
         national accounts operating in whole or part within the territories which
27       SNDA's members are authorized to conduct business under their
         respective franchise agreements unless: i)  the terms of the national
28       account permit the member to receive not less than a 20% return on
         investment; and, ii)  an SNDA member rejects such national account
         after a reasonable time to consider such terms;

                                                    1

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

3. Interfering with the customer contracts and relationships of SNDA's Members by requiring any of SNDA's members to terminate their contractual relationship with any customer in order that Sonitrol can service the customer pursuant to a National Account or Key Account agreement, or to otherwise cease marketing or pursuing business leads with any customer within the territory authorized in their respective franchise agreements.

and for an order requiring Sonitrol to show cause why a preliminary injunction should not issue to restrain defendants and their agents and employees from those same acts to be restrained while this action is pending.

This application is made on the grounds that SNDA's Members are entitled to the relief demanded to the extent of restraining the commission or the continuance of the acts complained of, specifically: (1) Sonitrol is engaged in the process of selling its business, during which it will disclose a great deal of confidential information to third parties, among them direct competitors; (2) The disclosure of their customers' confidential information (the members' trade secrets) will produce great or irreparable injury to SNDA's Members, in that their customers will lose confidence in their ability to provide security; (3) Sonitrol's National Accounts program discriminates against and harms SNDA's Members by requiring them to choose between participating in National Account contracts at commercially unreasonable prices or allowing Sonitrol or its contractors to operate within the Member's territories; (4) Pecuniary compensation for the damages disclosure of confidential information and enforcement of the current National Account policy would inflict on SNDA's Members would be extremely difficult if not impossible to calculate, seeking damages would result in a multiplicity of lawsuits and would not afford SNDA's Members with adequate legal relief; (5) There is a likelihood of success on the merits; and (6) the balancing of equities clearly favors SNDA, because Sonitrol will suffer no harm if the restraining order is granted whereas SNDA's members will suffer immeasurable harm if it is not.

This application will be based on, the Declarations of Doug Curtiss and Jim Buckalew; the Certificate Re Notice; the attached Memorandum of Points and Authorities; the pleadings,

//

//

//

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719 (707) 823-8737 Fax

APPLICATION FOR TRO

documents, records, and files in this action; and such oral and documentary evidence as may be
presented at the hearing.

Dated: April 25, 2008

SINGLER, NAPELL & DILLON, LLP

By_____
Bruce Napell
Attorneys for CDANA, Inc.

366/04/0006.7

APPLICATION FOR TRO

1

POINTS AND AUTHORITIES

2

3    TABLE OF CONTENTS                                                                      ii

4    TABLE OF AUTHORITIES                                                                   iii

5    I  INTRODUCTION                                                                        1

6    II  LEGAL ARGUMENT

7    A. SNDA can establish all of the elements necessary for a TRO                          1

8         1.  SNDA's members face the imminent threat of disclosure of their                2

9         confidential information and trade secrets.

10             a)  SNDA is likely to succeed on the merits.                                  4

11             b)  The balance of harms favors SNDA.                                         5

12        2.  Sonitrol is attempting to impose commercially unreasonable                     6

13        terms on franchisees through its National Account policy.

14             a) Sonitrol discriminates against franchisees by imposing                     7

15        commercially unreasonable terms through National Accounts.

16             b)  SNDA is likely to succeed on the merits.                                  9

17             c)  The balance of harms favors SNDA.                                         11

18        3.  SNDA's members face imminent threat of disruption of their                     12

19        relationships with specific customers.

20             a)  Sonitrol Interferes with Franchisees' Contracts with                      12

21        Existing Customers.

22             b)  SNDA is likely to succeed on the merits.                                  13

23             c)  The balance of harms favors SNDA.                                         13

24    III  CONCLUSION                                                                        14

25

26

27

28

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

**TABLE OF AUTHORITIES**

Cases

Acree v. General Motors Acceptance Corp. (2001) 92 Cal.App.4th 385          8

Auto-Chlor System of Minnesota, Inc. v. JohnsonDiversey, 328 F.Supp.2d          10

    980 (D.Minn, 2004)

Balboa Ins. Co. v. Trans Global Equities (1990) 218 Cal.App.3d 1327          13

Biosense Webster, Inc. v. Superior Court (2006) 135 Cal.App.4th 827          1

San Diego Water Co. v. Pacific Coast Steamship Co. (1894) 101 Cal. 216          2

Carl A. Haas Auto. Imports, Inc. v. Lola Cars Ltd., 933 F.Supp. 1381          9

(N.D.Ill.,1996)

Chico Feminist Women's Health Center v. Scully (1989) 208 Cal.App.3d 230          2

Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654          8

Foothill Properties v. Lyon/Copley Corona Associates, L.P. (1996) 46          8

Cal.App.4th 1542

GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.          13

(2000) 83 Cal.App.4th 409

Greenly v. Cooper (1978) 77 Ca.App.3d 382          4

Millennium Corporate Solutions v. Peckinpaugh (2005) 126 Cal.App.4th 352          13

Reeves v. Hanlon (2004) 33 Cal.4th 1140          12

Surgical Sales Corp. v. Heyer Schulte Neurocare, L.P., 1999 WL 500020, *3          9

(E.D.Pa.)

TK Power, Inc. v. Textron, Inc., 433 F.Supp.2d 1058 (N.D.Cal.,2006)          8

Whyte v. Schlage Lock Co. (2002) 101 Cal.App.4th 1443          2, 4

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-3737 Fax

113/09/0006.7a

APPLICATION FOR TRO

Statutes

    Civil Code

§ 3426.1                                        2


    Code of Civil Procedure at

§ 526                                           2

§ 527                                           2

§ 2009                                          2


    Commercial Code

§ 1304                                          8


Illinois Statutes

810 ILCS 5/2-102                                8


Treatises

Rest.2d Contracts, § 205                        8

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA  95472
(707) 823-8719  (707) 823-8737 Fax

113/09/0006.7a                                          APPLICATION FOR TRO

I.    **INTRODUCTION**

Defendant Sonitrol Corporation ("Sonitrol") owns the Sonitrol trademarks. It franchises other business owners to provide goods and services under such trademarks, and directly operates businesses which provide goods and services under such trademarks. The defining characteristics of Sonitrol security systems are in-place electronic detectors which respond to sound (referred to as impact activated audio detection devices), and centralized monitoring of detection devices located at numerous customers' premises. When a break-in is detected and verified by the central monitor, a report is made to the local police. Approximately 55% of customers in the Sonitrol system are serviced by independent franchisees, and 45% by Sonitrol owned locations. SNDA is a trade association whose members ("Members") collectively own more than 105 Sonitrol franchises throughout the United States and Canada. [Declaration of Doug Curtiss ("Curtiss") ¶ 3]. SNDA filed this lawsuit on behalf of its Members in its representative capacity as a trade association.

SNDA's members operate under a number of different forms of franchise agreement, dating in some cases back to the early 1970s. With one exception, the differences between the various forms of franchise agreement are not relevant to the relief sought in this motion.

SNDA is requesting an order restraining Sonitrol from disclosing its franchisees' or their customers' confidential information or trade secrets without the franchisees' authorization; from requiring franchisees to choose between commercially unreasonable pricing and terms or allowing Sonitrol to service customers in their territories under the National Accounts program; from interfering with franchisees' existing contracts with customers through the National Accounts Program; and from offering National Accounts for locations in the territories of franchisees with exclusive territories.

II.    **LEGAL ARGUMENT**

"The law is well settled that the decision to grant [a restraining order] rests in the sound discretion of the trial court." *Biosense Webster, Inc. v. Superior Court* (2006) 135 Cal.App.4th 827, 834 (citation omitted). Generally, the complaint must set forth a cause of action for injunctive relief to support issuance of a TRO or Preliminary Injunction. [See CAL. CIV. PRO.

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

1   CODE 526(a)(1)–(2)]. In this case, SNDA has requested injunctive relief in its Complaint. (See

2   Complaint, 5th, 7th and 8th causes of action, pp. 15 - 22).

3        A TRO may be issued to prohibit acts complained of, pending a hearing on whether the

4   plaintiff is entitled to a preliminary injunction. (See CAL. CIV. PRO. CODE. § 527; *San Diego*

5   *Water Co. v. Pacific Coast Steamship Co.* (1894) 101 Cal. 216, 218). It may be issued *ex parte*

6   and a bond is not essential; it is of short duration, normally expiring at the time of the hearing on

7   the preliminary injunction. (See *Chico Feminist Women's Health Center v. Scully* (1989) 208

8   Cal.App.3d 230, 237, fn 1). The facts necessary to support the TRO and OSC regarding

9   Preliminary Injunction are properly presented by affidavits or declarations. (See CAL. CIV. PRO.

10  CODE §§ 527 and 2009).

11       The legal requirements for granting a TRO are similar to or the same as those for granting

12  a preliminary injunction: the "interrelated factors" of the moving party's likelihood of success on

13  the merits, and the relative interim harm to the parties from the issuance or nonissuance of the

14  injunction." *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1449.

15       The Uniform Trade Secrets Act defines "trade secret" as "information... that: [¶] (1)

16  Derives independent economic value, actual or potential, from not being generally known to the

17  public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) is

18  the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Civil

19  Code, § 3426.1(d).

20  **A.  SNDA can establish all of the elements necessary for a TRO**

21       **1.   SNDA's members face the imminent threat of disclosure of their
             confidential information and trade secrets.**

22

23       As providers of security services, Sonitrol franchisees are necessarily privy to confidential

24  information regarding their customers, including their names, addresses, contact information,

25  hours of operation, the physical layout of their facilities, and the design of their security systems.

26  The customers expect the security company to keep this information confidential, and indeed,

27  maintaining the confidentiality of such information is vital to successfully providing security

28  service. In addition, the identity of a Sonitrol franchisee's customers, as well as specific

    information about each customer, is that franchisee's trade secret. Independent of the concern

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719 (707) 823-8737 Fax

2

1    about the customers' security, possession of such information gives the franchisee a competitive

2    advantage over other security providers. [Curtiss ¶ 4].

3         When a Sonitrol franchisee enters into a contract with a customer, it is required to provide

4    information about the customer to Sonitrol. Since 2001, Sonitrol has provided an internet service

5    which allows franchisees and their customers to access customer information on-line.

6    "MySonitrol.com" and "MySonitrol.net" (collectively the "Internet Sites"), provide Sonitrol

7    access to franchisees' and their customers' confidential information and trade secrets. The

8    information on the Internet Sites is provided by franchisees and customers pursuant to a Web Site

9    Agreement and a Privacy Policy which under ordinary circumstances prohibit Sonitrol from

10   disclosing such information. Although, as the owner of the Sonitrol brand and system, Sonitrol

11   ordinarily benefits from maintaining the information's confidentiality, Sonitrol is currently

12   seeking to sell its business. The sale process has proceeded to the point where potential buyers are

13   performing their "due diligence" and investigating Sonitrol. Competitors in the security industry

14   are among the potential purchasers. [Curtiss ¶ 5, 8, 9].

15        As part of the process of marketing itself, Sonitrol is currently, or will soon be, permitting

16   potential buyers access to information concerning its business. Because a significant portion of

17   the business is related to the Sonitrol Internet Sites, it is likely that potential purchasers will be

18   granted access to the Internet Sites. In reviewing the workings of the Internet Sites, potential

19   purchasers will necessarily receive access to franchisees' and their customers' confidential

20   information and trade secrets.

21        SNDA members make efforts to maintain the secrecy of their customer information. They

22   implement non-disclosure policies, and require their employees to enter into non-disclosure

23   agreements. The information members and their customers put on the Internet Sites is password

24   protected and encrypted, so that only the member, the customer and Sonitrol have access. [Curtiss,

25   ¶ 7]. Sonitrol's Franchisee Web Site Agreement includes Sonitrol's agreement not to disclose

26   that information to third parties "without advanced written permission except to consultants,

27   attorneys or others who have signed a non-disclosure agreement." [See Web Site Agreement, ¶ 3,

28   Curtiss Ex. A.]. In the ordinary course of business, SNDA's members are satisfied that Sonitrol

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-4737 Fax

3

1    has no incentive to disclose their confidential information or trade secrets, particularly to

2    competitors.  However, Sonitrol's search for a buyer is not the ordinary course of business.

3    Sonitrol's motives do not coincide with those of the franchisees, rather its incentive will be to

4    provide whatever information a potential buyer may request, regardless if the potential buyer is

5    also a competitor. [Curtiss ¶ 9].   Where the parties' interests diverge, the contractual requirement

6    that Sonitrol obtain the franchisee's written approval before disclosing its confidential information

7    to a third party should be strictly enforced.   Dealers are not party to any agreement Sonitrol may

8    have with these bidders, and has no way to protect themselves, or their customers' information

9    unless Sonitrol is prohibited from disclosing in the first place.

10            a)   SNDA is likely to succeed on the merits.

11        Revealing this information will damage SNDA's members in two ways:  First, granting

12    access to this information to any third party threatens Sonitrol's and its franchisees' reputations for

13    reliability and trustworthiness, which can damage their relationships with current customers and

14    make it more difficult to attract new customers.  Second, some of Sonitrol's direct competitors are

15    among the potential purchasers.  Granting competitors access to the Confidential Information will

16    enable them to target SNDA's members' customers more effectively, thus reducing the

17    competitive advantage the members have created through their investment in those relationships.

18    [Curtiss ¶ 4].  "A list of subscribers of a service, built up by ingenuity, time, labor and expense of

19    the owner over a period of many years is... part of the good will of his business...."  *Greenly v.*

20    *Cooper* (1978) 77 Ca.App.3d 382, 392.

21        The court's inherent power to grant injunctive relief, is codified in the Code of Civil

22    Procedure at  §§ 526 and 527.  In addition, courts are given the specific authority to enjoin the

23    misappropriation of trade secrets under the Uniform Trade Secrets Act.  Civil Code § 3426.2(a)

24    provides that an injunction may be issued to enjoin the "[a]ctual or threatened misappropriation"

25    of a trade secret."  Subsection (c) provides that the court may order "affirmative acts to protect a

26    trade secret."  "Injunctions in the area of trade secrets are governed by the principles applicable to

27    injunctions in general."  *Whyte v. Schlage Lock Co.* (2002)  101 Cal.App.4th 1443, 1449.

28

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

4

1   Because SNDA's members face the danger of imminent disclosure of their trade secrets

2   and confidential information, and because injunctive relief to prevent such disclosure is statutorily

3   provided, SNDA is likely to prevail on the merits and obtain an injunction prohibiting such

4   disclosure.

5                                   b)  The balance of harms favors SNDA.

6        SNDA's members are Sonitrol franchisees.  The nature of franchising is that the franchisee

7   is dependant on the franchised business, while the franchisor has wider options.  For example, in

8   the Sonitrol system, Sonitrol's franchisees are required to purchase Sonitrol branded equipment

9   from Sonitrol, thus Sonitrol can charge a non-competitive price, because franchisees cannot buy

10  from alternative suppliers.  In addition, most Sonitrol franchisees also pay a royalty to Sonitrol on

11  their revenues, including on the sale of Sonitrol branded equipment to their customer.  Thus, so

12  long as Sonitrol franchisees have gross revenues, Sonitrol makes money.  On the other hand,

13  franchisees whose gross revenues are insufficient to cover their costs are losing money, while

14  remaining responsible to pay royalties to Sonitrol.  The point being that franchisees (SNDA

15  members) are much more sensitive to market fluctuations than Sonitrol.  Franchisees who remain

16  in business purchase equipment from Sonitrol and pay Sonitrol royalties.  Nonetheless, a decline in

17  the franchisee's business will result in a loss of profitability.  [Curtiss ¶16]

18       Thus, any harm resulting from Sonitrol's disclosure of franchisees' and their customers'

19  confidential information to its potential purchasers will fall disproportionately on the franchisees.

20  Their relationships with their customers will suffer, due to a decrease in trust; their vulnerability to

21  competition from alternate security service providers will increase if competitors can use the

22  confidential information to target their specific customers, or to price their services.  Furthermore,

23  the type of harm threatened cannot be easily remedied, once confidential information has been

24  shared, the bell cannot be un-rung.  As discussed above, the mere act of disclosure threatens to

25  create mistrust between franchisees and their customers; in addition, disclosure to competitors

26  threatens to give the competitors an unfair advantage - knowledge of franchisees' systems and

27  customers greater than the knowledge franchisees have of the competitors' systems.

28

113/09/0006.7a                                                              APPLICATION FOR TRO

SIGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719   (707) 823-8737 Fax

1    It is unclear that Sonitrol would suffer any harm from the requested prohibition.

2    Disclosure of information concerning its system without disclosure of confidential information

3    identifiably linked to franchisees and their customers should be sufficient. If it is not sufficient,

4    Sonitrol has the option of disclosing such information for customers of its non-franchised,

5    company owned locations. In addition, if a potential purchaser requires franchisees' information,

6    Sonitrol can request the franchisees' approval, and offer necessary safeguards in exchange.

7        Because SNDA is likely to succeed on the merits, and because the balance of harms greatly

8    favors SNDA, its request for a TRO prohibiting Sonitrol from disclosing franchisees' and their

9    customers' trade secrets and confidential information should be granted.

10        2.    **Sonitrol is attempting to impose commercially unreasonable terms on franchisees through its National Account policy.**

11

12        Sonitrol franchise agreements provide for exclusive territories or "Areas of Primary

13    Responsibility" ("APR") within which franchisees may offer Sonitrol products and services.[2]

14    Later franchise agreements also provide that Sonitrol may establish National Account or Key

15    Account programs, under which Sonitrol contracts to provide security service for a single

16    customer with multiple locations in various territories. Under National Account contracts Sonitrol

17    establishes the prices for sale and installation of monitoring equipment and for ongoing

18    monitoring, but the prices and terms of the National Account agreements are generally

19    unfavorable to the franchisees. Franchisees are offered a dubious "option:" Provide the National

20    Account with equipment and services at the prices Sonitrol specifies, or refuse to participate in the

21    account. If the franchisee refuses, Sonitrol will sell and install the equipment itself or authorize

22    another to do so, and provide monitoring from its own Central Monitoring Stations. [Declaration

23    of Jim Buckalew ("Buckalew"), ¶ 4 – 5]

24        Sonitrol profits under all scenarios, whether: 1) the franchisee contracts with a customer;

25    2) when the franchisee agrees to participate in a National Account contract; or, 3) if the franchisee

26    declines to participate in the contract. Sonitrol's standard markup on products it sells to its

27    _____
[2] Pre 1980s franchise agreements provide for exclusive territories. Later agreements provide for
28    APRs, and include the language allowing Sonitrol conditional access to customers within the
     APR.

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

1    franchisees is 100%. Sonitrol franchisees also pay a royalty on their gross revenues (including

2    from sale and installation of equipment and monitoring - whether under an independent or

3    National Account contract). In addition, franchisees who agree to participate in National Account

4    contracts pay Sonitrol a 13% up front, non-refundable commission on the value of the agreement.

5    [Buckalew ¶ 6]

6              a)      Sonitrol discriminates against franchisees by imposing
                       commercially unreasonable terms through National
7                      Accounts.

8            The National Account prices agreed to by Sonitrol are almost always lower than the prices

9    individual franchisees would charge to local customers. Sonitrol has even offered the sale and

10   installation of equipment with all payment over time – although if the franchisee opts to

11   participate and install the equipment it still has to purchase it from Sonitrol at the regular price and

12   payment terms. [Buckalew ¶ 5]

13           When Sonitrol agrees to National Account pricing below the price which SNDA's

14   members would ordinarily charge for the same products and service, Sonitrol is setting

15   commercially unreasonable prices and breaching the covenant of good faith and fair dealing

16   inherent in the franchise agreements, as well as the covenant of good faith and fair dealing under

17   the Uniform Commercial Code. Franchisees lose money on agreement for the sale and installation

18   of equipment with less than a 20% rate of return. [Curtiss ¶ 15; Buckalew ¶¶ 4 – 7]. Sonitrol's

19   commercially unreasonable pricing discriminates against SNDA members in favor of Sonitrol, by

20   forcing the franchisees to choose between accepting an unprofitable agreement or allowing

21   Sonitrol or its contractors to offer sales and service within their territories or APRs.

22           Allowing Sonitrol to service accounts in a franchisee's APR harms the franchisee in

23   several ways. First, it means that there are at least two different Sonitrol monitoring stations

24   serving the same territory. Sonitrol distinguishes itself from other security services because its

25   sonic monitoring permits the Central Station Operator to determine whether the alarm was caused

26   by a break-in or a non-threatening event. When a Sonitrol Monitor calls in a "verified" alarm, the

27   police respond within minutes, as opposed to much longer response time for a non-verified alarm.

28   Local police do not distinguish between different Sonitrol Central Stations, so if the non-local

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

7

1    Station monitoring a National Account does not perform up to the standards of the local SNDA

2    member, the local police will begin to discount all reports from "Sonitrol." Thus, the SNDA

3    member loses control over its local reputation and its relationship with the local police. [Curtiss ¶

4    19].

5        Sonitrol's cut-rate National Account pricing is commercially unreasonable, and violates

6    the covenant of good faith and fair dealing imposed in every contract (including the franchise

7    agreements) as well as the covenant of good faith and fair dealing imposed by the Uniform

8    Commercial Code as adopted by the states in which all SNDA's U.S. members operate.

9        "'Every contract imposes upon each party a duty of good faith and fair dealing in its

10   performance and its enforcement.' (Rest.2d Contracts, § 205.)". *Acree v. General Motors

11   *Acceptance Corp.* (2001) 92 Cal.App.4th 385, 393, also citing *Foley v. Interactive Data Corp.*

12   (1988) 47 Cal.3d 654.  The covenant of good faith "requires neither party do anything which will

13   deprive the other of the benefits of the agreement... Depending on the circumstances, that duty

14   may go no farther than to act in a commercially reasonable manner." *Foothill Properties v.

15   *Lyon/Copley Corona Associates, L.P.* (1996) 46 Cal.App.4th 1542, 1551.  Furthermore, the

16   Uniform Commercial Code specifies that every contract to which it applies "imposes an obligation

17   of good faith in its performance and enforcement." See e.g., Cal. Commercial Code § 1304.  The

18   also UCC includes the specific requirement that when an agreement includes an open price term,

19   the party with the discretion to set the price be reasonable and set in good faith.  See e.g., Cal.

20   Commercial Code § 2305.

21

22        The UCC applies to "transactions in goods." Cal Comm.Code
        Section 2102 ....  The UCC does not apply to transactions involving
23      service. Complications arise when the transaction involves both goods
        and services. The courts have held application of the UCC in these
24      instances turns on the "essence" of the agreement.  The court discerns
        what is the predominant factor–whether the thrust is the rendition of
25      service with goods incidentally involved or whether the transaction is a
        sale of goods with labor incidentally involved.  *TK Power, Inc. v.
26      Textron, Inc.*, 433 F.Supp.2d 1058, 1061 (N.D.Cal.,2006) [citations
        omitted].

27   Courts generally hold that distributorships (which in many cases are also franchises) are governed

28   by the UCC. "Art. 2 governs 'transactions in goods' (810 ILCS 5/2-102), and distributorships are

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719   (707) 823-3737 Fax

8

1    generally held to fall within the ambit of that language...." *Carl A. Haas Auto. Imports, Inc. v.*

2    *Lola Cars Ltd.*, 933 F.Supp. 1381 (N.D.Ill.,1996). See also *Surgical Sales Corp. v. Heyer Schulte*

3    *Neurocare, L.P.*, 1999 WL 500020, *3 (E.D.Pa.). The sale of goods predominates in the Sonitrol

4    franchise system. Franchisees are required to purchase and re-sell Sonitrol detection equipment

5    from Sonitrol or its designated suppliers, and every customer contract necessarily requires the

6    purchase and installation of Sonitrol equipment. [See ¶¶ 7 and 10 of Curtiss Ex. C and §§ 5.1 and

7    5.3 of Curtiss Ex. D]. Thus, UCC's general obligation of good faith, as well as its specific good

8    faith pricing requirement, both apply to Sonitrol's relationship with its franchisees.

9          **b) SNDA is likely to succeed on the merits.**

10      Sonitrol must exercise its discretion to set the terms of National Account contracts in good

11    faith, and not set commercially unreasonable prices. Sonitrol has violated this duty in setting the

12    terms of its recent National Account agreement with the Briad Restaurant Group (T.G.I.Friday's).

13    Under the terms of that agreement, sale and installation of the detection equipment will not be

14    charged up front, but will be financed over 60 months for $83 per month. Accepting these terms

15    would be a hardship for SNDA's members because:

16      1. They would remain required to purchase the equipment under the regular terms (net 30

17    days) from Sonitrol, which price includes Sonitrol's standard 100% markup;

18      2. Their ordinary charge for such sale and installation would be between $5,500 and

19    $6,000 up front. Since $83 x 60 is less than $5,000, the National Account terms would result in the

20    members making a significantly discounted sale to each T.G.I.Friday's serviced, and then

21    financing the sale at no interest. [Buckalew ¶ 7].[3]

22      3. They would also be required to pay Sonitrol a 13% up front commission on the total

23    contract value.

24    Furthermore, Sonitrol is only offering franchisees two weeks to decide whether to accept or reject

25    the Briad Restaurant Group account. [See e-mail from Shelley Lappert re: two week turnaround,

26    Buckalew Ex. A].

27

28    [3] In at least one case, the SNDA member would also have to install $2,500 worth of conduit. Sonitrol refused to approve increasing the customer's price to cover this cost. [Buckalew ¶ 7].

SINGLER, NAPELL & DILLON, LLP<br>127 S. Main Street, Sebastopol, CA 95472<br>(707) 823-8319 (707) 823-8737 Fax

9

1    Sonitrol's company owned locations would receive effectively different terms from

2    Sonitrol. Sonitrol does not pay itself for equipment or pay the 13% commission; and because

3    Sonitrol's equipment cost (before the 100% markup) is half the price it charges SNDA members,

4    sales to Briad Restaurant Group (even financed at $83 per month for 60 months) represent a profit

5    to Sonitrol. [Curtiss ¶ 15]. Similarly, if Sonitrol uses an independent contractor to install

6    detection equipment at T.G.I.Friday's in a declining dealer's territory, it will pay the contractor a

7    negotiated rate. Thus, Sonitrol's National Account pricing discriminates against SNDA's

8    members by depriving them of a reasonable return if they accept the National Account contract,

9    while providing Sonitrol (via its company owned locations) a profitable return on the same sales,

10    and if Sonitrol does not do the work itself, the third party installer a fair return on the installation.

11    Sonitrol's setting of prices for National Accounts, and specifically for the Briad Restaurant

12    Group's account, is commercially unreasonable, and breaches the contract's covenant of good

13    faith. Not only are the prices set below those independent franchisees would charge individual

14    businesses for the same equipment and service, but they are essentially punitive of SNDA's

15    members because they require the members to finance the discounted price for five years at no

16    interest. [Buckalew ¶ 7]. With regard to an open price term, "for a merchant-seller to fix an open

17    price term in "good faith," it must do two things: (1) be honest in fact, and (2) observe "reasonable

18    commercial standards of fair dealing in the trade." If the merchant fails to do either, it lacks good

19    faith." *Auto-Chlor System of Minnesota, Inc. v. JohnsonDiversey*, 328 F.Supp.2d 980, 1006

20    (D.Minn, 2004).

21    Franchisees are required to choose between agreeing to the commercially unreasonable

22    terms of the National Account Agreement or declining to participate and suffering the intrusion of

23    another Sonitrol provider into their territory. Good faith requires that Sonitrol not deprive SNDA

24    members of the benefit of their franchise agreements. When the terms of a National Account are

25    commercially unreasonable, either choice the franchisee makes deprives it of the benefit of the

26    franchise agreement: either it must provide equipment and service at an unprofitable price, or it

27    must allow another Sonitrol provider into its territory and forfeit any relationship with a potential

28    customer.

SENGLER, NAPELL, & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

10

c)    **The balance of harms favors SNDA.**

As noted above, any agreement to sell, install and monitor a security system entered into by a SNDA member benefits Sonitrol. Sonitrol sells the member the equipment, and receives a profit on the sale. Sonitrol receives a royalty on the member's gross revenues – including the price of the sale of the same equipment to the customer, the member's installation charge, and on the monthly monitoring charge. Thus, unlike members, who are harmed by the commercially unreasonable National Account pricing, Sonitrol benefits both if franchisees participate in National Account agreements and if individual franchisees enter into agreements with the various locations of a national chain.

Conversely, Sonitrol's entry into commercially unreasonable National Account agreements harms franchisees whether or not they agree to participate. If the franchisees participate in the National Account, they not only pay a 13% commission to Sonitrol, but also have to provide equipment and service to the National Account customers at below their regular rates, or even at a loss. If the franchisee does not participate, it loses the possibility of a relationship with potential customers in its APR. In addition, Sonitrol or its contractor will be selling equipment and providing monitoring service to customers in the franchisee's territory. As described above, this both threatens the local franchisee's credibility with local police, but also reduces the good will the franchisee can build up for its business.

The balance of harms clearly tips entirely in SNDA's favor. Even if Sonitrol would suffer some harm if the Briad Restaurant Group and other National Accounts were temporarily restrained, the magnitude of that harm is minimal compared to the harm SNDA's members would suffer if they are required to chose between providing services at a loss, or losing the possibility of contracting with those customers in their APRs for commercially reasonable rates. Equity thus requires that the court grant the TRO and restrain the implementation of any commercially unreasonable National Accounts – where the franchisee cannot obtain at least a 20% return on investment (including the Briad Group National Account), at least until a full hearing on these issues may be held.

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

1    Further, the interests of the customer must also be taken into account. If this TRO is not

2    granted, and Sonitrol contracts with and installs equipment in the customer's locations, this will be

3    difficult to reconcile and potentially leave a customer un-served in and when SNDA prevails on its

4    claims. On the other hand, the worst that could happen if the TRO is granted is that the

5    customer's installation is delayed for a few weeks while the parties' respective rights and

6    obligations are being determined.

7                    3.    SNDA's members face imminent threat of disruption of their
                           relationships with specific customers.
8
9                          a) b. Sonitrol interferes with Franchisees' Contracts with
                               Existing Customers.

10    When Sonitrol enters into a National Account agreement, it insists that franchisees

11    terminate their agreements and direct dealings with its current customers which are part of the

12    system covered by the new National Account contract. If the franchisee wants to continue

13    servicing those locations, it must accept the National Account rate. [Curtiss ¶ 17; Buckalew ¶ 5].

14    For example, Sonitrol recently entered into a National Account contract with Cardinal Health

15    Care. Numerous SNDA members have contracts to provide security monitoring service to

16    individual Cardinal Health Care locations. Sonitrol insists that those individual relationships must

17    be terminated. [Curtiss Ex. E]. Sonitrol's insistence on terminating these agreements constitutes

18    interference with the franchisees' contracts, and will damage them by depriving them of the

19    benefit of their bargain for the remaining terms of the agreements, by forcing them to choose

20    between proceeding under the less profitable (or wholly unprofitable) terms of the National

21    Account agreement or completely ending their relationships with Cardinal Health Care.

22    Furthermore, it will damage the franchisees' goodwill and reputations in their APRs if they are

23    forced to terminate a customer relationship. SNDA therefore seeks a Temporary Restraining

24    Order prohibiting Sonitrol from requiring any SNDA Member to terminate any of its existing

25    contracts or relationships due to a later-enacted National Account contract (including but not

26    limited to Cardinal Health Care).

27    In *Reeves v. Hanlon* (2004) 33 Cal.4th 1140 the Supreme Court held that one who

28    wrongfully induces an at-will employee to leave that employment can be liable for interference

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 821-8719  (707) 821-8737 Fax

                                        12

1   with contract, notwithstanding that the contract was at-will. The basis for liability is the wrongful

2   conduct, and the fact that the contract was terminable at will is irrelevant. Numerous courts have

3   permitted plaintiffs to proceed with claims for injunctive relief to prohibit interference with

4   contractual relations or prospective advantage, see *Millennium Corporate Solutions v.*

5   *Peckinpaugh* (2005) 126 Cal.App.4th 352, *GAB Business Services, Inc. v. Lindsey & Newsom*

6   *Claim Services, Inc.* (2000) 83 Cal.App.4th 409 [overruled on other grounds], see also *Balboa Ins.*

7   *Co. v. Trans Global Equities* (1990) 218 Cal.App.3d 1327 [pointing out that interference with

8   prospective economic advantage, advantageous business relationships [sic], and interference with

9   contractual relations may support an injunction against unfair competition].

   **b)   SNDA is likely to succeed on the merits.**

11      Sonitrol, through the franchise agreements, requires SNDA's members to market the

12  Sonitrol system within their territory. Sonitrol encourages SNDA's members to enter into

13  contracts with businesses in their territories, whether or not the customer is an independent

14  business or part of a chain. Sonitrol profits from SNDA's members' entry into such contracts -

15  they purchase equipment from Sonitrol to install at the customer's location and pay royalties on

16  revenues received. SNDA members also pay Sonitrol other fees, including the monthly fee for

17  participating in the Internet Sites.

18      Sonitrol now seeks to deprive SNDA's members of the benefit of contracts it encouraged

19  them to enter and it has profited from, by transforming them into National Accounts and

20  transferring the relationships from the local franchisees to Sonitrol.

   **c)   The balance of harms favors SNDA.**

22      If Sonitrol is not prohibited from terminating SNDA's member's contracts with the local

23  branches of new National Accounts, including Cardinal Health locations, those members who

24  currently have such contracts will be harmed. They will lose their direct relationship with existing

25  customers, and the promotional value and goodwill associated with it. If they agree to continue

26  serving the account under the terms of the National Account contract, they will receive lower

27  compensation for the same services they already had contracts to provide. If they decline to

28  participate they will lose both any income from their customer, and the entire relationship with the

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

---

1  customer. Finally, if Sonitrol or the subcontractor it uses to service the account performs more

2  poorly than the SNDA member had prior to the transfer, it will damage Sonitrol's reputation --

3  hence the local SNDA member's. [Curtiss ¶¶ 18, 19].

4        The harm to Sonitrol, if any, is far less. If the TRO is granted, Sonitrol will continue to

5  receive the royalties from the SNDA member's servicing their Cardinal Health customers. In the

6  event of upgrades or system expansion, it will receive its profit for the sale of the new or

7  additional equipment. Thus, while SNDA's members and other franchisees will lose income and

8  goodwill, and suffer harm to their reputations, granting the TRO will not harm Sonitrol, as its

9  income stream from the various local customers will continue unchanged.

10       Because SNDA is likely to succeed on the merits, and because the balance of harms greatly

11  favors SNDA, its request for a TRO prohibiting Sonitrol from insisting that local franchisees'

12  existing contracts (including those with Cardinal Health) be terminated should be granted.

13       Sonitrol cannot offer any sales or services in franchisees' exclusive territories

14  **III.   CONCLUSION**

15       For all the reasons stated above, and in the attached declarations, a temporary restraining

16  order should be issued, prohibiting Sonitrol from: 1) disclosing SNDA members confidential

17  information and trade secrets; 2) prohibiting Sonitrol from implementing any National Accounts

18  with commercially unreasonable terms; and, 3) prohibiting Sonitrol from requiring franchisees to

19  terminate existing contracts with local branches of Sonitrol's new National Account customers.

20       Respectfully submitted,

21  Dated: April 25, 2008                     SINGLER, NAPELL & DILLON, LLP

22

23                                            By_____
24                                               Bruce Napell
                                                 Attorneys for SNDA
25

26

27

28

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

113/09/0008.7a                                                APPLICATION FOR TRO

BRUCE NAPELL (State Bar No. 115116)
BRYAN W. DILLON (State Bar No. 203052)
SINGLER, NAPELL & DILLON, LLP
127 S. Main Street
Sebastopol, California 95472
Telephone: (707) 823-8719
Facsimile: (707) 823-8737

Attorneys for S.N.D.A.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| S.N.D.A., a California non-profit mutual benefit corporation,<br><br>      Plaintiff,<br><br>      v.<br><br>SONITROL CORPORATION, a Delaware corporation; and DOES 1-50.<br><br>      Defendants. | CASE NO.: CGC-08-474387<br><br>UNLIMITED JURISDICTION<br><br>[PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY INJUNCTION SHOULD NOT ISSUE<br><br>Date:  April 28, 2008<br>Time:  11:00 am<br>Dept.:  301 |

Having reviewed the documents and evidence submitted, and it appearing to the satisfaction of the court that this is a proper case for granting a temporary restraining order, and that unless the temporary restraining order prayed for in the complaint is granted, great or irreparable injury will result to plaintiff.

IT IS THEREFORE ORDERED that defendant Sonitrol Corporation appear before this court in Department 301, 400 McAllister Street, San Francisco, CA 94102 on _____, 2008 at _____ a.m./p.m. At that time defendant must show cause, if any, why defendant and its agents and employees should not be enjoined during the pendency of this action from:

*366/04//0013.1*

1

TRO

SINGLER, NAPELL & DILLON, LLP
127 S Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

1. Disclosing any of SNDA's members trade secrets or confidential information to any third party without the SNDA member's express written authorization;

2. Directly or indirectly selling, servicing or otherwise contracting with national accounts operating in whole or part within the territories which SNDA's members are authorized to conduct business under their respective franchise agreements unless: i) the terms of the national account permit the member to receive not less than a 20% return on investment; and, ii) an SNDA member rejects such national account after a reasonable time to consider such terms;

3. Interfering with the customer contracts and relationships of SNDA's Members by requiring any of SNDA's members to terminate their contractual relationship with any customer in order that Sonitrol can service the customer pursuant to a National Account or Key Account agreement, or to otherwise cease marketing or pursuing business leads with any customer within the territory authorized in their respective franchise agreements.

The briefing schedule for the OSC shall be as follows:  SNDA shall file and serve its Motion for Preliminary Injunction on or before May 9, 2008.   Sonitrol Corporation shall file and serve an Opposition, if any, on or before _____, 2008.   SNDA shall file and serve its Reply Brief, if any, on or before _____, 2008.  Service on the parties shall be by overnight delivery, or other means that ensures delivery by the next business day.

It is further ordered that, pending hearing of this order to show cause, defendant and its agents and employees are hereby enjoined from:

1. Disclosing any of SNDA's members trade secrets or confidential information to any third party without the SNDA member's express written authorization;

2. Directly or indirectly selling, servicing or otherwise contracting with national accounts operating in whole or part within the territories which SNDA's members are authorized to conduct business under their respective franchise agreements unless: i) the terms of the national account permit the member to receive not less than a 20% return on investment; and, ii) an SNDA member rejects such national account after a reasonable time to consider such terms;

3. Interfering with the customer contracts and relationships of SNDA's Members by requiring any of SNDA's members to terminate their contractual relationship with any customer in order that Sonitrol can service the customer pursuant to a National Account or Key Account agreement, or to otherwise cease marketing or pursuing business leads with any customer within the territory authorized in their respective franchise agreements.

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

2

366-794-0013.1                                          TRO

1    It is further ordered that a copy of the Complaint, along with the underlying Application

2   for Temporary Restraining Order and Order to Show Cause and accompanying documents be

3   served on defendant not later than ___ days from the date of this order, if they have not already

4   been served.

5   _____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

366/04/00/3.1                                    3                                    TRO

1   BRUCE NAPELL (State Bar No. 115116)
2   BRYAN W. DILLON (State Bar No. 203052)
    SINGLER, NAPELL & DILLON, LLP
3   127 S. Main Street
    Sebastopol, California 95472
4   Telephone: (707) 823-8719
    Facsimile: (707) 823-8737

5   Attorneys for S.N.D.A.

6

7

8                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       FOR THE COUNTY OF SAN FRANCISCO

10

11  S.N.D.A., a California non-profit mutual          CASE NO.: CGC-08-474387

12  benefit corporation,                              UNLIMITED JURISDICTION

13              Plaintiff,

14      v.                                            DECLARATION OF JIM BUCKALEW
                                                      IN SUPPORT OF EX PARTE
15  SONITROL CORPORATION, a Delaware                  APPLICATION FOR TEMPORARY
                                                      RESTRAINING ORDER
16  corporation; and DOES 1-50.
                                                      Date:  April 28, 2008
17                                                    Time:  11:00 am
                                                      Dept:  301
18              Defendants.

19  I, Jim Buckalew, declare as follows:

20      1.  I am the President of Clarke Security Services, Inc., which is a franchisee of Sonitrol

21  Corporation under a franchise agreement for the Chicagoland West territory in Illinois.  All

22  statements in this declaration are made of my own personal knowledge and if called upon I could

23  competently testify thereto.

24      2.  I am an appointed Vice President of S.N.D.A. ("SNDA"), the association of

25  independent Sonitrol dealers which is the Plaintiff in this action.  I am also a member of SNDA's

26  National Accounts committee.

27      3.  SNDA is a trade association whose members ("Members") collectively own more than

28  105 Sonitrol franchises throughout the United States and Canada.  Defendant Sonitrol Corporation

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

1   ("Sonitrol") owns the Sonitrol trademarks. It franchises other business owners to provide goods

2   and services under such trademarks, and directly operates businesses which provide goods and

3   services under such trademarks. The defining characteristics of Sonitrol security systems are in-

4   place electronic detectors which respond to sound (referred to as impact activated audio detection

5   devices), and centralized monitoring of detection devices located at numerous customers'

6   premises. When a break-in is detected and verified by the central monitor, a report is made to the

7   local police.

8         4. Sonitrol franchise agreements provide for exclusive territories or "Areas of Primary

9   Responsibility" ("APR") within which franchisees may offer their products and services.

10  Agreements from the 1980s and after provide for APRs with limited exclusivity. The later

11  franchise agreements also provide that Sonitrol may establish National Account or Key Account

12  programs, under which Sonitrol enters into a contract to provide security service for a single

13  customer with multiple locations owned, controlled or licensed throughout in various APRs or

14  exclusive territories. Under such National Account contracts, Sonitrol establishes the prices for

15  sale and installation of monitoring equipment and for ongoing monitoring. Franchisees are

16  offered the following " option" of providing the sale, installation and monitoring of National

17  Account locations within their APR at the National Account prices, or of declining to participate

18  in the account. If the franchisee declines, Sonitrol is permitted to sell and install the equipment

19  itself or authorize another to do so, and provides monitoring from one of its own Central

20  Monitoring Stations.

21        5. The National Account prices agreed to by Sonitrol are almost always lower than the

22  prices individual franchisees would charge to local customers. For example, Sonitrol recently

23  entered into a National Account agreement with Briad Restaurant Group, which operates

24  approximately 68 T.G.I.Friday's restaurants around the country. The Briad Restaurant Group

25  agreement provides for the sale and installation of equipment with all payment over time -- i.e.,

26  with no initial installation charge -- although the franchisee who installs the equipment must

27  purchase it from Sonitrol at the regular price and payment terms. In other words, SNDA members

28  would have to pay Sonitrol's full list price (which includes its standard markup), and make

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

2

366/04/00011.1                                    DECLARATION OF J. BUCKALEW

1    payment within 30 days of delivery. [A copy of the announcement of the Briad Restaurant Group

2    agreement is attached as Exhibit A]. In addition, when Sonitrol enters into a National Account

3    agreement, it insists that franchisees terminate direct dealings with any current customers which

4    are part of the system covered by the new National Account contract. If the franchisee wants to

5    continue servicing those locations, except in a few circumstances it must accept centralized billing

6    through Sonitrol and the National Account rate.

7        6.   Franchisees generally aim for not less than a 20% return on investment (to cover the

8    costs of equipment, labor, and allocated overhead) on the sale and installation of monitoring

9    equipment. In discussions with the National Account committee, Sonitrol has indicated that a

10    42% margin was reasonable, with an 8 to 10% lower margin on National Accounts. [A copy of

11    meeting notes taken by Gregg Groenenmann, Sonitrol's V.P. of marketing is attached as Exhibit

12    B]. When Sonitrol enters into a National Account contract which provides terms that do not

13    permit participating franchisees to receive at least a 20% return, it does not decrease the price of

14    the equipment to be installed charged to the franchisees. Furthermore, Sonitrol receives a 13%

15    commission on the total contract value of all National Accounts, and dealers also pay royalties on

16    the revenues derived from such accounts that we service.

17        7.   For example, I estimate that the 13% commission plus the equipment and labor cost of

18    installation at a T.G.I.Friday's restaurant would be $4,920. An independent franchisee would

19    ordinarily charge between $5,500 and $6,000 for such an installation. The Briad Restaurant

20    Group agreement provides for no up front payment for purchase or installation, but for installment

21    payments of $83 per month for 60 months. $83 X 60 = $4,980. Thus, the franchisee's net return

22    over five years would be $60. Since the franchisee would have to pay the $4,920 up front, the

23    franchisee essentially finances the installation without interest. In short, the franchisee receives no

24    contribution to overhead and would lose money on each installation. In addition, all

25    T.G.I.Friday's will require after hours installations, which requires the franchisee to pay a night

26    labor premium. Finally the first Briad Restaurant Group installations offered to a franchisee is for

27    five restaurants in Las Vegas, Nevada. The Las Vegas building code requires installation of

28

SINGLER, NAPELL & DILLON, LLP
127 S. Main Street, Sebastopol, CA 95472
(707) 823-8719  (707) 823-8737 Fax

3

1  conduit at an estimated minimum $2,500 per restaurant. Since the $83 per month rate is set, the

2  franchisee will have to absorb these additional costs as well.

3       3.  In our experience, the National Account bookkeeping (dealing with Sonitrol's

4  centralized billing) is more time consuming than billing our own customers, further increasing the

5  overhead costs associated with the National Accounts. The paperwork accompanying Sonitrol's

6  payments do not clearly identify the customer or time period covered by the payment. In addition,

7  Sonitrol's payments are generally untimely.

8       9.  Sonitrol, through the franchise agreements, requires SNDA's members to market the

9  Sonitrol system within their territory. Sonitrol encourages SNDA's members to enter into

10  contracts with businesses in their territories, whether or not the customer is an independent

11  business or part of a chain. Sonitrol profits from SNDA's members' entry into such contracts –

12  they purchase equipment from Sonitrol to install at the customer's location and pay royalties on all

13  revenues received. SNDA members also pay Sonitrol other fees, including the monthly fee for

14  participating in the Internet Sites.

15      10.  If this TRO is granted, the harm to Sonitrol (if any) is far less than the harm that

16  SNDA's Members will suffer if it is not granted. If granted, Sonitrol will continue to receive the

17  royalties from the SNDA member's servicing their customers. In the event of upgrades or system

18  expansion, it will receive its profit for the sale of the new or additional equipment. Thus, while

19  SNDA's members and other franchisees will lose income and goodwill and harm to their

20  reputations, granting the TRO will not harm Sonitrol, as its income stream from the various

21  franchisees' contracts local customers will continue unchanged.

22      I declare under the penalty of perjury of the laws of the State of California that the

23  foregoing is true and correct. Executed this 24th day of April, 2008 at West Chicago, Illinois.

24

25

26                                     Jim Buckalew

27

28

4

SINCLAIR, NAPELL & DILLON, LLP
1275 Main Street, Sebastopol, CA 95472
(707) 823-6711   (707) 823-6777 Fax

**EXHIBIT A**



Pete Singler, 4/8/08 3:23 PM -0700, Fwd:                                                                 3

To: Joyce Roberts
Subject: Fwd:

Begin forwarded message:

From: "Leppert, Shirley" <slappert@Sonitrol.com>

Date: April 7, 2008 4:06:27 PM PDT

To: "Grear, Adam" <adam@sonitrolny.com>

Heads up.
We landed the Bried account through the NA program, these are TGI Friday locations. It is a bit complicated and I wanted to discuss with you, but I am sending the docs to give you a heads up.
Financed jobs, $168.00 RMR for 5 years includes equipment costs, two week turn around.  Please call me ASAP...thanks
Shelley Leppert |Director of Customer Operations| SONITROL CORPORATION
8 Campus Circle, Suite 150| Westlake, Texas 76262 | O: 817.302.2002| C: 817.307.2851| F: 817.837.3912| E:
sleppert@sonitrol.com

------ End of Forwarded Message

Attachment converted: Macintosh HD:las Vegas Sonitrol 6#105507.pdf (PDF /*IC*) (00105507)
Attachment converted: Macintosh HD:ATT00031 1.htm (    /    ) (00105508)
Attachment converted: Macintosh HD:TGI Economics.xls (XLS4/*IC*) (00105509)

2009-04-03 12:11                →    BIGAB                                              P.4/4

# SONITROL

## ADDENDUM
63635

This Addendum to Client Agreement No NA15775 dated 09/04/2007 made this 3rd day of April, 2008 by and between Dealer, an independent Sonitrol Dealer Franchise, hereinafter referred to as "Dealer" and BRIAD RESTAURANT GROUP, LLC located at 4500 W Tropicana Ave., Las Vegas, NV 89103; hereinafter referred to as "Client".

The Client hereby requests and agrees to the following addendum:
One (1) Sonitrol Corp. SON PLUS UL Sonitrol Plus 16 Zone Intrusion Panel, w/SAM; one (1) Sonitrol Corp. LCD PLUS SON LCD PLUS Keypad; five (5) Acenco 7939GY Door Contact, one (1) Sale Contact PL-HSC1; Surface Mount, Gray, 1" Gap, SPST; seven (7) Sonitrol Corp. AUDIOSENSOR PA20 Audiosensor; one (1) TG-7B Cellular; Telular, Digital w/Sonitrol Protocol and Logo (New Install), SoniPlus Compatible only; one (1) Plan20 Weekly Test, Activation and Alarm Transmission Cell Service; one (1) DK-APK1 Surge Protector Kit (includes Single Outlet and Telco Line unit); one (1) SonTelPLUS Son Tel Plus Module; one (1) Acenco 747 Indoor Siren, Two Tone, Wall Mount; one (1) SEC-1078 12 Volt, 7 Amp Hour Battery; three (3) Weather Resistant Panic Button for Cooler - SR-3040CTW; one (1) Wire and Misc. Hardware.

System Notes: Applicable Taxes, local fees, permits, union labor, lift rental charges, and/or plenum wire are not included unless otherwise noted. Installation fee includes all materials required to fully install system described above. Monthly amount includes cellular back-up service. Any test signals over 5 in a single month, or any alarm signals over 16 in a single month will be charged at a rate of $.025 per signal. Plan 20. Monthly fee includes system monitoring, full system maintenance on intrusion system and Sonitrol National Accounts $29,000.00 Limited Performance Warranty. Monthly also includes Full Service and Maintenance on all equipment and components with Lifetime Warranty. * The $166.00 fee per month includes the equipment installment amount of $83.00/mosh mentioned below. BRIAD RESTAURANT GROUP, LLC promises to pay Sonitrol Corporation the sum of $4,980.00, for the purchase of the security system devices listed below, at a rate of $83.00 per month for a period of 60 months or until paid in full. Failure to pay any installment when due or upon cancellation of this agreement, shall at the option of Sonitrol, cause the remaining unpaid installments to immediately become due and eligible, without notice of demand. Monthly Monitoring and maintenance is at a rate of $85.00 per month for a total of $166.00/per month.

| | | | | | |
|---|---|---|---|---|---|
| Installation | $ .00 | Tax $ TBA | Total | $ .00+tx |
| Deposit | $ N/A | | Balance Due Upon Installation | $ .00+tx |
| Equipment; Monthly Maintenance and Monitoring Fee * | $ 166.00+tx | Per month | Payment Mode | $ N/A |

| Sonitrol Independent Franchised Dealer: | Subject to terms and conditions outlined in Client Agreement: |
|---|---|
| Sonitrol of | Client Signature    X |
| Address | Title |
| City | Date     April 7, 2008 |
| State | Signature    Kristie Curtiss, NAM |
| | (Sonitrol Key Account) |
| Phone No. | Approved |
| License No. | Date     (Sonitrol Independent Franchised Dealer) |

This agreement shall not be binding upon Dealer unless approved in writing by a manager of the Dealership. In the event of non-approval, the sole liability of the Dealer shall be to refund to subscriber the amount that has been paid to Dealer by Client upon the signing of this addendum.



# SONITROL

## ADDENDUM
95634

This Addendum to Client Agreement No **NA15776** dated 08/04/2007 made this **3rd day of April, 2008** by and between Dealer, an Independent Sonitrol Dealer Franchise, hereinafter referred to as "Dealer" and **BRIAD RESTAURANT GROUP, LLC** located at **4570 W Sahara Ave., Las Vegas, NV 89102**, hereinafter referred to as "Client".

The Client hereby requests and agrees to the following addendum:

One (1) Sonitrol Corp. 3CN PLUS UL Sonitrol Plus 16 Zone Intrusion Panel, w/SAM; one (1) Sonitrol Corp. LCD PLUS 8CN LCD PLUS Keypad; five (5) Ademco 7939GY Door Contact; one (1) Safe Contact PL-HSC1; Surface Mount, Grey, 1" Gap, SPST; seven (7) Sonitrol Corp. AUDIOSENSOR PA25 Audiosensor; one (1) TG-79 Cellular; Telegar, Digital w/Sonitrol Protocol and Logo (New Install), SooPlus Compatible only; one (1) Plan20 Weekly Test, Activation and Alarm Transmission Cell Service; one (1) DK-APK1 Surge Protector Kit (includes Single Outlet and Telco Line unit); one (1) 8ceTelPLUS 8ce Tel Plus Module; one (1) Adamco 747 Indoor Siren, Two Tone, Wall Mount; one (1) SEC-1075 12 Volt, 7 Amp Hour Battery; three (3) Weather Resistant Panic Button for Cooler - SR-3040CTW; one (1) Wire and Misc. Hardware.

System Notes: Applicable Taxes, local fees, permits, union labor, lift rental charges, and/or plenum wire are not included unless otherwise noted. Installation fee includes all materials required to fully install system described above. Monthly amount includes cellular back-up service. Any test signals over 5 in a single month, or any alarm signals over 15 in a single month will be charged at a rate of 3.095 per signal. Plan 20. Monthly fee includes system monitoring, full system maintenance on intrusion system and Sonitrol National Accounts $20,000.00 Limited Performance Warranty. Monthly also includes Fall Service and Maintenance on all equipment and components with Lifetime Warranty. * The $156.00 fee per month includes the equipment installment amount of $43.00/month mentioned before BRIAD RESTAURANT GROUP, LLC promises to pay Sonitrol Corporation the sum of $4,980.00, for the purchase of the security system devices listed below, at a rate of $83.00 per month for a period of 60 months or until paid in full. Failure to pay any installment when due or upon cancellation of this agreement, shall at the option of Sonitrol, cause the remaining unpaid installments to immediately become due and eligible, without notice of demand. Monthly Monitoring and maintenance is at a rate of $96.00 per month for a total of $156.00/per month.

| | | | | | | |
|---|---|---|---|---|---|---|
| Installation | $ .00 | Tax $ | TBA | Total | $ | .00+tx |
| Deposit | $ N/A | | | Balance Due Upon Installation | $ | .00+tx |
| Equipment Monthly Maintenance and Monitoring Fee * | $ 156.00+tx | Per month | | Payment Mode | $ | N/A |

| Sonitrol Independent Franchised Dealer: | | Subject to terms and conditions outlined in Client Agreement: |
|---|---|---|
| Sonitrol of | | Client Signature  X |
| Address | | Title |
| City | | Date  April 3, 2008 |
| State | | Signature  Kristie Curtiss, NAM |
| | | (Sonitrol Key Accounts) |
| Phone No. | | Approved |
| License No. | | Date  (Sonitrol Independent Franchised Dealer) |

This agreement shall not be binding upon Dealer unless approved in writing by a manager of the Dealership. In the event of non-approval, the sole liability of the Dealer shall be limited to a refund of the amount that has been paid to Dealer by Client upon the signing of this addendum.



# SONITROL

## ADDENDUM
66633

This Addendum to Client Agreement No NA15775 dated 09/04/2007 made this 3rd day of April, 2008 by and between Dealer, an independent Sonitrol Dealer Franchise, hereinafter referred to as "Dealer" and BRIAD RESTAURANT GROUP, LLC located at 1800 E Flamingo Rd, Las Vegas, NV 89119; hereinafter referred to as "Client".

The Client hereby requests and agrees to the following addendum:
One (1) Sonitrol Corp. SON PLUS UL Sonitrol Plus 16 Zone Intrusion Panel, w/6AK; one (1) Sonitrol Corp. LCD PLUS SON LCD PLUS Keypad; five (5) Ademco 7939GY Door Contact, one (1) Safe Contact PL-HSC1; Surface Mount, Gray, 1" Gap, SPST; seven (7) Sonitrol Corp. AUDIOSENSOR PA20 Audiosensor; one (1) T9-79 Cellular; Telular; Digital w/Sonitrol Protocol and Logo (New Install), SonPlus Compatible only; one (1) Plan20 Weekly Test, Activation and Alarm Transmission Cell Service; one (1) DK-APK1 Surge Protector Kit (includes Single Outlet and Telco Line unit); one (1) SonTelPLUS Son Tel Plus Module; one (1) Ademco 747 Indoor Siren, Two Tone, Wall Mount; one (1) SEC-1275 12 Volt, 7 Amp Hour Battery; three (3) Weather Resistant Panic Button for Cooler - SR-3040CTW; one (1) Wire and Misc. Hardware.

System Notes: Applicable Taxes, local fees, permits, union labor, lift rental charges, and/or plenum wire are not included unless otherwise noted. Installation fee includes all materials required to fully install system described above. Monthly amount includes cellular back-up service. Any test signals over 5 in a single month, or any alarm signals over 15 in a single month will be charged at a rate of $.025 per signal. Plan 20. Monthly fee includes system monitoring, full system maintenance on intrusion system and Sonitrol National Accounts $20,000.00 Limited Performance Warranty. Monthly also includes Full Service and Maintenance on all equipment and components with Lifetime Warranty. * The $163.06 fee per month includes the equipment installment amount of $63.00/month mentioned below. BRIAD RESTAURANT GROUP, LLC promises to pay Sonitrol Corporation the sum of $4,980.00, for the purchase of the security system devices listed below, at a rate of $83.00 per month for a period of 60 months or until paid in full. Failure to pay any installment when due or upon cancellation of this agreement, shall at the option of Sonitrol, cause the remaining unpaid installments to immediately become due and eligible, without notice of demand. Monthly Monitoring and maintenance is at a rate of $85.00 per month for a total of $166.00/per month.

| | | | | | | |
|---|---|---|---|---|---|---|
| Installation | $ .00 | | Tax $ | TBA | Total | $ .00+tx |
| Deposit | $ N/A | | | Balance Due Upon Installation | $ .00+tx |
| Equipment Monthly Maintenance and Monitoring Fee * | $ 166.00+tx | Per month | | Payment Made | $ N/A |

| Sonitrol Independent Franchised Dealer: | Subject to terms and conditions outlined in Client Agreement: |
|---|---|
| Sonitrol of | Client Signature (X) |
| Address _____ | Title _____ |
| City _____ | Date April 3/2008 |
| State _____ | Signature Kristie Curtiss, NAM |
| | (Certified Key Accounts) |
| Phone No. _____ | Approved _____ |
| License No. _____ | Date _____ |
| | (Sonitrol Independent Franchised Dealer) |

This agreement shall not be binding upon Dealer unless approved in writing by a manager of the Dealership. In the event of non-approval, the sole liability of the Dealer shall be to refund to subscriber the amount that has been paid to Dealer by Client upon the signing of this addendum.

 

# SONITROL

## ADDENDUM
$5250

This Addendum to Client Agreement No NA15775 dated 09/04/2007 made this 3rd day of April, 2008 by and between Dealer, an independent Sonitrol Dealer Franchise, hereinafter referred to as "Dealer" and BRIAD RESTAURANT GROUP, LLC located at 4330 E Sunset Rd., Henderson, NV 89014, hereinafter referred to as "Client".

The Client hereby requests and agrees to the following addendum:
One (1) Sonitrol Corp. 6ON PLUS UL Sonitrol Plus 16 Zone Intrusion Panel, wRAM; one (1) Sonitrol Corp. LCD PLUS 6ON LCD PLUS Keypad; five (5) Ademco 7939GY Door Contact, one (1) Safe Contact PL-HSC1; Surface Mount, Gray, 1" Gap, SPST; seven (7) Sonitrol Corp. AUDIOSENSOR PA20 Audiosensor; one (1) TG-T5 Cellular, Telugu, Digital w/Sonitrol Protocol and Logo (New Install), SonPlus Compatible only; one (1) Plan26 Weekly Test, Activation and Alarm Transmission Cell Service; one (1) DK-APK1 Surge Protector Kit (includes Single Outlet and Telco Line set); one (1) SonTelPLUS Box Tel Plus Module; one (1) Ademco 747 Indoor Siren, Two Tone, Wall Mount; one (1) SEC-1075 12 Volt, 7 Amp Hour Battery; three (3) Weather Resistant Panic Button for Cooler - BR-3040CTW; one (1) Wire and Misc. Hardware.

System Notes: Applicable Taxes, local fees, permits, union labor, lift rental charges, and/or plenum wire are not included unless otherwise noted. Installation fee includes all materials required to fully install system described above. Monthly amount includes cellular back-up service. Any test signals over 5 in a single month, or any alarm signals over 15 in a single month will be charged at a rate of $0.025 per signal. Plan 20. Monthly fee includes system monitoring, full system maintenance on intrusion system and Sonitrol National Accounts $20,000.00 Limited Performance Warranty. Monthly also includes Poll Service and Maintenance on all equipment and coupled with Lifetime Warranty. * The $158.00 fee per month includes the equipment installment amount of $53.00/month mentioned below. BRIAD RESTAURANT GROUP, LLC promises to pay Sonitrol Corporation the sum of $4,980.00, for the purchase of the security system devices listed below, at a rate of $93.00 per month for a period of 60 months or until paid in full. Failure to pay any installment when due or upon cancellation of this agreement, shall at the option of Sonitrol, cause the remaining unpaid installments to immediately become due and eligible, without notice of demand. Monthly Monitoring and maintenance is at a rate of $65.00 per month for a total of $158.00/per month.

| | | | | | | |
|---|---|---|---|---|---|---|
| Installation | $ .00 | Tax $ TBA | Total | | $ .00+tx | |
| Deposit | $ NA | | Balance Due Upon Installation | | $ .00+tx | |
| Equipment Monthly Maintenance and Monitoring Fee * | $ 158.00+tx | Per month | Payment Made | | $ NA | |

| Sonitrol Independent Franchised Dealer: | Subject to terms and conditions outlined in Client Agreement: |
|---|---|
| Sonitrol of _____ | Client Signature ___X___ |
| Address _____ | Title _____ |
| City _____ | Date April 8, 2008 |
| State _____ | Signature Kristin Curtiss, NAM |
| | (Sonitrol Key Accounts) |
| Phone No. _____ | Approved _____ |
| License No. _____ | Date (Sonitrol Independent Franchised Dealer) |

This agreement shall not be binding upon Dealer unless approved in writing by a manager of the Dealership. In the event of non-approval, the sole liability of the Dealer shall be to refund to subscriber the amount that has been paid to Dealer by Client upon the signing of this addendum.


# SONITROL

## ADDENDUM
66894

This Addendum to Client Agreement No __NA15775__ dated 09/04/2007 made this __28th day of March, 2008__ by and between Dealer, an independent Sonitrol Dealer Franchise, hereinafter referred to as "Dealer" and __BRIAD RESTAURANT GROUP, LLC__ located at __6410 S Virginia St Reno, NV 89511__; hereinafter referred to as "Client".

The Client hereby requests and agrees to the following addendum:

One (1) Sonitrol Corp. SON PLUS UL Sonitrol Plus 16 Zone Intrusion Panel, w/SAM; one (1) Sonitrol Corp. LCD PLUS SON LCD PLUS Keypad; five (5) Ademco 7939GY Door Contact, one (1) Safe Contact PL-HSC1; Surface Mount, Gray, 1" Gap, SPST; seven (7) Sonitrol Corp. AUDIOSENSOR PA20 Audiosensor; one (1) TG-7B Cellular, Telugar, Digital w/Sonitrol Protocol and Logo (New Install), SonPlus Compatible only; one (1) Plan20 Weekly Test, Activation and Alarm Transmission Cell Service; one (1) DK-APK1 Surge Protector Kit (includes Single Outlet and Telco Line unit); one (1) SonTelPLUS Son Tel Plus Module; one (1) Ademco 747 Indoor Siren, Two Tone, Wall Mount; one (1) SEC-1075 12 Volt, 7 Amp Hour Battery; three (3) Weather Resistant Panic Button for Cooler - SR-3040CTW; one (1) Wire and Misc. Hardware.

System Notes: Applicable Taxes, local fees, permits, union labor, lift rental charges, and/or plenum wire are not included unless otherwise noted. Installation fee includes all materials required to fully install system described above. Monthly amount includes cellular back-up service. Any test signals over 5 in a single month, or any alarm signals over 15 in a single month will be charged at a rate of $.025 per signal. Plan 20. Monthly fee includes system monitoring, full system maintenance on intrusion system and Sonitrol National Accounts $20,000.00 Limited Performance Warranty. Monthly also includes Full Service and Maintenance on all equipment and components with Lifetime Warranty. * The $168.00 fee per month includes the equipment installment amount of $83.00/month mentioned below: BRIAD RESTAURANT GROUP, LLC promises to pay Sonitrol Corporation the sum of $4,980.00, for the purchase of the security system devices listed below, at a rate of $83.00 per month for a period of 60 months or until paid in full. Failure to pay any installment when due or upon cancellation of this agreement, shall at the option of Sonitrol, cause the remaining unpaid installments to immediately become due and eligible, without notice of demand. Monthly Monitoring and maintenance is at a rate of $85.00 per month for a total of $168.00/per month.

| | | | | | |
|---|---|---|---|---|---|
| Installation | $ .00 | Tax $ TBA | Total | $ .00+tx | |
| Deposit | $ N/A | | Balance Due Upon Installation | $ .00+tx | |
| Equipment; Monthly Maintenance and Monitoring Fee * | $ 168.00+tx | Per month | Payment Mode | $ N/A | |

| Sonitrol Independent Franchised Dealer: | Subject to terms and conditions outlined in Client Agreement: |
|---|---|
| Sonitrol of _____ | Client Signature  X |
| Address _____ | Title |
| City _____ | Date  March 28, 2008 |
| State _____ | Signature  Kristie Curtiss, NAM |
| | (Sonitrol Key Accounts) |
| Phone No. _____ | Approved |
| License No. _____ | Date |
| | (Sonitrol Independent Franchised Dealer) |

This agreement shall not be binding upon Dealer unless approved in writing by a manager of the Dealership. In the event of non-approval, the sole liability of the Dealer shall be to refund to subscriber the amount that has been paid to Dealer by Client upon the signing of this addendum.



# EXHIBIT B



National Accounts Steering Committee Meeting
Chicago, IL      July 20, 2007

Committee Members:

- Tom Patterson
- Jim Buckalew
- Leo Wanstreet
- Jim Payne

- Gregg Groenemann
- Alex Gellman
- Doug Curtiss (absent)
- Greg VanDeweel (absent)

Meeting Notes:

General

- Agreed that overall performance of the team has been good and everyone is pleased with the current NAM team.
- Discussed overall desire to improve SC/Dealer communication, respect & trust.
  - Agreed communication has greatly improved between SC/Dealers. Things like the Dealer Mgmt Reports & the Dealer Flash go a long way.
  - Let's expand the Flash to celebrate wins, successes & upcoming "top 10" National Account jobs.
  - Respect can be addressed by teams like this that involved the dealer more strategically on the front end of our processes.
  - Trust can be increased by improved communication and it will build over time.
- SC agreed to distribute a territory map, NAM & NASC contact info & standard criteria for a National Account.

Pricing

- SC presented Firepond for National Accounts and took everyone through the math embedded inside the program. The team felt that this will greatly help minimize the variances (peaks/valleys) between deals. It should also help improve profitability.
  - Moving from individual worksheets to standard common platform, Firepond.
  - RMR to be calculated at 1.25%
  - Labor rate standardized and is raised from $65/hr to $75/hr.
  - Base margin calculated at 40% on dealer price; then job factors increase the base margin from there. Overall Ntl Act job margin objective is 42%
  - Job factors include:
    - Building size factors: multiplier scales with square footage
    - Plenum wiring: multiplies install price by 5%
    - Lift allotment is $200 per day and $125 drop off
- We also discussed how much lower should Ntl Acts margins be versus general business; the consensus was that it would be about 8 – 10 pts lower.
- We discussed moving to a 2-tier pricing: standard & high-cost market pricing for cities LA, Chicago, NY, etc. We may not be able to get this in every case, but we should at least attempt it with every deal.
  - *Next Steps: Gregg will review Dealer proposal & we will discuss internally. It would also need to be a Phase II project since Firepond is already out; 9/1/07)*
- We agreed to look at Video labor units to ensure there is sufficient time to do things like network a DVR, do wire runs for cameras, etc.

Fire



- We agreed that due to the various ordinances with Fire; all Fire quotes will require a local site survey and that we should use the dealer's proposal and not try to do it ourselves. Also review if we can get a higher labor rate on fire.
- We also need language on the proposal that states that the final price is subject to local fire marshal requirements & codes. Permits & plans will also be extra.

## Commission / Pass Thru

- We discussed alternate commission strategies. We agreed to look at the ramifications of moving to commissions being driven off of TCV instead of 16% of the install + 2 months of RMR. The dealers felt this would help drive higher RMR and would provide greater incentive for longer term contracts.
- The general feedback is that Pass Thru is working; but we need to work with them to clean up issues prior to Pass Thru.
- They still want us to be able to reference their invoice numbers on our check and can not understand why we are not able to do this.

## Lead Time

- We agreed that national account customers generally plan well in advance and that we all agree to work to our best ability to satisfy job requirements. However, there was discussion as to the "standard" lead time that we tell a customer up front. We should set the lead time as 4 weeks and then manage to the exceptions.

## Obstacles

- We all agreed that an underperforming dealer hurts everyone. There was a lengthy discussion on how to best handle this. We agreed that the Nt'l Act Steering Committee would be a good "jury" for SC to present the facts leading up to a possible dealer suspension from the program. They would also be a good review team for the reinstatement once certain requirements have been met.
  - *Next Steps: Tom Patterson will discuss with the SNDA Board to determine if this role and team is appropriate. Update at next meeting.*
- The dealers would like more involvement from management (Ken/Greg) on dispute resolution, when the survey differs greatly from end proposal and significant install problems. We all agreed that NAM's should not be involved in project management or attempt to handles issues like the above. The NASC should handle all project management and escalate to Greg/Ken/Gregg to resolve higher level issues.
- We agreed that it is important that a dealer should not only get clear instructions for a National Account drop; but also have an outlet for quick decisions (like change orders) on potential job problems. We recommended a 1-800 number to the NASC that a tech can call to get a quick answer to a question they may have. We also discussed adding a "Do's & Don'ts" list to the packet more clearly denoting what we have the authority to approve and what has to go back to the customer to get the job completely quickly.
- How do we validate job profitability using a Dealer model? Provides feedback for future price adjustments. Use SC JP Audit concept. Look at metrics like "Labor units used vs. sold" and "Equip used but not quoted"
  - *Work on a Job Feedback sheet to be attached to the D&A for post-mortem review. (Next Steps: assign to Craig Patterson; Due: 9/1/07*

## Next Meeting

- Over the next 60 days, we would like to have a Pass Thru discussion with a few dealers in Dallas with our finance leaders.
- **NEXT MEETING: After the SNDA Mid-Year Meeting. October 18th, from 1pm to 6pm at the MGM Grand**

# EXHIBIT C

1  KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
   William M. Goodman (SBN 61305)
2  E-mail: wgoodman@kasowitz.com
   Christopher J. McNamara (SBN 209205)
3  E-mail: cmcnamara@kasowitz.com
   101 California Street, Suite 2050
4  San Francisco, CA 94111
   Telephone: (415) 421-6140
5  Facsimile: (415) 398-5030

6  Attorneys for Defendant:
   Sonitrol Corporation
7

8                  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9
                   **IN AND FOR THE COUNTY OF SAN FRANCISCO**
10

11

12  S.N.D.A., a California non-profit mutual          :        CASE NO.:  CGC - 08 - 474387
    benefit corporation,                              :
13                                                    :        **NOTICE TO ADVERSE PARTY**
                        Plaintiffs,                   :        **OF REMOVAL TO FEDERAL**
14                                                    :        **COURT**
              v.                                      :
15                                                    :
    SONITROL CORPORATION, a Delaware                  :
16  Corporation, and DOES 1-50.                       :
                                                      :
17                      Defendants.                   :
                                                      :
18

19

20

21

22

23

24

25

**TO THE PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT a Notice of Removal of this action has been filed in the United States District Court, for the Northern District of California, San Francisco Division, on April 28, 2008. A copy of said Notice of Removal is attached hereto at Exhibit 1, and is served and filed herewith.

DATED: April 28, 2008                    KASOWITZ, BENSON,
                                          TORRES & FRIEDMAN, LLP


                                          _____
                                          William M. Goodman (SBN 61305)
                                          E-mail: wgoodman@kasowitz.com
                                          Christopher J. McNamara (SBN 209205)
                                          E-mail: cmcnamara@kasowitz.com
                                          101 California Street, Suite 2050
                                          San Francisco, CA 94111
                                          Telephone: (415) 421-6140
                                          Facsimile: (415) 398-5030

                                          Attorneys for Defendant:
                                          Sonitrol Corporation